UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        }
                                        }
GERALD ALSTON,                          }
Individually and on behalf of all others similarly  }
situated,                               }
                                        }
                  Plaintiff             }
                                        }
v.                                      }
                                        }
TOWN OF BROOKLINE, MASSACHUSETTS,       }
BROOKLINE BOARD OF SELECTMEN,           }
BETSY DEWITT,                           }
In her Individual and Official Capacities,  }        CIVIL ACTION NO.
KEN GOLDSTEIN,                          }
In his Individual and Official Capacities,  }
NANCY DALY,                             }
In her Individual and Official Capacities,  }
JESSE MERMELL,                          }
In her Individual and Official Capacities,  }
NEIL WISHINSKY,                         }
In his Individual and Official Capacities,  }
SANDRA DEBOW,                           }
In her Individual and Official Capacities,  }
JOSLIN MURPHY,                          }
In her Individual and Official Capacities,  }
STANLEY SPIEGEL,                        }
LOCAL 950, INTERNATIONAL ASSOCIATION    }
OF FIREFIGHTERS                         }
                                        }
                                        }
                  Defendants            }
_____}

## COMPLAINT AND JURY DEMAND

     1.     Gerald Alston, a Black Brookline firefighter, brings this action against the Town

of Brookline, the Brookline Board of Selectmen, Local 950, International Association of

Firefighters, and the other named defendants (collectively, "Brookline") to vindicate his Fourteenth Amendment right to equal protection and freedom from racial discrimination.  He brings this case on behalf of himself and all others who have been damaged by Brookline's longstanding and well-established policy, custom, and practice of opposing racial equality, enforcing racial subordination, engaging in affirmative action and favoritism towards white residents and employees, and retaliating against persons who protest racial discrimination.

2.      For most of his firefighting career, Mr. Alston worked on a team with Lt. Paul Pender, an Irish-Catholic with a long Brookline legacy.  Mr. Alston, who is from Dorchester, participated in the METCO program, attending school in Natick, a predominantly white suburb, where he frequently had to address the ignorance of his white suburban classmates about Black people and about life in Boston.  Mr. Alston prided himself in his ability to handle racial ignorance and educate his white classmates about racism and prejudice.  When Mr. Alston joined the Brookline fire department in 2002, he was not naïve about the existence of racism in Brookline.   As a young man, Mr. Alston was taught to avoid driving through Brookline, particularly at night, because the police were known to target Black drivers.  Mr. Alston put Brookline's reputation to one side when he began working as a firefighter.  He did the same thing when he began working with Lt. Pender, despite the fact that he had heard rumors that Lt. Pender was a racist.  Mr. Alston dedicated himself to doing the job and soon came to love being a Brookline firefighter.

3.      In 2010, Lt. Pender called Mr. Alston a "fucking nigger" on Mr. Alston's voicemail.  Lt. Pender called Mr. Alston a "fucking nigger" because he was upset that Mr. Alston had gone out on an injury leave.  Lt. Pender's deeply rooted prejudices against Black people led him to falsely believe, without any evidence or basis in fact, that Mr. Alston had faked an injury.

In fact, Mr. Alston had suffered a serious, well-documented injury while on duty, which for good

reason has never been challenged or questioned by Brookline.  Unlike many white firefighters,

Mr. Alston never faked an injury as a Brookline firefighter.

4.      Lt. Pender's racist message and his failure to take accountability for it shattered

Mr. Alston's trust in Lt. Pender.  And Brookline's conduct in the aftermath slowly destroyed Mr.

Alston's trust in Brookline.

5.      After Mr. Alston reported the voicemail to the department's chief operating

officer, Brookline took no action except to inform Lt. Pender that Mr. Alston had made a

complaint.  Lt. Pender contacted Mr. Alston and expressed no remorse for his actions.  He told

Mr. Alston two implausible stories to excuse his message, including claiming that it had been

intended for a Black "gangbanger."  When Mr. Alston did not accept his explanation, Lt. Pender

became angry and told him that his complaint was "a joke because a lot of people use that word"

and that making it was the "stupidest thing [Mr. Alston] could have ever done."  Based on his

knowledge of Brookline's longstanding policy, Lt. Pender knew that Brookline would protect

him and punish Alston for reporting the racial slur.

6.      Most public safety organizations in the United States would have fired Lt. Pender

immediately for saying "fucking nigger" on a subordinate's voicemail.  But Brookline's Board of

Selectmen protected Lt. Pender from any adverse consequences pursuant to policy.  It did not

question Lt. Pender about the multiple lies he told to excuse and rationalize his racist message; it

did not investigate his intimidating and retaliatory conduct towards Mr. Alston after learning of

Mr. Alston's complaint; and it did not terminate his employment, demote him, or make him

ineligible for promotion.  It kept the facts of his racist conduct secret from other firefighters, the

Town's civil rights commission, and the public, and within months of the slur arranged for him

to travel to the White House to receive a medal of valor from Attorney General Eric Holder. Selectwoman Jesse Mermell tweeted out coverage of the medal ceremony.  The purpose and effect of the Selectmen's actions was to protect Mr. Pender from any stigma and to mark him with the Selectmen's corporate stamp of approval.

7.      Pursuant to policy, Brookline not only protected Lt. Pender, it rewarded him.  It promoted him to acting Captain just months after he left the racist message and only days after he allegedly served an outrageously lenient two-shift suspension.  It made him the official trainer for all firefighters in Brookline, and promoted him permanently to Captain in 2013.

8.      Since 2010, Brookline has punished Mr. Alston for complaining about Lt. Pender's racial slur.  It ignored his complaints about Lt. Pender's promotion; it concealed the truth about Lt. Pender's conduct from other firefighters; it allowed false rumors to spread that Mr. Alston's complaint was meritless; it encouraged firefighters to shun and ostracize him; it conducted an ineffective and widely mocked anti-discrimination training; and it repeatedly conducted sham investigations to attack Mr. Alston's credibility and cover-up ongoing retaliation and harassment against Mr. Alston.

9.      To take advantage of the 300-day statute of limitations for employment discrimination actions in Massachusetts, Brookline persuaded Mr. Alston to keep his complaints "in-house" for years by lying to him and cynically taking advantage of his loyalty to the fire department and his desire to be seen as a team player.  It promised Mr. Alston that Lt. Pender would be ineligible for promotion, and then claimed that his promotion to Captain was temporary and would be rescinded.   It promised to "take care of" the retaliation against him and prohibited him from obtaining relief from the Town's civil rights commission.

10.     Brookline did not stop punishing Mr. Alston even after he complained to the Massachusetts Commission against Discrimination and filed a lawsuit in superior court.

11.     In the fall of 2013, Brookline stepped up its efforts to discredit Mr. Alston because press coverage of Mr. Alston's lawsuit in the Boston Globe threatened to expose Brookline's illegal practices.  Brookline attacked Mr. Alston publicly and behind closed doors; forced him out of the fire department on a pretext; and falsely and maliciously arranged for him to be deemed "unfit for duty" by a biased and incompetent psychiatrist.  By early 2014, Brookline had placed Mr. Alston on an unpaid leave with the intent to terminate his employment.

12.     Throughout Mr. Alston's ordeal, Brookline fought to prevent the civil rights commission charged with enforcing the Town's bylaw against racial discrimination from fulfilling its charge to investigate and resolve complaints of racial discrimination, including Mr. Alston's.   The Selectmen refused to appoint commissioners, refused to comply with the commission's requests for information, and ultimately abolished the commission in the spring of 2014, replacing it with a toothless diversity commission.  In the summer of 2014, after a clerk-magistrate dismissed Mr. Alston's discrimination lawsuit for failure to comply with procedural rules governing discovery, Mr. Alston lost his last protection against termination.  Within months, Brookline stopped Mr. Alston's paycheck, and he soon became unable to afford basic needs, including insulin to manage his diabetes.

13.     Mr. Alston maintained faith that if the Board of Selectmen reviewed his case and examined the facts, they would see the injustice and correct the situation.   In the fall of 2014, he wrote to the Board outlining the many bad decisions that had been made by the Town's administrative staff and requested to be heard.  When the Board ignored his letter, Mr. Alston

and several supporters appeared before the Board during its public comment session to request a full investigation and the restoration of Mr. Alston's job.

14.     The Board of Selectmen did not deserve Mr. Alston's faith.  Instead of action, the Board of Selectmen gave Mr. Alston more empty promises and retaliation.  The Board did not restore Mr. Alston to duty, and assigned town counsel, who had been personally involved in the decision to force Mr. Alston out of the fire department, to oversee a meaningless and perfunctory third-party "review" of the Town's own reports regarding Mr. Alston.  The Board ensured that the third-party reviewer would not interview Mr. Alston or any other witness and would not look underneath the Town's sham reports.  Although the Board promised to conduct a racial climate review of all the Town's departments, as of the date of this filing, no such review has been completed, and no reforms had been implemented.  Only a public protest against Brookline's treatment of Mr. Alston at the Town's annual Martin Luther King, Jr. celebration in early 2015 saved Mr. Alston's job.  After the protest, the Board agreed to restore Mr. Alston to paid administrative leave and to hire a new psychiatrist to examine his fitness for duty.

15.     The new Town psychiatrist found that Lt. Pender's racial slur called into question how Mr. Alston was perceived by other firefighters and raised concerns about whether they would have Mr. Alston's back in dangerous situations.  She found that the Town's promotion of Lt. Pender to Captain had harmed Mr. Alston and that the Town needed to modify the work environment to reduce Mr. Alston's level of stress and restore Mr. Alston's trust in his fellow firefighters.  At the direction of human resources and town counsel, however, she did not change the onerous conditions that had previously been placed on Mr. Alston's return.  A psychiatrist retained by Mr. Alston found that Mr. Alston was fit for duty, but that that the racial environment in the Brookline fire department was too hostile for Mr. Alston to safely return to work.

16.     Brookline knowingly destroyed Mr. Alston's career, health, and reputation to protect Lt. Pender and the Town. In doing so, Brookline carried out a deeply embedded policy of elevating white people and subordinating Black people.  That policy embodies the tougher and truer law of Brookline than the dead words found in any Town bylaw or human resources binder.

## PARTIES

17.     Plaintiff Gerald Alston joined the Brookline Fire Department in 2002.  He earned the highest score on the civil service exam in his entering class.  Mr. Alston grew up in Boston and graduated from Natick High where he participated in the METCO program.  Before becoming a Brookline firefighter, Mr. Alston performed in the R&B group "Classic Example," which produced several albums and a Billboard 100 hit.   He has been a dues paying member of the Brookline firefighter's union, Local 950, International Association of Firefighters since joining the department.  Mr. Alston resides in Boston.

18.     Defendant Town of Brookline is a duly organized town in the Commonwealth of Massachusetts.   Brookline has a town form of government, headed by an elected five-member Board of Selectmen and a representative town meeting.  An elected moderator presides over the town meeting and appoints the Town's advisory (finance) committee.  Brookline has a population of approximately 59,000, which is approximately 3% Black, 76% white, 16% Asian-American, and 5% Hispanic or Latino.

19.     Defendant Brookline Board of Selectmen are the chief elected and executive officers of the Town of Brookline, with overall responsibility for supervising Town affairs.  They serve as the Police Commissioners and Fire Commissioners for the Town.  The Selectmen have the authority to hire and fire the town administrator, the town counsel, the director of human

resources, the police chief, the fire chief, and other department heads.  The Selectmen appoint

members of Town boards and commissions, including the Town's civil rights/diversity

commission.  The Selectmen are responsible for adopting and overseeing town administrative

policies and representing the Town of Brookline in lawsuits, as plaintiff and defendant.  The

Chair of the Brookline Board of Selectmen sets the agenda for the Board and communicates

regularly with the administrative staff, including the town counsel, human resources director, and

the town administrator.  The Selectmen frequently appoint and serve on ad-hoc committees to

address Town issues.

20.     Defendant Betsy DeWitt served on the Board of Selectmen between 2006 and

2015, serving as Chair from 2008 to 2014.  In 2011, she established an ad-hoc Diversity

Committee composed of herself and Selectwoman Jesse Mermell.  Ms. DeWitt is white. Ms.

DeWitt resides in Brookline, Massachusetts.

21.     Defendant Jesse Mermell served on the Board of Selectmen between 2010 and

2013.  She was elected with 82% of the vote against a largely unknown opponent.  Selectwoman

Mermell served on an ad-hoc Diversity Committee with Ms. DeWitt from 2011 to 2013.

Selectwoman Mermell chaired the Town's Martin Luther King Day celebration committee

between 2010 and 2012.  Ms. Mermell is white.  Ms. Mermell resides in Brookline,

Massachusetts.

22.     Defendant Ken Goldstein served on the Board of Selectmen between 2009 and

2015.  He was elected in 2009 without any opposition.  He served as Chair of the Brookline

Selectmen from 2014 to 2015.  Mr. Goldstein chaired the Town's Martin Luther King Day

celebration committee in 2013 and 2015.  Mr. Goldstein is white.  Mr. Goldstein resides in

Brookline, Massachusetts.

23.     Defendant Neil Wishinsky is the Chair of the Board of Selectmen.  He was elected to the Board in 2013.  He ran unopposed for the seat vacated by Selectwoman Jesse Mermell, who unexpectedly left the Board in January of 2013 to become the communications director for Massachusetts Governor Deval Patrick.  Mr. Wishinsky's first official act as a Brookline Selectmen was to vote for Paul Pender's promotion from Lieutenant to Captain.    He was elected Chair in 2015.  Mr. Wishinsky is white.  Mr. Wishinsky resides in Brookline, Massachusetts.

24.     Defendant Nancy Daly is a Brookline Selectwoman since 2005.  She served as the Chair of the Board's ad-hoc Diversity Committee, beginning in 2013.  Ms. Daly is white.  Ms. Daly resides in Brookline, Massachusetts.

25.     Defendant Stanley Spiegel is an elected town meeting member and an appointed member of the advisory committee.  Mr. Spiegel has frequent contact with the Board of Selectmen both formally and informally.  The advisory committee must vote to approve any financial settlement the Town makes of a legal claim against it, including any claim for racial discrimination.  Mr. Spiegel is white.  Mr. Spiegel resides in Brookline, Massachusetts.

26.     Local 950, International Association of Firefighters, is the Brookline firefighter's union.  The officers of the Union are white.

27.     Defendant Sandra DeBow is the Town's director of human resources.  She was appointed by the Board of Selectmen in 2006.  Before becoming director she had no experience as a human resources manager.  She left her position in the Boston Police labor department under a cloud.  A hearing officer found that she had unreasonably obstructed the union's request for information, a finding which was confirmed by the Commonwealth's Employment Relations

Board.  She left Boston and joined Brookline's team after testifying at the hearing, but before the decision questioning her conduct issued.  Ms. DeBow is white.  Ms. DeBow resides in Boston, Massachusetts.

28.    Defendant Joslin Murphy is the town counsel.  She was appointed by the Board of Selectmen in 2013 despite multiple conflicts of interest.  She worked as a Brookline police officer for nine years and is related by marriage to two Brookline police officers, including the deputy superintendent.  She is also related by marriage to an employee of the department of public works.  At the time of the events covered by this lawsuit, her husband was a sergeant in the police department.  The Selectmen nonetheless routinely rely on Ms. Murphy to provide advice regarding citizen complaints against the police.  Ms. Murphy is white.  Ms. Murphy resides in Brookline, Massachusetts.

## JURISDICTION

29.    This action is brought pursuant to 42 U.S.C. §§ 1981, 1983 and 1988 and the First and Fourteenth Amendment of the United States Constitution. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction under 28 U.S.C. § 1367.

30.    Venue is proper in this Court under 28 U.S.C. § 1391(b), because the events giving rise to the claims occurred in this district.

## ALLEGATIONS

### *The Unconstitutional Policy*

31.    The Town of Brookline has a longstanding and well-established policy, custom, and practice of opposing racial equality, promoting racial subordination, retaliating against

persons who complain about racial discrimination, and engaging in favoritism and affirmative action towards white residents and employees.

32.     The Town of Brookline's policy of disregarding the Fourteenth Amendment is enforced by the Brookline Board of Selectmen through their agents in the Town administration, including but not limited to the office of town counsel, the town administrator, the department of human resources and other town department heads.  The Town of Brookline's policy is also enforced by the town moderator, town meeting, the school committee, and the superintendent.

33.     The Town of Brookline's unconstitutional policy, practice, and custom violated Mr. Alston's constitutional rights and caused him damages.

34.     The Town of Brookline's unconstitutional policy, practice, and custom violated the rights of numerous other individuals in Brookline.

35.     The Town of Brookline opposes racial equality and enforces racial subordination as a matter of longstanding and deeply rooted policy, practice, and custom:

a.     The Town of Brookline requires Black people to be deferential, compliant, and obedient to white people, particularly on issues involving race and racism.

b.     The Town of Brookline opposes efforts by citizens and employees to enforce the Town of Brookline's written policies and bylaws regarding anti-discrimination.

c.     The Town of Brookline routinely and habitually denies well founded claims of racial discrimination and retaliation and forces individuals to sue to vindicate their rights.

d.     The Town of Brookline conceals and covers up incidents of racial discrimination and retaliation by conducting sham investigations and reviews and by issuing false and misleading reports.

e.     The Town of Brookline defames the character of persons who oppose racial discrimination.

f.     The Town of Brookline retaliates against individuals who oppose racial discrimination by threatening to reveal confidential information, threatening criminal prosecution, and by employing the police to intimidate them.

g.     The Town of Brookline uses its diversity department as window dressing to maintain the sham of equal opportunity.

h.     The Town of Brookline opposes affordable housing production plans and fair housing testing.

i.     The Town of Brookline disfavors Black employees in its hiring, promotion, and disciplinary practices.

36.     The Town of Brookline engages in favoritism and affirmative action towards white residents and employees.

a.     The Town of Brookline privileges white people over other racial and ethnic groups.

b.     The Town of Brookline ignores, minimizes, and covers up misconduct by white people.

     c.     The Town of Brookline hires, promotes, and retains white people who have committed serious misconduct.

     d.     The Town of Brookline treats violations of law and policy committed by white people leniently.

     e.     The Town of Brookline favors white people for employment positions and for positions on appointed boards and commissions whose qualifications are worse than those of other applicants.

     f.     The Town of Brookline reserves its 25 department head positions for white people, with the exception of the diversity department, which is the only department in the history of Brookline ever to be led by a Black person.  The Town of Brookline also reserves the position of superintendent of schools and the position of headmaster of Brookline High School for white people.  Those positions have never been held by anyone other than a white person in the history of Brookline.

     g.     The Town of Brookline defends white people against any challenge to the regime of racial subordination.

37.     The Town of Brookline's opposition to racial equality and support of racial subordination has deep roots.  Up until the late 18th century, Brookline residents held Black people in slavery, and the Town of Brookline itself owned at least one enslaved Black person, who was left to the Town by Edward Devotion in his will.  The Town named a school in Mr. Devotion's honor.  The Town of Brookline and its white majority supported the practice of slavery and claimed it was morally justified by the false doctrine of white supremacy.  The practice was ultimately discontinued, but not because of any official act of the Town of

Brookline.  It stopped only because Black people throughout Massachusetts successfully sued for their freedom in a series of lawsuits.  Although the practice ended, the Town of Brookline continued to maintain that it was morally unobjectionable.  As late as the 1930s, one historian wrote that a "deep mutual regard" existed between Brookline slave-owners and the Black people they owned.  He wrote that "only an exceptionally acute conscience could have been bothered by this sort of slavery."   And recently Brookline public schools taught Black and white children that slave-owners were public servants who acted in the best interests of the whole community. A Brookline textbook sent home with children last year explained that "slaves were treated well or cruelly depending on their owners" and that some "planters took pride in being fair and kind to their slaves."

38.     The Town of Brookline's unconstitutional policy has kept free Black people out of Brookline for centuries.   By design, Black people make up a much smaller percentage of the population and the municipal workforce than they do in neighboring Boston.  In Brookline, Black people make up 3% of the population and 5% of the municipal workforce. In Boston, by contrast, 25% of the population and 26% of the city's workforce is Black.   In 1969, Brookline studied the impact of race on fair housing and determined that a pattern of racial discrimination operated to keep Black people out of Brookline.  Brookline found that a fear of Black people moving into white neighborhoods was at the root of this pattern of discrimination.  In 2013, Brookline found that it was likely that racial discrimination was occurring in Brookline's for sale and rental housing markets.  Despite this finding, as a matter of policy, the Town of Brookline does not conduct fair housing testing or otherwise enforce its fair housing bylaw.

39.     Since the late 19th century, the Town of Brookline has operated the municipal workforce as a job trust for white residents and their families and friends.  Many current white

employees of the Town have multi-generational legacies of employment, and large kinship
networks exist across the municipal workforce.  By way of example, the Town of Brookline
appointed a white woman with multiple relationships within the workforce, Defendant Joslin
Murphy, as the town's chief legal counsel last year.  A former Brookline police officer, she is
related by marriage to a lieutenant in the police department, a deputy superintendent in the police
department, and an employee of the department of public works.  Her husband, a recently retired
police sergeant, served as president of the police union for many years.  His father was also a
Brookline police sergeant.  These interlocking relationships between white employees across
town departments are pervasive.

40.     The Town of Brookline maintains its racist and unconstitutional policies by
providing the administration wide latitude to covertly implement and enforce them.

41.     To conceal its opposition to racial equality and to maintain the façade of
compliance with civil rights laws, the Town of Brookline from time to time establishes
committees, working groups and commissions whose nominal charge is to investigate racial
inequality, prepare reports, and propose action.  The Town of Brookline uses these bodies to
suppress racial equality and enforce racial subordination.

> Brookline Community Relations Committee (1953):  Suppressed any meaningful
> action to integrate Brookline public schools and housing in the wake of
> nationwide legal challenges to segregation, culminating in the Supreme Court's
> landmark *Brown v. Board of Education* decision.
>
> Brookline Civil Rights Committee (1964):  Worked to prevent integration of
> Brookline public schools with Boston public schools in the wake of NAACP
> lawsuits seeking two-way busing remedies across school districts.  Promoted one-

way busing (the METCO program) of Black children from Boston to shield Brookline from remedies requiring white students to enroll in schools in which Black students were the majority.

Brookline Committee on Urban Responsibilities (1969):  Suppressed any changes to the Town's policy of racial subordination in housing, education, and employment in the wake of widespread protests by Black people in Boston and in cities across the country.

Human Relations Commission (1971):  Suppressed and discouraged racial equality in Brookline housing, employment, and education between 1972 and 2012.  The commission's first director, a prominent social psychologist chosen from a field of 100 applicants, left Brookline within a year, protesting that his appointment was "just tokenism."  Forty-two years later, the first woman of color to chair the commission resigned, protesting that the Selectmen had blocked the commission from working to address the Town's disparate treatment of people of color.

Selectmen's Subcommittee on Police and Community Relations (1987):  Concealed racial harassment and profiling by the Brookline police and discouraged citizen complaints against the police in the wake of widespread complaints of racial harassment and profiling.

Citizen Complaint Review Committee (2008):  Covered up actions by white town officials and the Brookline police to intimidate and silence outspoken Black town meeting member.  Discouraged citizen complaints against the police by Black people.

<u>Inclusion and Diversity Working Group (2010)</u>:  Concealed racially unequal hiring, promotion, and disciplinary practices.  Concealed racial discrimination complaints made in multiple Town departments.

<u>Selectmen's Subcommittee on Diversity and Inclusion (2011)</u>:  Concealed ongoing racial harassment and retaliation against firefighter Gerald Alston for opposing racism in the fire department and in the Town administration.  Concealed the Town of Brookline's decision to promote Paul Pender to Captain shortly after he called Mr. Alston a "fucking nigger" on a recorded voicemail.  Opposed citizen efforts to enforce the Town bylaw against racial discrimination.

<u>Selectmen's Committee on Diversity, Equal Employment Opportunities, and Affirmative Action (2013)</u>:

Concealed unconstitutional policy and suppressed citizen efforts to investigate, expose, and dismantle Town of Brookline policy of racial subordination.

Publicized negative letter about Gerald Alston.

<u>Diversity, Inclusion, and Community Relations Commission (2014)</u>:

Ongoing concealment of the Town of Brookline's unconstitutional policy.

Delayed racial climate review ordered in 2014.

### *The Policy is Widespread*

42.   The following cases are representative of how the Town executes the policy.  Based on the cloak of secrecy the Town operates under, there are many more examples that have not yet come to light.

43.   In 2005, a white employee in the department of public works was convicted of assault with a dangerous weapon and intimidation of a witness and sentenced to 60 days of incarceration.  The employee informed his supervisor of his convictions.  The Town did not take

any adverse action against the employee.  In 2011, the Town promoted the employee.  He resigned in 2014 after he challenged the Town's failure to promote him a second time.  The Town did not assert the white employee's felony convictions as a grounds for not promoting him.

44.     In 2007, the Town of Brookline promoted a white employee to a senior administrator position over a Black employee with superior qualifications.  The Black employee had a master's degree in the relevant field and more experience in the Town of Brookline workforce.  The white employee did not have an advanced degree and had a shorter tenure in the department.  A town meeting member raised questions about the hiring decision to the Board of Selectmen.  In response, a member of the Board of Selectmen met privately with the town meeting member and disparaged the competency of the Black employee.  To support his claims, the Selectmen referred to negative comments in the employee's personnel file.  The Black employee's supervisor had secretly placed disparaging comments in the file, without giving the employee the opportunity to rebut them.

45.     In late 2007, the Town of Brookline hired a Black woman as the director of the Town's early childhood education center, which is run by the recreation department.  The Town intended to shield itself from charges of racism after two Black employees filed racial discrimination complaints with the Massachusetts Commission against Discrimination in 2006.  Parents and staff objected to having a Black director and objected to the director's efforts to make the center's programming more multicultural and racially inclusive.  Parents and staff asked the head of the recreation department to terminate the director or force her to resign.  The department head did not support the director, and town counsel began to investigate pretexts on which to fire her.  In early 2008, the department head convened a meeting for parents and staff to

voice their complaints about the center's director.  The purpose of the meeting was to persuade the director to resign.  The day after the meeting, someone left a bomb threat in the director's work mailbox at the center that read, "Got you Nigger, Boom."  In response, town counsel coordinated a sham investigation with the police department which did not produce any official suspects.  The Town then fired the director for a pre-textual reason that it had been aware of before the bomb threat but had taken no action on.  To avoid potential liability for discrimination, the Town hired another Black woman director to head the center.  The new director left a year later because of the hostile racial climate at the center.  The Town did nothing to address the racial climate at the center.

46.     A parent with children at the center asked the Board of Selectmen to investigate the unexplained departures of the two Black directors.  The Selectmen did not conduct any investigation.

47.     Between 2006 and 2009, a Black employee in the parks department was racially harassed by supervisors and fellow employees.  He was told, among other things, that he was doing "nigger work," that he could live like a king in his native Haiti on the money he was making with the Town, and asked "how did you get a white man's job?"  The human resources director conducted a sham investigation into his complaint and denied it.  The employee complained to the Massachusetts Commission against Discrimination.  In 2009, the MCAD found probable cause that the Town had fostered a racially hostile environment.  The Town did nothing to address the racial climate.

48.     In 2007, the Brookline police brought a criminal assault charge against a Black town meeting member and town counsel banned him from town hall because he objected to a white town official's rudeness to a senior citizen following a public meeting.  The officer who

recommended the criminal charge was the nephew of the white town official.  The charges and the town hall ban were quickly dropped, but the Town did not sanction the police, the town official, or town counsel for their misconduct.  The chief of police subsequently promoted the police officer who recommended the assault charge and appointed him to head the internal affairs department charged with investigating citizen complaints against the police.  The Town's actions defamed the Black town meeting member by creating the innuendo that he had done something criminal, inappropriate, or otherwise out of bounds.   The Selectmen appointed an ad-hoc committee to review the matter but instructed the committee to make no findings about the incident.

49.     In 2008, the Town hired a white woman as a police officer over a Black woman with a higher score on the civil service exam.  The white woman was a Brookline High School graduate, a Brookline resident, and the daughter of a Brookline firefighter and a parks and recreation commissioner.  The Black woman was also a Brookline High School graduate and a resident of Brookline.  Like virtually all Black applicants to Brookline municipal jobs, the Black woman had no relatives on the town payroll.  To justify hiring the white woman over the Black woman despite the Black woman's higher score on the civil service exam, the Town manufactured a pretext.  The Town claimed that the Black applicant was bypassed because she had an inconsistent work history and because she stated in her application that she had no history of drug use but admitted in her job interview that she had smoked marijuana as a teenager.  She explained to the Town interviewers that she understood the question on the application to apply to her history of drug use as an adult.

50.     In response to inquiries by the Black applicant in 2013, the director of the town's human relations department, the chief of police, and the town counsel discouraged the woman

from examining her application file by falsely suggesting it contained damaging information about her.  Town counsel also falsely claimed that the woman had scored lower on the exam than the white woman hired.

51.     In 2008, a white employee of the department of public works, a truck driver, was arrested for possession of heroin.  The employee used heroin and drank frequently while on the job.  The Town did not terminate the employee, take any disciplinary measures against him, require him to enroll in any substance abuse program, or subject him to drug or alcohol testing. The employee was fired by his previous employer after he was arrested for armed robbery while masked in 2000.  The Town of Brookline hired him in 2003 shortly after he completed a 2 ½ year sentence in the house of correction.  This white employee's misconduct was an open secret among Town employees.

52.     In 2011, the Town hired a white woman to be the headmaster of the high school over a Black man with a seventeen year tenure at the high school as a highly regarded teacher and administrator.  Among other things, the Black man had developed a calculus project for African-American scholars that had significantly improved their participation and performance in advanced math classes.  The job posting provided that a doctorate was preferred.   Although the white woman did not have the preferred credential, the Town hired her over the Black man. The Town rejected the Black man's candidacy because Brookline was "not ready" for a Black headmaster, according to a member of the search committee.  The Town authorized a financial settlement to protect itself from a finding of racial discrimination, and the Black administrator subsequently left the high school.   Twenty-three years earlier, the Town rejected another Black man's candidacy for headmaster for a less qualified white candidate.  In that case, the Black

candidate had been a successful principal within the Brookline schools, and had increased the racial diversity of Brookline teachers by recruiting Black teachers from North Carolina.

53.     In 2011, a white member of the town's advisory committee told a white woman administrator in the town's planning department that his uncle would shoot her if he had the chance.  The woman complained to the Town's human resources office.  The human resources director did not contact the police because the advisory committee member who made the threatening statement was a white man.  She conducted a sham investigation instead, which she refused to produce to the media.  The Chair of the Board of Selectmen, Nancy Daly, defended the advisory committee member publicly and said that his statement was intended as a joke.  The Town did not censor or discipline the advisory committee member in any way, and the woman who reported the matter subsequently resigned.

54.     In 2012, six white Brookline police officer, two of whom were supervisors, were lightly disciplined for falsifying records relating to paid details.

55.     In 2013, the Town convened a search committee to identify candidates for a new head of the planning department.  The planning department is responsible for serving Brookline's low-income residents by administering Brookline's community development block grant funds.  The Town selected only white people to serve on the six person search committee and did not highlight the need for a candidate with expertise in working with and for low income residents.  The most qualified applicant for the department head was a Black man with a master's degree from Harvard, but the Town did not offer him the job because it had identified a preferable, although less qualified, white woman candidate with connections to the Town's former town administrator.

56.     On August 26, 2014, a white Brookline firefighter was arrested for allegedly driving 114 miles an hour while drunk.  The Town protected the white firefighter by refusing to confirm his employment as a Brookline firefighter.  The same white Brookline firefighter was arrested in 2009 for assault and battery and in 2012 for driving under the influence of alcohol.  Despite these arrests, he was protected by the Town.

57.     On the day the Charlestown church shootings were announced in the spring of 2015, white students at Brookline high displayed a slide in class that included the words "motherfucking nigger."   The class included six Black students.  The administration did not call the police to report a hate crime.  The administration waited several days before informing the parents of the Black students that white students had displayed a racial slur to the class.  The administration conducted a sham investigation, and did not suspend the white students who displayed the slide.  The administration and town counsel classified the racist message as a technology violation rather than hate speech or racial harassment to protect the record of the white students and the Town.

58.     In the fall of 2015, the Town terminated an Asian-American teacher because he challenged the Town's policy of racial subordination by teaching students to question conventional histories of the United States.  The Town claimed in the notice of termination that the teacher was being terminated for saying "bullshit" in front of two high school students.  The Town served the teacher with a no trespass order/gag order that prohibited the teacher from speaking to any public school parent about the incident.  Under the direction of town counsel, the no trespass order/gag order falsely threatened the teacher with arrest and imprisonment by improperly citing Massachusetts criminal trespass statute.  The Town used the order to intimidate the teacher into not speaking publicly about his unjust dismissal.  Although the illegality of the

no trespass order/gag order was raised publicly, the Selectmen took no steps to investigate or discipline town counsel.

59.     In the fall of 2015, a white firefighter was arrested for assault and battery with a dangerous weapon.  The initial report by the Town to the media described him only as a Dorchester man and omitted the fact that he was a Brookline firefighter.  After the media reported that he was a Brookline firefighter, the Town terminated him.  The assault and battery with a dangerous weapon was captured on video.  The Union filed a grievance on his behalf pursuant to its practice of filing grievances on behalf of white employees regardless of the evidence.

60.     In November 2015, a white employee of the department of public works threatened to shoot people in the department.  The Town posted police protection at the department and conducted an investigation.  Because the employee was white, however, the Town concluded that the threat was a misunderstanding.

### The Board of Selectmen Fought to Protect the Policy

61.     The Board of Selectmen blocked citizens from exposing and changing the Town's unconstitutional policy.

62.     In 2010, just days before Lt. Pender left his racist message on Mr. Alston's voicemail, Town Meeting passed a resolution calling for the Town to improve its diversity practices by (1) issuing an annual diversity report, (2) appointing a committee to examine and improve the Town's diversity practices, and (3) holding an annual Dr. Martin Luther King, Jr. celebration.  The Selectmen lent their support only to the symbolic step of holding an MLK, Jr. celebration.  During discussions of the resolution, Selectwoman Nancy Daly cautioned that the

author of the resolution should not expect Brookline "to look like Boston." The Selectmen assigned one of its own members, Jesse Mermell, to chair the Martin Luther King, Jr. celebration committee. Ms. Mermell prevented the committee from examining the Town's diversity practices. The Selectmen instead assigned the human resources director to write non-substantive annual reports regarding the racial composition of the workforce and the town's diversity practices. The Selectmen discontinued the annual reports after three years.

63.    During debate on the resolution, the Selectmen claimed that a new committee to examine diversity issues was not necessary because the Town already had a human relations commission. But the Selectmen knew that the Commission and its director did not investigate discrimination and were not involved in monitoring the Town's hiring, promotion, or disciplinary practices.

64.    In 2011, town meeting members and citizens again asked the Selectmen to take action to address the Town's treatment of people of color in the workforce. The Selectmen were provided with specific concerns that had been raised by employees of color concerning unfair treatment in the workplace. The Chair of the Selectmen, Betsy DeWitt, responded by falsely and angrily claiming that the Town had recently adopted an affirmative action policy. When this falsehood was exposed, the Selectmen announced publicly that Selectwoman Jesse Mermell was going to chair an ad-hoc committee to examine the Town's workforce diversity policies. But Ms. Mermell never appointed anyone to the committee.

65.    The Selectmen instead formed a secret ad hoc Diversity committee of two Selectwomen, Betsy DeWitt and Jesse Mermell, to shield the Town's practices, including its treatment of Mr. Alston and Lt. Pender, from public scrutiny. The committee confirmed with the office of town counsel, the human resources department, and the human relations department

that the Town did not follow any equal opportunity, affirmative action, or other workforce

diversity policy.  The committee also confirmed that the Town had discontinued a 1994

affirmative action policy that required the Town to monitor its hiring and employment practices.

The subcommittee concealed this research from concerned citizens.

66.     In 2012, for the first time in its 40-year existence, the Town's human relations

commission, also described as the Town's civil rights agency, began investigating the Town's

unconstitutional practices.  The Town's bylaw charged the commission with enforcing the

Town's nominal policy against discrimination.  Section 3.14.3(g) of the Town's bylaw

empowered the commission to:

> Initiate, receive, secure the investigation of and seek the satisfactory adjustment of
> complaints charging discrimination, or failure to take or delay in taking appropriate
> action or abuse of authority in connection therewith by any town official or employee
> which may be brought to the commission's attention.

And Section 3.14.5 provided the Commission broad access to information:

> All departments and agencies in the Town shall cooperate fully with the Commission.
> They shall comply with its requests for information concerning practices inconsistent
> with the Town policy of non-discrimination, equal opportunity and affirmative action.
> Upon receipt of recommendations in writing from the Commission for giving effect to
> that policy, each department or agency shall submit a reply within a reasonable time,
> indicating the disposition of and action taken with regard to such recommendations.

67.     The commission disclosed publicly that the Town did not follow any written

equal opportunity, affirmative action, or workforce diversity policy; the commission questioned

why the Town had not had a Black department head or any person of color serve as a department

head in 40 years; the commission questioned the chief of police about the department's

promotional practices upon discovering that all of the force above the patrol officer level were

white; and the commission heard testimony from a Black woman that she had been passed over

for a position on the Brookline police force in favor of a white woman.

68.     Pursuant to the Town's bylaws, the commission drafted, voted on, and recommended a new affirmative action and equal opportunity policy to the Selectmen that required department heads to report quarterly regarding their recruiting, hiring, promotion, and disciplinary practices.  The policy was modeled on an executive order issued by Governor Deval Patrick.

69.     In 2013, the Selectmen blocked the commission from further investigating and exposing the Town's unconstitutional practices:

- The Selectmen appointed a white man, a corporate lawyer with no experience in civil rights matters, to the commission to sabotage, block and obstruct efforts to uncover the Town's hiring, disciplinary, and promotional practices.

- The Selectmen intentionally deprived the commission of a quorum by refusing to appoint two Black men and a Latino man with civil rights experience to seats vacated by resignations.

- The Selectmen opposed a resolution in town meeting requesting that the Selectmen lift the moratorium on appointments and appoint the three applicants of color.

- The Selectmen appointed an ad-hoc Committee on Diversity, Equal Employment Opportunities, and Affirmative Action to develop a warrant article to abolish the commission and eviscerate the Town's anti-discrimination bylaw.

- The Selectmen named Selectwoman Nancy Daly as chair of the committee and excluded diversity advocates from the committee, including members of the human relations commission and town meeting members who had advocated for stronger anti-discrimination measures.

- The Selectmen denied the commission access to reports of discrimination and to town employees, including the fire chief.

70.    The Selectmen feared that the commission would uncover the Town's treatment of Gerald Alston and Paul Pender, among many other cases.

71.    The Selectmen lied about the reason they refused to appoint two Black men and a Latino man to the commission.   In response to charges that the Selectmen had discriminated by refusing to appoint commissioners of color, the Selectmen claimed they stopped making appointments as soon as they determined that the commission's charge was likely to change.  But the local newspaper reported that the Selectmen had openly discussed changes to the commission's charge a week before they appointed a white man to the commission.

72.    Selectmen Ken Goldstein told one of the Black applicants to the commission that his application had been denied because he had implied at a public hearing that a Black member of the Selectmen's handpicked ad-hoc diversity committee was a "house servant."  At the hearing, the diversity committee member in question said that the commission would benefit from having more "Uncle Remuses" as members.

73.    Before the town meeting debate on the resolution regarding the composition of the commission, the town moderator instructed the same Black applicant that he was prohibited from calling the Selectmen or any other Town body racist at town meeting.  The moderator further instructed the applicant that he was forbidden from stating that the Selectmen's opposition to seating applicants of color on the commission was motivated by racism.

74.    In 2014, the Selectmen's committee successfully passed an article in Town Meeting abolishing the human relations commission and creating a new diversity commission.

The Selectmen's committee deliberately stripped the new commission of any jurisdiction over the Town's workforce and provided it no authority to investigate racial discrimination.

75.   The Selectmen abolished the commission to preserve the Town's unconstitutional and racist policy and discourage further challenges to it.   The new bylaw is Article 3.14 of the Town's bylaws.

### *The Policy Damaged Gerald Alston*

76.   The Town's unconstitutional and racist policy is the moving force causing Mr. Alston harm.

77.   On May 28, 2010, Mr. Alston broke his coccyx while on duty at the firehouse. He was treated at the hospital and sent home to recover.  In the days following, Mr. Alston received a number of get well messages from his fellow firefighters at home.  Mr. Alston heard rumors that his supervising officer, Lt. Paul Pender, was claiming that he was faking his injury to obtain leave going into the summer season.  In fact, Mr. Alston's medical record confirmed the legitimacy of his injury and it was never challenged by the Town.

78.   The Town privileges and protects Mr. Pender because he is white and because of his family's history in Brookline.  Mr. Pender grew up in Brookline and attended Brookline High School.  His father, Paul Pender, Sr., also grew up in Brookline.  He was a firefighter and an accomplished middle weight boxer.  In 2010, the Town named a rotary in Paul Pender, Sr's honor.

79.   On May 30, a call came into Mr. Alston's cell phone from Mr. Pender.  Mr. Alston did not pick up the phone in time to receive the call.  Mr. Alston's wife picked up the

phone and saw from the caller ID that the call had come from Mr. Pender.  She played the message and told Mr. Alston that he should listen to it himself.

80.     Mr. Pender says "fat fuck" and the other voice replies "what?"   Mr. Pender then says "fucking nigger" and the call ends.  Mr. Pender was calling Mr. Alston a "fat fuck" and a "fucking nigger" without realizing that his call had not been disconnected and was being recorded.  Lt. Pender left the message because he concluded, without any investigation, that Mr. Alston had faked his injury.  In fact, Mr. Alston's injury was well-established, corroborated by multiple medical sources, and never challenged or questioned by the Town.   Unlike many white firefighters, Mr. Alston had never faked an injury in his eight year career as a Brookline firefighter.

81.     Mr. Alston attempted to resolve the matter confidentially by reporting the message to the second-in-command at the fire department, the chief operating officer Michael O'Neill.

82.     Pursuant to well-settled Town of Brookline policy, Mr. O'Neill took no steps to investigate the complaint or discipline Mr. Pender.  Mr. O'Neill informed Mr. Alston that the Town of Brookline did not prohibit the use of racial slurs and that Mr. Alston would have to resolve the matter himself.  Mr. O'Neill then informed Mr. Pender about the complaint.

83.     After learning that Mr. Alston had complained about the message, Mr. Pender attempted to intimidate Mr. Alston into dropping the complaint.  He told Mr. Alston that he had not intended the slur for him.  He told Mr. Alston that he was calling a "gangbanger" a "fucking nigger" at the precise time he left the message for Mr. Alston.  Mr. Pender later changed his story and claimed the slur was directed at an 18-wheel truck that cut him off in traffic.  When

Mr. Alston challenged Mr. Pender for his changing stories and lack of remorse, Mr. Pender was defiant.  He told Mr. Alston that complaining about the racist message was the "stupidest thing" Mr. Alston could have done.  He said he considered the situation a joke because a lot of people use the word "nigger."  He accused Mr. Alston of having a vendetta against him and trying to take his job.

84.     After months of no action by the Town, on July 27, 2010, Mr. Alston filed a written complaint against Mr. Pender with the chief of the fire department, and a few days later the fire chief, town counsel, and human resources convened a meeting to discuss the complaint. Mr. Alston played the message and town counsel immediately said "we have a problem."  The fire chief stated that he was going to fire Mr. Pender.  Mr. Alston knew that if Mr. Pender was fired he would be retaliated against by his fellow firefighters and he asked the fire chief not to fire Mr. Pender.  The fire chief told Mr. Alston that he was going to make Mr. Pender ineligible for promotion.

85.     The Town knew that Mr. Pender's conduct violated the law.  Just a year earlier, the Massachusetts Appeals Court had forcefully condemned the use of the n-word in the workplace:

> We think that a supervisor who calls a Black subordinate a "fucking nigger" has engaged in conduct so powerfully offensive that the MCAD can properly base liability on a single instance. That term inflicts cruel injury by its very utterance. It is degrading, it is humiliating, and it is freighted with a long and shameful history of humiliation, the ugly effects of which continue to haunt us all. The words have no legitimate place in the working environment — indeed, they have no legitimate place — and there is no conceivable justification for their use by a workplace supervisor.

86.     Pursuant to policy, the Town took no action to discipline Mr. Pender and transferred him out of Mr. Alston's firehouse pending an investigation.  The Chair of the Board of Selectmen, Betsy DeWitt, was notified of the complaint and the investigation.

87.     Mr. Pender's transfer led to speculation in the firehouses about what had happened between Mr. Alston and Mr. Pender.  Local 950 spread rumors that Mr. Alston had made a false allegation of racism against Mr. Pender.  While the investigation was ongoing, the Town pressured Mr. Alston to agree to drop his complaint against Mr. Pender.  The director of human resources participated in conversation with Mr. Alston and the Union.  She asked him how long he wanted Mr. Pender to suffer.  Mr. Alston was uncomfortable being held accountable for Mr. Pender's discipline, particularly in the presence of the Union given that Mr. Pender was also a Union member.  Mr. Alston told the director that he wanted the Town to follow its policies.  The human resources director called Mr. Alston an "asshole" and hung up on him. Mr. Alston did not know that:

- The only anti-discrimination policy adopted by the Town was defunct because the Board did not allow the human relations commission to hear complaints of discrimination.
- The Town's practice was to discourage racial discrimination complaints and cover them up.
- He had a right to bring his complaint to the MCAD within 300 days.

88.     By mid-August 2010, the Board of Selectmen knew that Mr. Pender had left a racist voicemail for Mr. Alston and that nothing had been done to address it by the fire department after Mr. Alston complained.  The Board of Selectmen also knew that Mr. Pender had attempted to intimidate Mr. Alston into dropping the matter and had changed his story

several times about the circumstances of the message.   The Board did not fire, demote, or make Mr. Pender ineligible for promotion for his gross misconduct.

89.     The Board gave Mr. Pender an extremely short suspension to enforce its policy of racial subordination of black people and favoritism toward white people.   There is no evidence that Mr. Pender lost any pay as a result of this suspension.  The Board did not make a public statement about the matter or communicate with the fire department or Mr. Alston about the incident.  The Board handed down a short suspension after a purposefully slow and long investigation to leave the impression that Mr. Alston's claims against Mr. Pender lacked merit. The Board kept the discipline and the incident secret to protect the Town's reputation and to avoid an embarrassing conversation with the White House, which was occupied for the first time by a Black president.

90.     After Mr. Pender's complaint, the Board of Selectmen adopted an allegedly "zero tolerance" anti-discrimination policy.  The policy is window dressing, and the Board does not enforce it.   The human resources director told the Selectmen that the policy would not change the Town's "tried and true" process of investigating discrimination complaints.  The Selectmen knew that this tried and true process meant enforcing the Town's unconstitutional and racist policy.

91.     The Board ordered Mr. Pender to attend a mediation with Mr. Alston.  Mr. Pender was openly hostile towards Mr. Alston at the mediation, even refusing to shake Mr. Alston's hand, but the Town did nothing to address it.   Mr. Pender never apologized to Mr. Alston for his conduct or showed any remorse.

92.     The Town promoted Mr. Pender from Lieutenant to Acting Captain a few days after his suspension was handed down.  The Town posted the promotion on a bulletin board in every firehouse in Brookline.   The Town promoted Mr. Pender to send the message that Mr. Pender had done nothing wrong and to discourage any further protest against racial discrimination by Mr. Alston and by other Black Town employees and citizens.  The Town arranged for Mr. Pender and his family to fly to Washington, D.C. to attend a medal ceremony at the White House.   The ceremony related to Mr. Pender's performance at a fire two years earlier.

93.     The Town and Local 950 retaliated against Mr. Alston because he protested the Town's policy of racial subordination of black people and racial favoritism toward white people.

94.     On the day of the White House medal ceremony, an anonymous poster to an online message board frequented by firefighters questioned why a "racist" was receiving a medal at the White House.  Mr. Alston did not post the message, but the president of Local 950 targeted him for retaliation anyway, posting this message on the Local 950's Facebook page:

> To the faceless coward who for no good reason, except of course his own self intrest [sic] leaked to the media about one our BROTHER's alleged acts of misconduct on what should have been the proudest day of their professional lives is _____, I honestly can't even find an appropriate word for it.  I have been around this job a long time and seen and heard a lot, but this even exceeds my wildest expectations of someone having a personal agenda to destroy another.  This union went through this type of personal, meritless attacks before and it almost destroyed us, don't let this ever happened again, for all our sakes!

95.     The Union damaged Mr. Alston's reputation in the fire department by falsely claiming that Mr. Alston's complaint against Mr. Pender was meritless and self-interested.

96.     Mr. Alston protested Mr. Pender's promotion to human resources but the Town did nothing address it.  The Board of Selectmen arranged for the fire chief to retire early despite the fact that he had recently signed a new three year contract.  The purpose of arranging the fire

34

chief's retirement was to avoid accountability for the fire chief's promise not to promote Mr. Pender.

97.     Mr. Alston protested the Union's retaliation against him but the Town did nothing to address it.

98.     Pursuant to policy, the Board of the Selectmen and the Town created a retaliatory and hostile work environment for Mr. Alston after he complained about racial discrimination. Their actions were intended to create an atmosphere of distrust around Mr. Alston by creating the false perception that he had made a meritless claim against a fellow firefighter for personal gain.

99.     The Town used the new anti-discrimination policy to harass and retaliate against Mr. Alston.  The Town trained supervisors to secretly report workplace friction involving Mr. Alston so that human resources could create reports portraying Mr. Alston as a problem employee.  On multiple occasions, the human resources department prepared reports to the Board purporting to investigate incidents involving Mr. Alston.  In every case, the reports falsely painted Mr. Alston as being disruptive and overly-sensitive.  The reports were intended to leave the false impression that Mr. Alston was either imagining or fabricating complaints of harassment and retaliation.

100.    The Town's harassment and retaliation against Mr. Alston caused him to be hospitalized for stress.  Mr. Alston's medical doctor recommended that Mr. Alston be placed on a leave of absence because of the stress caused by the Town's treatment of him.  The Town refused to grant Mr. Alston a paid leave and informed him that he would need to use his sick time if he wanted to take a leave.  The Town denied the possibility that Mr. Alston might be entitled to injured on duty status under Massachusetts law.  Mr. Alston could not afford to take

an unpaid leave and did not take a leave at this time.  Several years later, however, based on public pressure, the Town relented and placed Mr. Alston on a paid administrative leave.  That paid leave has now extended for nine months and constitutes an acknowledgment by the Town that the Town's racially hostile environment is the fundamental obstacle to his safe return to work.

101.    Mr. Alston attempted to stop the harassment and retaliation by filing a formal complaint with MCAD and then the superior court of Massachusetts.  These formal complaints led to more harassment and retaliation by the Town.  The Town continued to ignore Mr. Alston's complaint that it had promoted Mr. Pender in violation of the fire chief's agreement and Mr. Alston's complaint that the Union had retaliated against him.  The Town also ignored Mr. Pender's continuing retaliation against Mr. Alston.  Mr. Pender told Mr. Alston that Mr. Alston had a personal vendetta against him and if he didn't he would "not be suing for money."  Mr. Pender blamed Mr. Alston for people "looking at me like I am a racist."

102.    The Town conducted a sham investigation into only some of the MCAD allegations and prepared a report that left the false impression that Mr. Alston had invented his complaints.  Although the report purported to reflect the opinions of all of Mr. Alston's supervisors, the Town deliberately avoided interviewing Alston's direct supervisor, Lt. Ronald Cronin, who would have corroborated Mr. Alston's claims.

103.    The Town encouraged supervisors to deny that Mr. Alston had been subjected to any ostracism.  The second-in-command in the department, Mike O'Neill, refused to go along with the scheme and retired under questionable circumstances.

104.    The Town and Local 950 continued to conceal from the fire department rank and file the true facts about Mr. Pender's conduct.

105.    In the spring of 2013, the Board of Selectmen voted to permanently promote Mr. Pender to Captain.  The Board knew that Mr. Alston's racial discrimination and retaliation complaint was pending before the MCAD.  The Board knew that Mr. Pender had said "fucking nigger" on Mr. Alston's voice mail and told conflicting stories about it to Mr. Alston and the Town.  The Board knew that Mr. Pender had attempted to intimidate Mr. Alston into dropping his complaint.  The Board nonetheless voted to promote Mr. Pender pursuant to the Town's unconstitutional policies.  The intent and effect of the vote was to solidify the message to the fire department that Mr. Pender had done nothing wrong and to cast doubt on Mr. Alston's credibility and character.

106.    Both before and after the Selectmen promoted Mr. Pender to Captain, the Town retaliated against Mr. Alston by denying him promotions to Acting Lieutenant.  The practice is for the senior man on the fire truck to serve as Acting Lieutenant when the officer assigned to the truck is not available.  Although Mr. Alston was entitled to Acting Lieutenant promotions in April and May of 2013 because he was the senior man on the truck, the Town refused to promote him.   The Town assigned Lieutenants from other fire stations to his truck to avoid promoting him.   Although Mr. Alston protested the failures to promote, the Town did not conduct an investigation.

107.    Mr. Alston removed his case from the MCAD and filed a discrimination lawsuit in state court, which was dismissed a year later by a clerk-magistrate for procedural reasons.  The Boston Globe reported the claims in the lawsuit in the fall of 2013.

108.    The Boston Globe story publicly exposed the Town's failure to address Mr. Pender's conduct for the first time.  Pursuant to policy, the Board of Selectmen moved to contain the damage by spreading lies and innuendo about Mr. Alston.  In response to an inquiry by Town Meeting members, the Chair of the Board, Betsy DeWitt, falsely stated that Mr. Alston's complaint had been investigated pursuant to the Town's anti-discrimination policy.  Ms. DeWitt knew that the anti-discrimination policy had been enacted after Mr. Alston's complaint.  Ms. DeWitt also knew that she had concealed Mr. Alston's complaint from the human relations commission, the Town body specifically charged under the Town's bylaws at the time with investigating racial discrimination complaints.

109.    The chair of the Selectmen's diversity committee, Nancy Daly, distributed a letter to the editor of the local Brookline newspaper to the public at a meeting of the committee, prior to its publication.  Ms. Daly said that the letter gave "another side of the story."   The letter attacked Mr. Alston's courage and credibility.  It suggested through innuendo that he lacked courage as a firefighter and that his lawsuit against the Town was "ignorant, fraudulent, and deceitful."  The letter was solicited from a retired Black firefighter for the purpose of retaliating against Mr. Alston.  The firefighter who purportedly wrote the letter had retired in 2007, three years before the incident, and Ms. Daly provided no evidence that he had any information about what had happened between Mr. Pender and Mr. Alston.  The letter Ms. Daly distributed was more derogatory than the version of the letter ultimately published in the local paper.

110.    The next day, Stanley Spiegel, a town meeting and advisory committee member, distributed the published version of the letter to town meeting members for the stated purpose of providing "diversity" of opinion regarding the lawsuit.

111.    The Board of Selectmen blocked the human relations commission from

intervening to protect Mr. Alston.  The Board refused to release the Town's investigatory reports

and clarify public uncertainty over whether Mr. Alston had in fact been subjected to a racial slur

by Mr. Pender.  The Chair of the Board, Betsy DeWitt, refused to meet with the human relations

commission to discuss Mr. Alston's complaint.  And Ms. DeWitt authorized town counsel to

prevent the fire chief from discussing the workplace culture in the fire department with the

commission.

112.    In mid-December 2013, an unidentified firefighter wrote the word "Leave" on the

door behind Mr. Alston's jacket.   The message was intended to retaliate against Mr. Alston and

force him from the fire department.  Mr. Alston photographed the message and said to the

firefighters present that "this is the kind of thing that makes people go postal."  Mr. Alston said

that he was not like that though.  He said that he was going to sue the Town.  The Union reported

the incident but did not discuss it with Mr. Alston.  The incident was reported up the chain of

command to the fire chief, who reported it to the director of human resources and the town

counsel the next day.  But no immediate effort was made by the Town to speak with Mr. Alston

about the message, and the Town did not immediately initiate an investigation to determine

whether the message violated the Town's anti-discrimination and retaliation policy.

113.    The shift commander ordered the word to be washed off of the door without

making any efforts to preserve it for forensic analysis.  The Town did not immediately ask the

firefighters who were on duty when the incident occurred whether they had written the "Leave"

message or knew who had.  Much later, the Town began yet another sham investigation, which

failed to identify the perpetrator.  In a report delivered to Ken Goldstein, the new Chair of the

Selectmen, five months after the incident, the Town claimed that Mr. Alston could have written the message or it could have been written by a member of the MIT fraternity across the street.

114. The Board of Selectmen knew that the "Leave" message was intended to retaliate against Mr. Alston for filing a racial discrimination lawsuit against the Town.

115. The Town intended to find that Mr. Alston had not been discriminated against or retaliated against before it even began its investigation into the "Leave" message. The human resources director did not call Mr. Alston for an interview until three months after the incident. When Mr. Alston asked that the interview be set up through his counsel, the human resources director informed him in a letter that his racial discrimination claims against the Town were outside the scope of the "Leave" investigation. She instructed him that he needed to speak with her directly, without a lawyer present.

116. Mr. Alston returned to the firehouse for his next shift three days after receiving the harassing message. Nobody from the Town had contacted him to discuss the message or express concern for his safety or wellbeing. At the beginning of the shift, Mr. Alston addressed the "Leave" incident. Although no firefighter complained about feeling threatened by Mr. Alston and the supervisors present agreed no action was required, the Town began a sham investigation of Mr. Alston under the Town's workplace safety policy and ordered Mr. Alston to submit to a fitness for duty examination with the Town's psychiatrist.

117. The Town also issued Mr. Alston a stay away order under Massachusetts criminal trespass law, which required Mr. Alston to stay away from the Town's firehouses on threat of arrest and prosecution.

118.    The Town issued the stay away order to communicate the false impression that Mr. Alston was dangerous.  The Town claimed falsely that Mr. Alston had threatened to shoot people in the firehouse, and the Union attempted to bolster the Town's claims against Mr. Alston by asking for police officers to be posted at all of the Town's fire stations days after the alleged threats.  The fire chief refused to honor the Union's request because he knew that Mr. Alston was not a threat to workplace safety.  The Town's psychiatrist agreed, concluding on January 6, 2014 that Mr. Alston did not pose a threat to workforce safety.

119.    The Town used the workplace safety policy to retaliate against Mr. Alston for suing the Town.  In May of 2014, five months after Mr. Alston complained about the "Leave" message on his door, the Town falsely determined that Mr. Alston had violated the workplace safety policy.  The Town knew the elements of a violation had not been met because Mr. Alston did not intend to place anyone in fear with his comments and no firefighter was placed in fear by them.

120.    Local 950 did not object to the finding of a violation, did not attempt to negotiate on behalf of Mr. Alston, and did not seek injured on duty status for Mr. Alston.  The Town informed Mr. Alston that he had been determined to be unfit for duty and placed him on unpaid administrative leave.  Local 950 did not object to this employment action and did not file a grievance on Mr. Alston's behalf.

121.    As a condition of returning to duty, the Town directed Mr. Alston to submit to abusive and onerous conditions designed to protect it in litigation and to leave the impression that Mr. Alston was to blame for hostility he encountered in the fire house.  The Town conditioned Mr. Alston's return on a further fitness for duty examination and intended Mr. Alston to be found unfit for duty in any subsequent examination.

41

122.    Through discovery in Mr. Alston's superior court matter, the Town obtained Mr. Alston's medical records.  They showed that Mr. Alston had tested positive for cocaine once in 2010, on the same day he was hospitalized for stress.  The records showed that Mr. Alston had reported some cocaine use in the months prior to December 2011.  Mr. Alston's medical providers did not find he was an addict or an abuser of drugs. They determined his isolated drug use had resulted from severe workplace stress.

123.    The Town did not discipline Mr. Alston after obtaining his medical records. Instead, the Town used the information to try to discredit Mr. Alston and impugn his character. At the time the Town obtained the records, the Town psychiatrist had already examined Mr. Alston and issued two reports.  The Town instructed the Town psychiatrist to conduct an additional exam so that his report would include Mr. Alston's positive test.  The purpose of providing this three and four year old information was to discredit Mr. Alston in his claims against the Town.  The Town psychiatrist had not independently sought to obtain the records.

124.    The Town also leaked the information in Mr. Alston's file to Defendant Stanley Spiegel and others in an effort to smear Mr. Alston and undermine his support in the community.

125.    The Town has no written substance abuse policy governing the use of drugs or alcohol by Town employees.  Mr. Alston's positive test was four years old and there was no contemporaneous evidence that Mr. Alston was using or abusing drugs.  The human resources director nevertheless directed that Mr. Alston undergo two years of random testing upon his return to duty.  The condition was retaliatory and not consistent with how white employees are treated by the Town.

126.    In October 2014, Mr. Alston used up his remaining sick and leave time and received his last paycheck from the Town.  Neither Local 950 nor the Town contacted him to check on his health or wellbeing.

127.    The human resources director intentionally waited until Mr. Alston was no longer receiving a paycheck to request a meeting with him to discuss his status.  At the beginning of November, after Mr. Alston had gone a month without a paycheck, she scheduled a reasonable accommodation meeting for the purpose of terminating Mr. Alston.  The Town intended to terminate Mr. Alston by falsely claiming that he was disabled and that no reasonable accommodation could be made for him within the fire department.  The human resources director had used this strategy to pressure at least one other firefighter to take early retirement.

128.    Through counsel, Mr. Alston attempted to obtain a meeting with the Chair of the Board of Selectmen, Ken Goldstein, to discuss a resolution.  Mr. Alston mistakenly believed that the Town's administration was not providing a full accounting of his situation to the Board.  The Chair agreed to meet with Mr. Alston.  Days before the meeting, assistant town counsel sent an e-mail that implied that counsel's representation of Mr. Alston could form the basis for a felony charge carrying state prison time.  The implication was baseless and intended to intimidate.  When Mr. Alston's counsel did not drop the engagement, the Chair cancelled the meeting.

129.    At the end of November, Mr. Alston filed a letter with the Board of Selectmen outlining the mistakes made by the administration in handling his case, asking the Board of Selectmen to take responsibility, and requesting a hearing under the Town's anti-discrimination policy.  Mr. Alston believed in good faith that the Selectmen would right the wrong against him if they examined the facts.

- Mr. Alston asked the Board to conduct an independent investigation to find the facts and grant him a hearing to address his appeal of multiple decisions made by the administration concerning his case.

- Mr. Alston pointed out that the human resources office and town counsel were attempting to scapegoat him for their mistakes.

- Mr. Alston asked the Selectmen to investigate a recent MCAD finding of probable cause against the fire chief and the human resources director involving a Jewish firefighter and to investigate anti-Semitism in the department.

- Mr. Alston asked the Selectmen to investigate whether the Town had misled MCAD regarding anti-discrimination trainings that MCAD had conducted at the Town's request in 2010 and 2011. Mr. Alston pointed out that the Town had led MCAD to believe that the trainings were proactive when, in fact, they had been prompted by Mr. Pender's racist conduct.

- Mr. Alston asked for a racial climate review of the entire department.

130. The Selectmen ignored Mr. Alston's letter.

131. In early December of 2014, Mr. Alston and several supporters addressed the Board of Selectmen during the public comment period. Mr. Alston asked the Board to conduct a third-party investigation into how his case had been handled and place him back on paid administrative leave.

132. The Town retaliated against Mr. Alston for publicly protesting his treatment, including by providing town meeting and advisory committee member, Stanley Spiegel with access to Mr. Alston's personnel file. A week after Mr. Alston's appearance before the

Selectmen, Mr. Spiegel told several witnesses that he had access to Mr. Alston's personnel file in his capacity as a town meeting member. He told a supporter wearing an "I support Gerald Alston" sticker that she would not support Mr. Alston if she knew the "real story" contained in Mr. Alston's personnel file. He said that she was not entitled to access to it, but that he and the Selectmen were. He represented to the supporter that he was speaking on behalf of the Town. Mr. Spiegel also falsely claimed in front of several witnesses that two Black firefighters had volunteered to him that they did not support Mr. Alston. In a subsequent investigation, Mr. Spiegel failed to identify the names of these firefighters. His claim lacked foundation and was intended to smear Mr. Alston in the eyes of the public and discourage Mr. Alston and others from continuing to speak out publicly about the Town's discriminatory conduct.

133.    The supporter complained about Mr. Spiegel's conduct to Ken Goldstein, the Chair of the Board of Selectmen, and Mr. Alston's lawyer separately complained to town counsel after learning about the breach of confidentiality. The next day town counsel wrote a sham report concluding that Mr. Spiegel had not engaged in any misconduct. Town counsel conceded in the report that she had not spoken to the supporter who had made the complaint and had reached her conclusion based on speaking to Mr. Spiegel and a witness. The witness, a town meeting member, corroborated the supporter's account, but town counsel credited Mr. Spiegel's denial. Mr. Alston appealed the ruling of town counsel to the Board of Selectmen under the Town's anti-discrimination policy, but the Board refused to grant Mr. Alston a hearing.

134.    Concerned about the integrity and the contents of his personnel file, Mr. Alston and his lawyer made an appointment to review it in a conference room at Town Hall. Mr. Alston and his lawyer were met in the conference room by an armed police detective, who had taken custody of Mr. Alston's personnel file. The police detective indicated he had been

instructed by town counsel to watch Mr. Alston and his lawyer as they reviewed the personnel file.  The police detective did not know why he had been asked to hold the file and remain in the room.  He admitted it was not a common practice.  Mr. Alston's lawyer called the Chair of the Board of Selectmen, Ken Goldstein, and complained about the police detective's presence.  The Chair could not explain why a police detective had been provided Mr. Alston's file and told to remain in the room.  Mr. Alston's lawyer complained that it was meant to intimidate Mr. Alston. The Chair spoke with town counsel and called Mr. Alston's lawyer back and explained that the police detective would be removed from the room.  The Selectmen took no action to discipline town counsel for her improper conduct.

135.    Mr. Alston discovered his personnel file was incomplete and brought the problem to the attention of human resources.  The human resources specialist then reviewed the file with the police detective to identify missing pages.  Mr. Alston was upset to see the police officer joining in the review of his personnel file.  A missing page was supplied with redactions that appeared to have been made that day by the human resources director.  Mr. Alston subsequently discovered at least two letters relevant to his case had been removed from the file.

136.    In January 2015, Mr. Alston and his lawyer met with the Chair of the Board of Selectmen, Ken Goldstein, and town counsel, Joslin Murphy, to discuss Mr. Alston's case.  In the course of that meeting, the Chair admitted that he had doubts about Paul Pender's story but that it would be going too far to impose consequences on Town employees who lie.  The Chair also stated that he did not agree with the fire chief's decision to promote Paul Pender to Acting Captain shortly after the incident but claimed not to have known about it.  With respect to the statements made by Stanley Spiegel, the Chair said that Mr. Spiegel was free to smear Mr. Alston and the Town could not do anything about it.

137.    During the meeting town counsel attempted to bait Mr. Alston into a reaction by superfluously repeating the phrase "fucking nigger" in Mr. Alston's letter of appeal to the Selectmen.

138.    The meeting terminated because the Chair falsely and outrageously claimed that Mr. Alston had threatened his family.  Towards the end of the meeting, Mr. Alston explained to the Chair that he had a family to support and had asked the Chair whether he had a family in an effort to make a connection.  Mr. Alston had been without pay for three months at this point. The Chair reacted defensively and abruptly.  He told Mr. Alston that Mr. Alston was threatening his family, got up from his seat, took his coat, and left Mr. Alston and his counsel alone in the room with town counsel.   Mr. Alston left the room and asked the Chair to justify his claim that Mr. Alston had threatened his family.  The Chair refused to engage with Mr. Alston, except to threaten to go to the police station and file charges against Mr. Alston.  The Chair resigned from the Board of Selectmen three weeks later, and Neil Wishinsky was elected Chair.

139.    In February, Mr. Alston sat for another fitness for duty exam because the Town agreed to restore him to paid administrative leave and retain a different psychiatrist.  The new psychiatrist concluded that Mr. Alston could return to work only if he complied with onerous and restrictive conditions, including meeting with a therapist weekly and a psychiatrist monthly and releasing them to discuss his treatment with the Town.  The conditions falsely implied that Mr. Alston's complaints of retaliation and harassment were in his head and that he was a problem worker.  The Selectmen endorsed the conditions to retaliate against Mr. Alston.

140.    Mr. Alston refused to submit to the conditions imposed by the Town and demanded that the Town correct the unsafe racial climate.  Mr. Alston repeatedly asked the Selectmen for a meeting to discuss his case, but the Selectmen refused to meet with him.  Mr.

Alston reiterated his request for a hearing before the Selectmen, but the Selectmen refused to hold one.  Mr. Alston appealed personally and directly to Chairman Neil Wishinsky, but Mr. Wishinsky refused to meet with him.  Mr. Alston also requested a meeting with the leadership of Local 950 but they declined to meet with him either.

141.    The conditions imposed by the Town are punitive and lack a legitimate basis.  Mr. Alston has obtained a review from a psychiatrist that establishes that the only obstacle to his return to duty is the racially hostile environment fostered by the Town of Brookline.  The psychiatrist opines that Mr. Alston's problems with the environment in the firehouse are not in his head and therefore cannot be resolved through psychiatric treatment and monitoring.

142.    The Town's policy has impacted every aspect of Mr. Alston's life.  He has suffered financially, psychologically, and physically.  His marriage has ended, his debts have increased, his health has deteriorated, and he struggles daily with the loss of the job that he loved to do and excelled at.

### The Selectmen Use Window Dressing and Tokenism to Conceal the Policy

143.    The Selectmen ordered a racial climate review of the entire Town workforce in December of 2014 to create the illusion of action on Mr. Alston's complaint.  But after almost a year, the Town has not completed the review and has not taken any substantive actions to change the racial climate.

144.    For public relations purposes, the Selectmen ordered a sham review of Mr. Alston's matter by a Latino board member of the Lawyers Committee for Civil Rights, a lawyer whose office turned out to be a post office box at a UPS store.  Through town counsel, the Selectmen directed the reviewer not to interview any witnesses or seek to discover any

documents.  The Selectmen directed the reviewer to base his findings entirely on biased reports that had already been provided to the Selectmen by the human resources director and town counsel.

145.    In order to preserve and continue the Town's unconstitutional policy, the Selectmen groomed Black employees and citizens for token positions.

146.    In 2014, the Selectmen appointed a Black man director of the Town's newly constituted diversity commission.  The Selectmen chose him because he proved that he would uphold the Town's policy of opposing racial equality, enforcing racial subordination, and engaging in affirmative action and favoritism towards white residents and employees.

- He was a longtime employee of the Town and had never objected to the Town's discriminatory policies.  He had no experience or expertise in civil rights enforcement.  He worked as a mid-level staffer in the health department, focusing on treatment for addiction.

- He served as the only Black member of the Inclusion and Diversity Working Group in 2010.  The working group formed to purportedly examine the town's diversity practices and make recommendations to the Selectmen.  But, in fact, the working group concealed the Town's racially unequal hiring, promotion, and disciplinary practices and concealed racial discrimination complaints made in multiple Town departments.

- He served as the staff member for the human relations commission in 2013.  In this role, he concealed information about racial discrimination complaints from the commission, including but not limited to Mr. Alston's complaint.  He specifically concealed the "Leave" incident from the commission.

- He participated in retaliating against Mr. Alston by signing off on the retaliatory fitness for duty order after Mr. Alston complained about the "Leave" message.

- He took no action to respond to complaints of discrimination against the police department.

- He took no action to respond to complaints about the town's hiring practices, including complaints that a well-qualified Black woman lawyer's application for a position in the town counsel's office had been purposely ignored on multiple occasions.

147.    In 2015, the Selectmen recruited a Black man to run for an open seat on the Board of Selectmen.  He was endorsed by all sitting members of the Board and several former Selectmen and was elected in the spring of 2015.  He too had proven that he would uphold the Town's policy of opposing racial equality, enforcing racial subordination, engaging in affirmative action and favoritism towards white residents and employees, and retaliating against persons who protest racial discrimination:

- The Selectmen appointed him to the search committee for a new town administrator and he did not object to a search process that produced no Black candidates.

- The Selectmen appointed him to the Citizen Complaint Review Committee and he voted to make it more difficult for a citizen to obtain a complaint against a police officer.   He did not object to the Selectmen's use of the Committee to conceal the facts about the Town's discrimination against a Black town meeting member.

- The Moderator appointed him to the advisory committee.  On the advisory committee, he opposed a warrant article seeking to empower the human relations commission and a warrant article seeking to appoint three applicants of color to the commission.

- The Selectmen appointed him to the Selectmen's Committee on Diversity, Equal Employment Opportunities, and Affirmative Action.  He voted to abolish the human relations commission.  He did not object to the Selectmen's transparent effort to prevent the commission from uncovering the Town's racially discriminatory policies and practices, including as they applied specifically to Mr. Alston.  He did not object to the Chair's circulation of a letter calling Mr. Alston's complaint "fraudulent, ignorant, and deceitful." And he stated at a public hearing that the human relations commission would benefit from more "Uncle Remuses."

## COUNT I

(Town Defendants: Town of Brookline, Board of Selectmen, Town Counsel, Human Resources Director)

148.    Plaintiff repeats and incorporates the above allegations.

149.    The Town Defendants violated the Fourteenth Amendment guarantee of equal protection and freedom from racial discrimination by executing a policy, practice, and custom of opposing racial equality, enforcing racial subordination, engaging in affirmative action and favoritism towards white residents and employees, and retaliating against persons who protest racial discrimination.

150.    The Town Defendants sought through the execution of the policy to deter Mr. Alston and others in Brookline from enjoying their First Amendment rights to freedom of speech and to petition the government for redress of grievances.

151.    The Town Defendants' unconstitutional policy, practice, and custom caused Mr. Alston to suffer damages compensable pursuant to 42 U.S.C. § 1981 and § 1983.

152.    The Town Defendants are policymakers for the Town of Brookline and their decisions caused Mr. Alston to suffer damages compensable pursuant to 42 U.S.C. § 1981 and § 1983.

153.    The Town Defendants' unconstitutional policy, practice, and custom violates the rights of all Black employees, students, and citizens of the Town of Brookline.

## COUNT II

(Individual Defendants: Betsy DeWitt, Ken Goldstein, Neil Wishinsky, Nancy Daly, Jesse Mermell, Sandra Debow, Joslin Murphy, Stanley Spiegel)

154.    Plaintiff repeats and incorporates the above allegations.

155.    The Individual Defendants violated 42 U.S.C. § 1981, § 1983, and § 1985 by enforcing the Town's unconstitutional policy, practice, and custom against Gerald Alston.

156.    The Individual Defendants sought through the execution of the policy to deter Mr. Alston and others in Brookline from enjoying their First Amendment rights to freedom of speech and to petition the government for redress of grievances.

157.    The Individual Defendants violated 42 U.S.C. § 1981, § 1983, and § 1985 by retaliating against Gerald Alston for opposing the Town's unconstitutional and racist policy.

158.    The Individual Defendants violated 42 U.S.C. § 1981, § 1983, and § 1985 by discriminating against Gerald Alston on the basis of race.

159.    The Individual Defendants acted under the color of law.

160.    The Individual Defendants' conduct violated clearly established law.

161.    The Individual Defendants' conduct caused Gerald Alston damages.

## COUNT III

### (Local 950)

162.    Plaintiff repeats and incorporates the above allegations.

163.    Local 950 violated 42 U.S.C. § 1981 and § 1983 by retaliating against Gerald Alston because he protested Paul Pender's racist conduct.

164.    Local 950 violated 42 U.S.C. § 1981 and § 1983 by failing to file grievances on behalf of Gerald Alston that it would have filed on behalf of a white union member.

165.    Local 950 violated 42 U.S.C. § 1981 and § 1983 by failing to fairly represent Gerald Alston in the same way it represents white union members.

166.    Local 950 violated 42 U.S.C. § 1981, § 1983, and § 1985 by enforcing the Town's unconstitutional policy against Mr. Alston.

167.    Local 950's conduct caused Gerald Alston damages.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Gerald Alston requests judgment against Defendants as follows:

A.  Declare that the Defendants violated the First and Fourteenth Amendments to the United States Constitution;

B.  Enter Judgment for the Plaintiff and against the Defendants on all Counts;

C.  Enjoin the Town of Brookline from enforcing its unconstitutional policy;

D.  Strike down Article 3.14 of the Town's bylaws as unconstitutional;

E.  Award damages sufficient to compensate Plaintiff, in an amount to be proven at trial;

F.  Award punitive damages;

G.  Certify the class harmed by the policy pursuant to Fed. R. Civ. P. 23, certify Plaintiff as representative of the class, and designate Plaintiff's counsel as counsel for the class;

H.  Establish a reparations fund for persons harmed by the Town's policy;

I.  Award costs and attorney's fees pursuant to 42 U.S.C. § 1988;

J.  Award such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

GERALD ALSTON

By his attorney,

_____/s Brooks A. Ames_____
Brooks A. Ames (BBO #641192)
BROOKLINE JUSTICE LEAGUE, INC.
1309 Beacon Street, 3rd Floor
Brookline, MA 02446
brooksames1@gmail.com
(617) 763-5526

Dated:  December 1, 2015