UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GERALD ALSTON, JUANA BAEZ, ROGELIO
RODAS, CRUZ SANABRIA, DEMETRIUS
OVIEDO, and DEON FINCHER, on behalf of
themselves and all others similarly situated,

     *Plaintiffs*,

     v.                                                                CIVIL ACTION NO. 15-13987-GAO

TOWN OF BROOKLINE, MASSACHUSETTS;
BROOKLINE BOARD OF SELECTMEN;
BETSY DEWITT, in her individual and official
capacities; KENNETH GOLDSTEIN, in his
individual and official capacities; NANCY DALY,
in her individual and official capacities; JESSE
MERMELL, in her individual and official capacities;
NEIL WISHINSKY, in his individual and official
capacities; SANDRA DEBOW, in her individual
and official capacities; JOSLIN MURPHY, in her
individual and official capacities; STANLEY
SPIEGEL; and LOCAL 950, INTERNATIONAL
ASSOCIATION OF FIREFIGHTERS,

     *Defendants*.

REPORT AND RECOMMENDATION ON
MOTIONS TO DISMISS BY DEFENDANTS TOWN OF BROOKLINE AND BROOKLINE
BOARD OF SELECTMEN (#34); BETSY DEWITT, KENNETH GOLDSTEIN, NANCY
DALY, JESSE MERMELL, NEIL WISHINSKY,
SANDRA DEBOW, AND JOSLIN MURPHY (#36); STANLEY SPIEGEL; AND
LOCAL 950, INTERNATIONAL ASSOCIATION OF FIREFIGHTERS (#53)

KELLEY, U.S.M.J.

## I. **Overview of the case**

In this putative class action, six named plaintiffs allege a host of violations of 42 U.S.C. §

1981 and § 1983 against the Town of Brookline ("the Town"), the Brookline Board of Selectmen

("the Board"), and Local 950, International Association of Firefighters ("the Union"); and

violations of 42 U.S.C. § 1981, § 1983, and § 1985 against certain members of the Board in their official and individual capacities ("the Town individual defendants") and against Stanley Spiegel, who is a Town Meeting Member. (Amended complaint, #21 at ¶¶81-84.) The 85-page, 270-paragraph amended complaint states at the outset that the plaintiffs "bring this claim on behalf of themselves and all others who have been damaged by Brookline's longstanding and well-established policy, custom and practice of opposing racial equality, enforcing racial subordination, engaging in affirmative action and favoritism towards [W]hite residents and employees, and retaliating against persons who protest racial discrimination." *Id.* at ¶2.

Plaintiffs are represented by one attorney, Brooks Ames, who filed the original complaint on December 1, 2015, on behalf of one plaintiff, Gerald Alston, a Brookline firefighter alleging civil rights violations. (#1.) On January 26, 2016, the amended complaint was filed, adding seven more plaintiffs. (#21.) Two of them, Officers Prentice Pilot and Estifanos Zerai-Misgun of the Brookline Police Department, filed Notices of Voluntary Dismissal on February 8, 2016. (##30, 31.)[1]

---

[1] In their pleadings the parties reference a long history of acrimony between the plaintiffs' attorney and the Town on the subject of racial discrimination. *See*, e.g., #11, motion to dismiss by the Town at 2, "[T]he complaint appears to largely be a continuation of a policy campaign begun several years ago by Plaintiff's counsel Brooks Ames regarding the proper role of the Town's … human relations commission while he was a Town official on that body…"; *id.* at 25, stating that the suit "seeks to revive long-standing policy debates within the Town," and was "filed in tandem with a long-standing media campaign that has been waged against the Town and its officials, including a stream of accusations against them for example, on Facebook and 'Twitter' accounts…". Attorney Ames' responses confirm that the dispute here is deeply personal. Perhaps the clearest example of this is in his response to defendant Spiegel's motion to dismiss, where he states: "Mr. Spiegel's motion for sanctions is not based on any absence of law or facts supporting the complaint against him. It is brought in bad faith against me, as counsel for the plaintiffs, for the sin of violating the Town of Brookline's policy against making and supporting charges of racism." (#56 at 5.) There follows a five-page diatribe against Spiegel's attorney, whom Ames accuses of representing Spiegel for the purpose of furthering "intimidation and harassment by the Town and its proxies against persons who make and support claims of racial discrimination." *Id.* at 8. While this

The allegations concerning each plaintiff are set out in detail below, but in short, the plaintiffs consist of Gerald Alston, a Brookline firefighter who allegedly was discriminated against because he is Black[2] and then suffered retaliation for speaking out about it; Cruz Sanabria, a Hispanic Brookline resident who allegedly was falsely charged with a crime in Brookline, among other retaliatory acts, for speaking out against racism; Juana Baez, a Hispanic Brookline resident who allegedly had a violent encounter with a tow truck driver and a Brookline police officer; Rogelio Rodas, a Hispanic Brookline resident who allegedly was assaulted by a Brookline police officer; Demetrius Oviedo, a Brookline resident whose ethnicity is never stated in the amended complaint, who passed the civil service exam to become a Brookline firefighter but was not hired for allegedly discriminatory reasons and who also had problems with the Brookline police; and Deon Fincher, a Black sanitation worker in Brookline who claims he was treated differently on the job than were White[3] workers.

Plaintiffs allege that the Town's policy of "disregarding the Fourteenth Amendment" violated their constitutional rights. (#21 at ¶124.) The policy "has kept free Black people out of Brookline for centuries," as evidenced by the fact that only 3% of the population of Brookline is Black. *Id.* at ¶130. The amended complaint lists various committees that the Town has established from 1953 to the present to address issues concerning racism and argues that in fact these efforts "suppress racial equality and enforce racial subordination." *Id.* at ¶134. Plaintiffs set

---

background may in part explain how this lawsuit came to be filed, the court does not consider this information in ruling on the defendants' motions.

[2] This is the designation plaintiffs use in the amended complaint.

[3] Again, this is plaintiffs' designation, albeit with a small "w."

out numerous incidents of lenient treatment afforded to White people, such as an instance where an unnamed employee from the department of public works was not terminated for getting a criminal conviction, or an instance where a White person was promoted over a Black person with superior qualifications for a "senior administrator position" in the Town. *Id.* at ¶¶136-157.

In a section entitled "The Board of Selectmen Fight to Protect & Conceal the Policy," the amended complaint relates instances where the Board thwarted unnamed citizens' efforts to expose and change "the Town's unconstitutional policy."[4] *Id.* at ¶¶159-173.

The amended complaint asserts that "the Town Defendants' unconstitutional policy practice and custom caused Plaintiffs to suffer damages compensable pursuant to 42 U.S.C. § 1981 and § 1983" and "the individual defendants violated 42 U.S.C. § 1981, 1983, and 1985 by enforcing the Town's unconstitutional policy, practice, and custom," "by retaliating against Plaintiffs for opposing the Town's unconstitutional and racist policy," and "by discriminating against Plaintiffs on the basis of race." *Id.* at ¶¶254, 258, 260-61. Plaintiffs seek declaratory judgment against all defendants, a finding that Article 3.14 of the Town's bylaws violates the U.S. Constitution, compensatory and punitive damages, class certification, establishment of a reparations fund, costs and attorney's fees. (#21 at ¶84.)

This report and recommendation addresses the motions to dismiss filed by all defendants. (##34, 36, 48, 53). Plaintiffs opposed the motions to dismiss (##40, 56, 64), and all defendants replied. (##65, 68, 71.)

For the reasons set out below, the court recommends as follows:

---

[4] None of these allegations involve any of the named plaintiffs.

1. The District Court should exercise its discretion under Fed. R. Civ. P. 20 and 21 to sever Mr. Alston's case from the cases of the other named plaintiffs, as the plaintiffs' cases do not meet the criteria under Fed. R. Civ. P. 20 (a)(1) to be tried together in the same action. The District Court should dismiss all but the first named plaintiff without prejudice to the filing of new, separate lawsuits by the dropped plaintiffs.[5] *See Cruz v. Bristol-Myers Squibb Co., PR*, 699 F.3d 563, 569 (1st Cir. 2012).

2. With regard to the remaining plaintiff, Mr. Alston, the District Court should dismiss his claims against all defendants except Spiegel, without prejudice and with leave to replead, for failure to comply with the threshold test of Fed. R. Civ. P. 8: that a plaintiff must set forth a "short and plain statement" of his claims showing that he is entitled to relief.

3. Alston's claims against Spiegel should be dismissed with prejudice for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

## II. <u>Facts</u>

The facts as alleged in the amended complaint are as follows.

### A. Defendants

Defendant Town of Brookline "is a duly organized town in the Commonwealth of Massachusetts… headed by an elected five-member Board of Selectmen and a representative town meeting." (#21 at ¶110.)

Defendant Brookline Board of Selectmen comprises elected officers of the Town. *Id.* at

---

[5] Plaintiffs have included class allegations. (#21 at ¶¶247-50.) Although the commonality requirements of Rule 20 and 23 are analogous, as is made clear in the text of the Rules, joinder under Rule 20 is a separate issue from class certification under Rule 23.

¶111. The Selectmen serve as the Police and Fire Commissioners, and hold ultimate decision-making power for hiring, firing, promotion, demotion, and disciplinary suspension of Brookline police officers and firefighters. *Id.* at ¶111. They also hold authority to hire and fire Town employees such as the town administrator, town counsel, director of human resources, police chief, and fire chief. *Id.* They adopt and oversee Town administrative policies, and appoint and serve on committees to address Town issues. *Id.* The elected Chair of the Brookline Board of Selectmen ("Chair") sets the agenda for the Board and communicates with administrative staff. *Id.*

At some time relevant to this suit, DeBow was the Town's human resources director, Murphy was town counsel, and Spiegel was a town meeting and advisory committee member. *Id.* at ¶¶119, 120, 208. The remaining individual defendants, DeWitt, Goldstein, Daly, Mermell, and Wishinsky, served on the Board. *Id.* at ¶¶112-16.

### B. Plaintiff Gerald Alston

#### 1. Pender Voicemail and Investigation

Gerald Alston, who is Black, joined the Brookline Fire Department in 2002. (#21 at ¶102.) On May 28, 2010, Alston was injured at work and heard "rumors that his supervising officer, Lt. Paul Pender, was claiming that [Alston] was faking his injury to obtain leave." *Id.* at ¶175. Pender enjoys privileges in Brookline because he is White and because his father was a Brookline firefighter and boxer. *Id.* at ¶176. On May 30, Pender left a voicemail for Alston; at the end of the voicemail Pender said "fat fuck" and "fucking nigger." *Id.* at ¶¶177-78. Pender later told Alston that the comments were not directed at him, but rather at "a gangbanger" or an "18-wheel truck that cut him off in traffic." *Id.* at ¶181. Pender considered the situation a joke,

and accused Alston of having a vendetta against him. *Id.*

Alston reported the message to the Fire Department's chief operating officer, who took no action. *Id.* at ¶¶179-80. On July 27, 2010, Alston filed a written complaint with the Town, and met with the fire chief, town counsel, and "human resources." *Id.* at ¶182. Upon hearing the message, town counsel said "we have a problem." *Id.* The fire chief offered to fire Pender, but Alston refused; the chief then said he would make Pender ineligible for promotion. *Id.* After this meeting, the Town transferred Pender to a different firehouse and opened an investigation. *Id.* at ¶184. During the investigation, the Town pressured Alston to drop his complaint: the director of human resources, defendant Sandra Debow, asked Alston in a phone conversation "how long he wanted [Pender] to suffer." *Id.* at ¶185. Alston told Debow that he wanted the Town to follow its policies; she then called Alston an "asshole" and hung up. *Id.* The Union "spread rumors that Mr. Alston had made a false allegation of racism against Mr. Pender" and sent a representative to a meeting with Debow and Alston. *Id.*

By mid-August 2010, the entire Board knew of the voicemail and investigation. *Id.* at ¶186. It gave Pender "an extremely short suspension" with pay. *Id.* at ¶187. A few days after the suspension, the Town promoted Pender from lieutenant to acting captain. *Id.* at ¶190. The Board then adopted a "'zero tolerance' anti-discrimination policy" which did not change the Town's process for investigating discrimination complaints. *Id.* at ¶188. At a Board-ordered mediation between Pender and Alston, Pender refused to shake Alston's hand or apologize to him. *Id.* at ¶189. The Town "arranged for" Pender and his family to fly to the White House where Pender received an award; it did not inform the White House of the investigation or suspension. *Id.* at ¶190.

### 2.   Retaliation against Alston

The Town and the Union "retaliated against Mr. Alston because he protested the Town's policy of racial subordination of [B]lack people and racial favoritism toward [W]hite people." *Id.* at ¶191. The Board and the Town "created a retaliatory and hostile work environment" by training supervisors to "secretly report workplace friction" with Alston; having human resources prepare reports "portraying [Alston] as a problem employee;" and painting Alston as a "disruptive and overly-sensitive" person who "imagin[ed] or fabricat[ed] complaints of harassment and retaliation." *Id.* at ¶¶196-97. The Union also retaliated against Alston, by "falsely claiming that [his] complaint against Mr. Pender was meritless and self-interested." *Id.* at ¶193. Alston "protested the Union's retaliation against him but the Town did nothing to address it." *Id.* at ¶195. Although Alston's doctor recommended medical leave due to stress, the Town required him to use sick time instead of granting paid leave. *Id.* at ¶198.

Alston filed a formal complaint with the Massachusetts Commission Against Discrimination ("MCAD") and filed a lawsuit in the Massachusetts Superior Court. *Id.* at ¶199. In response, the Town perpetrated "more harassment and retaliation" against Alston. *Id.* The Town conducted a sham investigation and produced a report showing that Alston had fabricated his complaints. *Id.* at ¶200. The Town "encouraged supervisors to deny" retaliating against Alston. *Id.* at ¶201. In spring 2013, while Alston's MCAD complaint was pending, the Board voted to make Pender's promotion permanent. *Id.* at ¶203. The Town denied Alston promotions to acting lieutenant, although he was "the senior man on the truck." *Id.* at ¶204. At a committee meeting, defendant Nancy Daly distributed a letter that had been sent to the local Brookline newspaper. *Id.* at ¶207. The letter "attacked [Alston's] courage and credibility," and "was

solicited from a retired Black firefighter for the purpose of retaliating against" Alston. *Id.* The next day, defendant Stanley Spiegel distributed the letter to town meeting members to provide "'diversity' of opinion regarding the lawsuit." *Id.* at ¶208. The Board "blocked the human relations commission from intervening," and "refused to release the Town's investigatory reports and clarify public uncertainty." *Id.*

### 3. "Leave" Incident

In mid-December 2013, Alston found the word "Leave" written on a door underneath his jacket. *Id.* at ¶210. Alston photographed the message and told other firefighters "this is the kind of thing that makes people go postal." *Id.* Alston said "he was not like that though" and that "he was going to make the Town pay legally." *Id.* The Union reported the writing to the Town, the fire chief, the human resources director and town counsel, but the Town did not immediately investigate. *Id.* at ¶¶210-11. Instead, because of his "going postal" comment, the Town began a sham investigation of Alston under the workplace safety policy, requiring him to have a fitness-for-duty investigation with the Town psychiatrist. *Id.* Further, the Town issued a stay-away order requiring Alston to stay away from the Town's firehouses. *Id.* at ¶¶215-16. The Union asked for police officers to be posted at the firehouses, but the fire chief refused. *Id.* at ¶216.

Three months after the writing, the Town called Alston for an interview, but refused to allow his attorney to attend. *Id.* at ¶213. Five months after the writing, the Town wrote in a report that Alston himself or a member of a neighboring fraternity could have written the word. *Id.* at ¶211. However, the Board knew this was false, and that the word was actually intended as retaliation for the lawsuit Alston had filed. *Id.* at ¶212.

On January 6, 2014, the Town's psychiatrist concluded Alston posed no threat to

workplace safety. *Id.* at ¶216. However, in May 2014 the Town "falsely determined that Mr. Alston had violated the workplace safety policy." *Id.* at ¶217. The Town placed Alston on unpaid leave. *Id.* at ¶218. The Union did not object to this or file a grievance, and it "did not object to the finding of a violation, did not attempt to negotiate on behalf of Mr. Alston, and did not seek injured on duty status for Mr. Alston." *Id.* The Town conditioned Alston's return to duty upon accepting "abusive and onerous conditions designed to protect it in litigation and to leave the impression that [Alston] was to blame for hostility he encountered in the fire house." *Id.* at ¶219.

The Town also obtained Alston's medical records through his Superior Court case; the records indicated some cocaine use prior to December 2011. *Id.* at ¶220. Based on these records, the Town instructed the Town psychiatrist to conduct an additional exam including this information. *Id.* at ¶221. Further, the Town "leaked the information in Mr. Alston's file" to defendant Spiegel and "others." *Id.* at ¶222. The Town has no written substance abuse policy and there was no indication that Alston continued to use drugs. *Id.* at ¶223. However, the human resources director included two years of random drug testing in Alston's conditions to return to duty. *Id.* This was retaliatory and different from the treatment of White employees. *Id.*

In October 2014, Alston used up his remaining sick and leave time and received his final paycheck. *Id.* at ¶224. The Union did not contact Alston to check on his health or wellbeing. *Id.* at ¶224. In November 2014, the human resources director "scheduled a reasonable accommodation meeting for the purpose of terminating Mr. Alston." *Id.* at ¶225. Alston's counsel attempted to schedule a meeting with Goldstein. *Id.* at ¶226. In response, assistant town counsel threatened Alston's counsel via email. *Id.* At the end of November, Alston filed a letter with the Board, asking them to 1) conduct an independent investigation; 2) grant him a hearing

to address his appeal; 3) investigate a recent MCAD finding against the fire chief and human resources director involving a Jewish firefighter; 4) investigate whether the Town had misled MCAD about its reasons for requesting anti-discrimination training; and 5) conduct a racial climate review of the entire department. *Id.* at ¶227. The Board did none of these things. *Id.* at ¶228.

In December 2014, Alston again asked the Board to conduct an investigation of his case and place him back on administrative leave. *Id.* at ¶229. Instead, the Town retaliated against Alston by providing Spiegel with Alston's file.[6] *Id.* at ¶230. Spiegel then intimated to a "supporter" of Alston that there was damaging information in Alston's file. *Id.* After Alston complained, Town counsel spoke to Spiegel and a witness, and wrote a "sham report" the next day concluding that Spiegel had not engaged in misconduct. *Id.* at ¶231.

Alston and his attorney arranged to inspect his personnel file; when they arrived, a police detective was present to observe. *Id.* at ¶232. After Alston's attorney called Goldstein, the police detective was removed. *Id.* In reviewing his file, Alston noted that information was missing. *Id.* at ¶233. When he brought this up to human resources, a specialist reviewed his file with the police detective. *Id.* The specialist added a missing page with redactions "that appeared to have been made that day by the human resources director," and Alston discovered that there were two relevant letters missing from the file. *Id.*

In January 2015, Alston and his attorney met with Goldstein and town counsel. *Id.* at ¶234. Goldstein admitted "doubts" about Pender's story, disagreed with Pender's promotion, and

---

[6] No further explanation of this allegation is included in the amended complaint.

claimed to be powerless with regard to Spiegel's comments. *Id.* During the meeting, town

counsel "superfluously repeat[ed] the phrase 'fucking nigger.'" *Id.* at ¶235. The meeting ended

when Goldstein perceived that Alston was threatening him, and left abruptly. *Id.* at ¶236.

Goldstein threatened to file charges against Alston, but no charges were actually filed. *Id.*

at ¶¶236-37. In retaliation, the Town circulated a flyer to the police with a picture of Alston,

falsely stating that Alston had threatened Goldstein and was possibly armed. *Id.* at ¶237.

In February 2015, Alston had a second fitness-for-duty exam; the new psychiatrist added

conditions "including meeting with a therapist weekly and a psychiatrist monthly and releasing

them to discuss his treatment with the Town." *Id.* at ¶238. The Board endorsed the conditions. *Id.*

Alston refused the conditions, and asked to meet with the Board and Union, who declined his

requests. *Id.* at ¶239. Alston obtained a review from an independent psychiatrist, who concluded

that his problems were not "in his head" and required adjustment of the firehouse environment,

not psychiatric treatment. *Id.* at ¶240. Alston suffered severe impacts, including divorce, debt,

deteriorated health, and loss of "the job that he loved to do and excelled at." *Id.* at ¶241.

### C. Plaintiff Juana Baez

Juana Baez is a Brookline resident from the Dominican Republic who identifies as

Hispanic. *Id.* at ¶¶47, 64, 106. On August 15, 2015, Baez and her newborn baby had just

returned from the hospital. *Id.* Her baby's father, Alberto Rodrigo-Torres, parked Baez' car near

her home in an area not marked as a tow zone or fire lane while he carried groceries upstairs.[7] *Id.*

Baez had a permit to park on the property. *Id.* While Rodrigo-Torres was inside, a White tow

---

[7] The amended complaint does not specify the race of Rodrigo-Torres, who is not a party to this action.

truck driver hooked up the car. *Id.* Rodrigo-Torres and Baez attempted to persuade him not to

tow the car and offered to pay the "drop fee." *Id.* at ¶65. The driver cursed and yelled, refused to

let them pay the fee, and opened and closed his truck door in a way that almost hit Baez and her

baby. *Id.* Rodrigo-Torres stepped in the bed of the tow truck to prevent the driver from leaving,

and called the police. *Id.*

When the police arrived, they accepted the tow truck driver's version of events, and took

no action towards him. *Id.* at ¶¶47, 66. Instead, they handcuffed Rodrigo-Torres and ordered him

not to speak Spanish; demanded a passport from Baez, who is a U.S. citizen; and falsely accused

Baez of breaking the tow truck's window. *Id.* at ¶66. Although the driver accused Rodrigo-

Torres of scratching his truck with a key, the police took no pictures of the alleged damage and

did not examine Rodrigo-Torres' keys. *Id.* at ¶69. Twice, the police left Rodrigo-Torres in a

closed car without air conditioning although the outside temperature was approximately 85

degrees. *Id.* at ¶70.

Rodrigo-Torres was charged with malicious destruction of property and Baez was

charged with disorderly conduct. *Id.* at ¶67. Rodrigo-Torres' charges remain pending, although

no evidence against him has been produced. *Id.* at ¶71. Baez was summonsed for an arraignment

rather than a show cause hearing, despite the fact that the police did not witness the disorderly

conduct reported by the tow truck driver. *Id.* at ¶68. Although the case was immediately

dismissed, Baez had to pay court costs of $150. *Id.* at ¶71. Further, the police referred Baez to

the Department of Children & Families ("DCF"). *Id.* at ¶68. The DCF worker closed the referral,

"telling Baez that her problem with the Brookline police was the color of her skin." *Id.* at ¶71.

Baez suffered severe emotional distress, and is now afraid of the police. *Id.* at ¶72.

In November 2015, Baez wrote to the Board complaining about the police's treatment of her, and asking that the Town and the police contact her only through counsel. *Id.* at ¶73. The Town Administrator responded that the police would contact Baez directly, "[b]ecause that's the way we do it." *Id.* at ¶74. On January 20, 2016,[8] after Baez spoke at a public Board meeting about the incident, the police asked Baez to sign a release form. *Id.* at ¶75. Although the Town's procedures would require it to notify Baez of an investigation, she has not received any notification. *Id.*

### D.  Plaintiff Rogelio Rodas

Rogelio Rodas is a Brookline resident of Guatemalan descent who identifies as Hispanic. *Id.* at ¶¶47, 107. In the fall of 2015, Rodas, his 12-year-old son, and a neighbor were returning to their home. *Id.* at ¶76. The entrance to their parking lot was blocked by orange cones due to utility work, and Brookline police officer Jeffrey Hudnick was on paid detail. *Id.* Rodas asked how he could enter the lot, and Officer Hudnick told Rodas to drive over the cones. *Id.* Rodas did so, and moved a fallen cone to the sidewalk so that other residents could enter the parking lot. *Id.* Officer Hudnick "ran after Rodas, grabbed him by the shoulder, and dragged him back to the entrance of the parking lot." While Rodas' son was crying, Officer Hudnick screamed at Rodas to "pick up the fucking cone," threatened to arrest him for destroying property, and said he would "shove the cone up [Rodas'] ass." *Id.*

When Rodas complained to the Brookline police department, he was invited to a meeting with Officer Hudnick and Sergeant Tom Ferris. *Id.* at ¶77. Rodas was hoping that Officer

---

[8] The amended complaint says January 20, 2015, but this date is before the alleged incident.

Hudnick would apologize to his son, but instead Officer Hudnick accused Rodas of behaving rudely towards him. *Id.* There exists video footage of the incident, but the police have not shared it with Rodas. *Id.* at ¶78. The police investigation remains ongoing. *Id.*

On January 27, 2011, Rodas' 11-year-old son was assaulted by a White man. *Id.* at ¶146. Rodas reported the incident to the police and identified the man. *Id.* The police applied for a criminal complaint, but deliberately did not notify Rodas of the hearing. *Id.* When no witnesses appeared, the magistrate dismissed the complaint.[9] *Id.*

### E.  Plaintiff Cruz Sanabria

Cruz Sanabria is a Puerto Rican and Hispanic Brookline resident. *Id.* at ¶¶47-48, 105. In 2013, Sanabria applied to be on the Town's civil rights commission. *Id.* at ¶48. During an interview for that position, members of the Board discouraged Sanabria from identifying as Puerto Rican; "interrogated" him about his experiences of discrimination; and interpreted a particular experience of his as "not related to his race."[10] *Id.* In 2013 and 2014, Sanabria spoke against discrimination at public meetings, including Brookline's Town Meeting. *Id.* at ¶49.

In 2014, Sanabria's White neighbors "began harassing him by calling the police for fabricated and trivial reasons." *Id.* at ¶50. The police "did nothing to prevent or deter" the calls. *Id.* On March 28, 2014, Sanabria told the police "that his neighbor had pushed him and sworn at him," and the police merely wrote a report. *Id.* On August 27, 2014, Sanabria's neighbor falsely

---

[9] The allegations of paragraph 146 are emblematic of the problems throughout the amended complaint. These events appear to be time-barred, and have no factual link to other allegations. The officers are not named. There is no factual support for the conclusory allegation that the police intentionally refused to notify Rodas of the hearing.

[10] The amended complaint does not specify whether Sanabria was chosen to be on the civil rights commission.

accused him of vandalizing her bicycle; the police took no action. *Id.* at ¶51. "On November 17,

2014, the same neighbor falsely accused Sanabria of slamming a door in her face." *Id.* at ¶52.

The responding police officer determined "that the neighbor and her roommate were not

rational" and did not arrest Sanabria; later that evening, "the officer called Sanabria and

informed him that the neighbors were out to get him." *Id.* However, on December 7, 2014,

Sanabria received a summons to court for the charge of assault with a dangerous weapon (the

door). *Id.* at ¶53. Sanabria worried that he might lose his job and suffered "severe emotional

distress." *Id.* When he went to court, the clerk-magistrate dismissed the summons for lack of

probable cause. *Id.* at ¶54. The summons was issued in retaliation for Sanabria's opposition to

discrimination in Brookline. *Id.*

Sanabria met with the police chief, who did not admit wrongdoing. *Id.* at ¶55. Sanabria

filed a complaint with defendant Neil Wishinsky, then chair of the Board. *Id.* Chair Wishinsky

insisted that Sanabria meet with the police internal affairs investigator, even after Sanabria told

him that the investigator was biased and had similarly recommended unfounded criminal charges

against a Black person. *Id.* at ¶57. The police covered up evidence favorable to Sanabria and

started a false rumor "that Sanabria had a 'problem' with women." *Id.* at ¶¶58-59. Sanabria's

counsel wrote to the Board, requesting that evidence be released. *Id.* at ¶60. Further, counsel

asked the Board "not to refer the cover up of public records to Town Counsel because the keeper

of records for the police department was Town Counsel's brother-in-law." *Id.* The Board referred

the matter despite Sanabria's concerns about conflict of interest, released some of the recorded

calls only after Sanabria complained to the Attorney General, and refused to hold a hearing on

the matter. *Id.* at ¶¶61-63.

16

**F.  Plaintiff Demetrius Oviedo**

The amended complaint does not specify Oviedo's race. Discrimination on the basis of race is a threshold requirement of the claims alleged. *See,* e.g., *Ríos-Colón v. Toledo-Dávila*, 641 F.3d 1, 4 (1st Cir. 2011); #21 at ¶¶252, 261. Since he has not provided this rudimentary information, it is not necessary to recount his factual allegations.

**G.  Plaintiff Deon Fincher**

Deon Fincher is a Black man who was hired in 2009 as a laborer in the Town's department of public works, sanitation division. (#21 at ¶¶87, 109.) He was the only Black worker in that division. *Id.* Under the Town's contract, two laborers work on each garbage truck, dividing duties equally between driving and throwing trash into the truck. *Id.* at ¶¶88, 90. However, Fincher did not know this and so, had to throw trash full time. *Id.* Fincher also did not get full employment status for nine months, instead of the regular probationary period of six months, and did not get as much overtime as White workers. *Id.* at ¶89.

 Fincher was treated differently than White workers in several respects. After he suffered work-related injuries to his shoulder, requiring surgery, the Town allowed Fincher's partner to drive full time while refusing Fincher's requests for alternate job assignments or reduced hours, despite medical evidence of his injuries and restrictions. *Id.* at ¶¶90-93, 101. While he was injured, Fincher received worker's compensation benefits, in contrast to an injured White employee who had received a "generous retirement benefit." *Id.* at ¶¶95, 101. Fincher was also required to produce documentation for work absences, unlike White workers. *Id.* at ¶94. Fincher's supervisors were hostile; one yelled at him for requesting a union representative, and another demanded Fincher return to work to complete administrative paperwork at a time when

17

his father was hospitalized and transportation would be difficult. *Id.* at ¶¶96, 97. In contrast, when a White employee drove to work drunk, he merely had to apologize. *Id.* at ¶96.

Fincher was also harassed by police while in Brookline. *Id.* at ¶98. One day while Fincher was in a dog park, a police officer demanded to see his dog's tags and tried to make him leave. *Id.* at ¶99. Fincher was the only Black man in the park; the officer did not stop or question any White people. *Id.* The officer relented when a coworker told the officer Fincher worked for the Town. *Id.* Another time, police told Fincher he could not park in a lot behind a store or leave his dog in the car; again, the officer stopped harassing Fincher when he learned he worked for the Town. *Id.* at ¶100.

### H.  Policies and Additional Allegations

The amended complaint includes at least twenty-one alleged municipal policies:

1. Town "requires Black and Hispanic people to be deferential, compliant, and obedient to [W]hite people, particularly on issues involving race and racism."[11] (#21 at ¶127a.)

2. Town "opposes efforts by citizens and employees to enforce [Town's] written policies and bylaws regarding anti-discrimination." *Id.* at ¶127b.

3. Town "routinely and habitually denies well founded claims of racial discrimination and retaliation and forces individuals to sue to vindicate their rights," having never sustained a claim of racial bias against an employee or police officer. *Id.* at ¶127c.

4. Town "conceals and covers up incidents of racial discrimination and retaliation by conducting sham investigations and reviews, by issuing false and misleading reports, and

---

[11] The amended complaint contains no factual allegations explaining how the Town has the power to compel individual behavior.

by forcing individuals with claims to sign gag orders prohibiting them from revealing the

Town's misconduct." *Id.* at ¶127d.

5. Town "defames the character of persons who oppose racial discrimination and leaks

confidential information in order to discredit them." *Id.* at ¶127e.

6. Town "retaliates against those who protest racial discrimination" through "threatening to

reveal confidential information, threatening criminal prosecution, and by employing the

police to intimidate them." *Id.* at ¶127f.

7. Town "uses its diversity department as window dressing to maintain the sham of equal

opportunity." *Id.* at ¶127g.

8. Town "opposes affordable housing production plans and fair housing testing." *Id.* at

¶127h.

9. Town "disfavors Black and Hispanic employees in its hiring, promotion, and disciplinary

practices." *Id.* at ¶127i.

10. Town's "police department harasses Black and Latino residents and employees," by

stopping and questioning them on pretexts without reasonable suspicion; arresting and

prosecuting them without probable cause; "verbally and physically harassing them"; and

"following and surveilling them" without cause. *Id.* at ¶127j.

11. Town "engages in favoritism and affirmative action towards [W]hite residents and

employees, while disfavoring Black and Hispanic residents and employees." *Id.* at ¶128.

12. Town "privileges [W]hite people over other racial and ethnic groups." *Id.* at ¶128a.

13. Town "ignores, minimizes, and covers up misconduct by [W]hite people." *Id.* at ¶128b.

14. Town "hires, promotes, and retains [W]hite people who have committed serious

19

misconduct." *Id.* at ¶128c.

15. Town "treats violations of law and policy committed by [W]hite people leniently." *Id.* at ¶128d.

16. Town "favors [W]hite people [who are less qualified than other applicants] for employment positions and for positions on appointed boards and commissions." *Id.* at ¶128e.

17. Town "reserves… for [W]hite people" 25 department head positions excluding the diversity department, the superintendent of schools position, and the headmaster of Brookline High School position. *Id.* at ¶128f.

18. Town "defends [W]hite people against any challenge to the regime of racial subordination." *Id.* at ¶128g.

19. Town "gives warnings to [W]hite people for traffic violations for which people of color receive fines."[12] *Id.* at ¶128h.

20. Town "releases [W]hite motorists for [unlicensed driving] violations" for which "it arrests people of color." *Id.* at ¶128i.

21. Town "allows [W]hite people to avoid prosecution for criminal acts." *Id.* at ¶128j.

In addition, the amended complaint contains a number of vague allegations concerning unnamed individuals who are not parties to the case. This information is voluminous, encompassing twenty-six paragraphs and eleven pages of the amended complaint. *Id.* at ¶¶135-158, 243-246. For example,

On May 20, 2015, a prominent Brookline businessman of Indian descent

---

[12] This, and the following policy, are the *only* mention of traffic or driving violations in the entire amended complaint, and are unrelated to the plaintiffs' individual experiences.

complained in writing to the [Board] about an incident with the police that had occurred the day before. The complaint letter outlined in detail a series of events that led the businessman to conclude that his rights had been violated and that the Brookline police had tried to provoke an incident that would justify his arrest. The supervising officer was Sgt. Michael Raskin [who is not a defendant in the instant case]. The [Board has] refused to hold a hearing on the complaint in contravention of their own policies and duties as police commissioners. The businessman has experienced discrimination from the Brookline police on two prior occasions. Once, while crossing Beacon Street in Coolidge Corner, he alerted a detail officer to a dangerous situation. The detail officer refused to assist and told him, 'go back to where you came from,' referring to his country of origin. On another occasion, a police officer followed his car for several blocks, positioning the police car right up against his rear bumper. When he complained to the police department, the supervisor told him that his license plate was one digit off from a car that had been reported stolen.

*Id.* at ¶153.

In December 2014, a member of the [Town's] diversity commission was confronted by a police officer in Coolidge Corner. As a result of this interaction, over a twelve month period, the commissioner conducted an investigation of other Black men's experiences with the police in Coolidge Corner. He discovered that all six Black men that he spoke with had experienced racial harassment by the Brookline police.

*Id.* at ¶158.

On the day the Charlestown church shootings were announced in the spring of 2015, [W]hite students at Brookline [H]igh displayed a slide in class that included the words 'motherfucking nigger.' The class included six Black students. The administration did not call the police to report a hate crime. The administration waited several days before informing the parents of the Black students that [W]hite students had displayed a racial slur to the class. The administration conducted a sham investigation, and did not suspend the [W]hite students who displayed the slide. The administration and town counsel classified the racist message as a technology violation rather than hate speech or racial harassment to protect the record of the [W]hite students and the Town.

*Id.* at ¶154. Because these allegations are only tangentially related to the named plaintiffs' actual claims, the remaining information will not be summarized here.

### III. <u>Case History</u>

Plaintiff Alston filed a discrimination charge with MCAD.[13] (#21 at ¶199.) He then

removed his case to state court; it was later dismissed "for procedural reasons."[14] *Id.* at ¶205.

On December 1, 2015, the instant complaint was filed with Mr. Alston as the only named

plaintiff. (#1.) On January 12, 2016, the Town, the Board, and the seven individual defendants

moved to dismiss for failure to state a claim. (##10, 11, 14, 20.) On January 26, 2016, an

amended complaint naming the additional plaintiffs was filed (#21), and the above named

defendants, and in addition, the Union, subsequently moved to dismiss. (##34, 36, 45, 52.)

Defendant Spiegel also filed a motion for sanctions. (#54.) On April 8, 2016, the prior motions to

dismiss were denied as moot. (#57.) Plaintiffs opposed the motions to dismiss and Spiegel's

motion for sanctions (##40, 56, 64), and all defendants replied. (##65, 68, 71.)

### IV. <u>Severance of Plaintiffs</u>

The amended complaint relates the stories of eight[15] individual plaintiffs with no facts in

common.  Under Rule 20, multiple plaintiffs may join in a case when "they assert any right to

relief... with respect to or arising out of the same transaction, occurrence, or series of transactions

or occurrences," *and* "any question of law or fact common to all plaintiffs will arise in the

action." Fed. R. Civ. P. 20(a)(1). Where these conditions are not met, the district court has broad

---

[13] The amended complaint does not state the date of these filings or what, if any, MCAD proceedings
occurred before Alston removed his case to court.

[14] The amended complaint does not state the date of these events.

[15] Two of these, Estifanos Zerai-Misgun and Prentice Pilot, filed notices of dismissal. (##30, 31.) Their
allegations remain in the amended complaint (#21 at ¶¶17-46), but are not summarized here.

discretion to sever plaintiffs' claims *sua sponte* or on motion of a party. Fed. R. Civ. P. 21; *and see Bern Unlimited, Inc. v. Burton Corp.*, 25 F. Supp. 3d 170, 186 (D. Mass. 2014) (quoting *Wright & Miller*, 7 Fed. Prac. & Proc. Civ. § 1689). "Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." *Acevedo-Garcia v. Monroig*, 351 F.3d 547, 558–59 (1st Cir. 2003) (citing Fed. R. Civ. P. 21, 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2387 (1971), and 88 C.J.S. *Trial* § 17 (2003) ("A severance occurs when a lawsuit is divided into two or more separate and independent or distinct causes")).

> In deciding to sever, courts look to
>
> (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims.

*Spinal Imaging Inc. v. State Farm Mut. Auto. Ins. Co.*, No. CIV. A. 12-11498-RWZ, 2013 WL 1755200, at *4 (D. Mass. Apr. 24, 2013) (citing *Preferred Med. Imaging v. Allstate Ins. Co.,* 303 F. Supp. 2d 476, 477 (S.D.N.Y. 2004)).

Here, all factors weigh in favor of severing Alston's claims from those of the other plaintiffs. None of the plaintiffs have alleged the same "transaction or occurrence"; there is no factual overlap between any of their claims. Nor can one say that they have they alleged a "series of transactions or occurrences" similar enough to meet the standard. *See,* e.g., *Coughlin v. Rogers*, 130 F.3d 1348, 1350 (9th Cir. 1997) (common allegation of delay in immigration applications insufficient to form series); *Harris v. Spellman,* 150 F.R.D. 130, 132 (N.D. Ill. 1993) (similar procedural errors in independent administrative hearings did not form

series, when hearings involved different incidents of purported misconduct raising different

issues of law); and *Nassau County Ass'n of Ins. Agents v. Aetna Life & Casualty Co.,* 497 F.2d

1151 (2nd Cir. 1974) (no series of insurance transactions where defendants' actions "were

separate and unrelated, with terminations occurring at different times for different reasons with

regard to different agents).

Plaintiffs' allegations of an overarching "policy or custom" cannot glue together these

disjointed pieces.  Although in their opposition to the defendants' motion to dismiss, plaintiffs

cite cases standing for various propositions, such as, local governments may be sued for

enforcing a policy of racial discrimination, *see* #40 at 4-5, plaintiffs cite no cases, and the court

can find none, in which such a broad-ranging number of fact scenarios encompassing so many

different legal claims have been brought in one case.  It is true that under certain circumstances,

a widespread policy of discrimination may form a basis for joinder.

> A summary of [joinder] cases indicates that in causes of action involving
> discrimination, Title VII or otherwise, courts look to whether the discrimination
> took place at roughly the same time, if it involved the same people, whether there
> is a relationship between the discriminatory action, whether the discriminatory
> action involved the same supervisor or occurred within the same department, and
> whether there is a geographic proximity between the discriminatory actions. ...
> On the other hand, … allegations of a common discriminatory policy or practice,
> or a company-wide policy of discrimination, could tilt the balance in favor of
> joinder despite those other factors which might favor severance.

*Wynn v. Nat'l Broad. Co.*, 234 F. Supp. 2d 1067, 1087 (C.D. Cal. 2002), *dismissed*, No. CV00-

11248-SVW(RZX), 2002 WL 31681865 (C.D. Cal. Mar. 6, 2002) (quoting *Byers v. Illinois State

Police,* No. 99–C8105, 2000 WL 1808558 *4 (N.D. Ill. Dec. 6, 2000)). However, this is not such

a case. It is not like *Mosley v. Gen. Motors Corp.*, 497 F.2d 1330 (8th Cir. 1974), where the

policy concerned only employment, or *United States v. Mississippi,* 380 U.S. 128 (1965), where

24

the policy was a state statute affecting voting rights. Here, plaintiffs have not alleged "a" policy. They have alleged *twenty-one* separate unwritten policies drawing upon different factual predicates and broad-ranging legal doctrines, including discriminatory policing practices, employment and hiring discrimination, and various forms of First Amendment retaliation. The facts alleged are simply not sufficiently related to form a "series of transactions or occurrences."

Nor does the amended complaint present common questions of law or fact. It is not enough that plaintiffs' claims "arise under the same general law." *See,* e.g., *Coughlin,* 130 F.3d at 1351 (severing where "each Plaintiff's claim is discrete, and involves different legal issues, standards, and procedures"); *Botero v. Commonwealth Limousine Serv. Inc.*, 302 F.R.D. 285, 286–87 (D. Mass. 2014) (shared operative facts are necessary, and "joinder is not warranted simply because defendants allegedly committed the exact same violation of the law in exactly the same way") (citations and quotation marks omitted).

Plaintiffs' allegation that defendants conspired to discriminate does not connect their claims. Courts have found joinder inappropriate, even in the face of conspiracy allegations, when Rule 20 requirements are not met. *See,* e.g., *Abraham v. Am. Home Mortgage Servicing, Inc.*, 947 F. Supp. 2d 222, 230 (E.D.N.Y. 2013) (standing alone, conspiracy allegation cannot create common transaction or occurrence under Rule 20, "nor does it obviate the need for separate proof as to each individual claim") (quoting *Richards v. Deutsche Bank Nat'l Trust Co.,* 2012 U.S. Dist. LEXIS 115302, CV 12–4786, at *2 (C.D. Cal. Aug. 15, 2012)); *Pac. Century Int'l Ltd. v. Does 1-101*, No. C-11-02533-DMR, 2011 WL 2690142, at *4 (N.D. Cal. July 8, 2011) (severing defendants even in light of specific conspiracy claims, where plaintiff could not meet Rule 20 requirements); and *Insolia v. Philip Morris Inc.,* 186 F.R.D. 547, 549 (W.D. Wis. 1999)

(severing plaintiffs where a conspiracy charge was "the only thread holding together plaintiffs' argument").

Cases examining Rule 23's requirement of a common question of law or fact for certification of a class aid interpretation of Rule 20's analogous commonality provision.[16] In the class certification context, it "is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (in context of class action, noting that discrimination laws "can be violated in many ways—by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company" and finding that "mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once."). Here, the factual scenarios range even more broadly. In *Dukes*, all the plaintiffs alleged employment discrimination. In contrast, here plaintiffs allege discriminatory acts in hiring, employment conditions, First Amendment retaliation, accommodations for injury, and policing practices. The applicable legal standards for these multiple types of discrimination vary, and there is no common answer – or question – that can address all the plaintiffs' issues in one stroke.

Even if plaintiffs could overcome these difficulties, examination of judicial economy,

---

[16] *See In re EMC Corp.*, 677 F.3d 1351, 1355 (Fed. Cir. 2012) (Rule 23 and Rule 20 both serve to limit the scope of an action "consistent with fairness to the parties") (citation omitted); *Mosley v. Gen. Motors Corp.*, 497 F.2d 1330, 1334 (8th Cir. 1974) ("cases construing the parallel requirement under Federal Rule of Civil Procedure 23(a) provide a helpful framework for construction of the commonality required by Rule 20").

resolution potential, and presentation of proof at trial would still weigh in favor of severance.

Each plaintiff has alleged events involving different actors and circumstances. Combined

litigation of these claims would "devolve into 'scores of mini-trials involving different evidence

and testimony' regarding each [plaintiff's] factual circumstances." *Botero,* 302 F.R.D. at 287

(citing *Patrick Collins, Inc. v. Does 1–38,* 941 F.Supp.2d 153, 165 (D. Mass. 2013)). Keeping

these claims together would not economize the court's time; as in *Coughlin,* "even if Plaintiffs'

cases were not severed, the court would still have to give each claim individualized attention."

130 F.3d at 1351. As addressed above, because the plaintiffs' claims vary so widely, there is

little chance of a common settlement.

Finally, no party will suffer prejudice. Plaintiffs may replead their claims individually.

Defendants will not be disadvantaged by responding to those individual suits; rather, they may

have a chance to address each plaintiff's claim fully, and come to a separate resolution on the

merits of each individual claim.

For the reasons above, I recommend that all plaintiffs other than Alston be severed from

this action and dismissed without prejudice.

### V. Pleading Standards

The court now turns to the remaining plaintiff, Gerald Alston. With regard to his claims,

the amended complaint fails to meet the requirements of Rule 8(a) of the Federal Rules of Civil

Procedure. This rule mandates that a complaint contain "a short and plain statement of the claim

showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). At a minimum, the

complaint must "'give the defendant fair notice of what the plaintiff's claim is and the grounds

upon which it rests.'" *Calvi v. Knox County*, 470 F.3d 422, 430 (1st Cir. 2006) (quoting

*Educadores Puertorriqueños en Acción v. Hernández*, 367 F.3d 61, 66 (1st Cir. 2004) (further

citation omitted)); *Barbosa v. Commonwealth of Massachusetts,* No. CV 14-13439-ADB, 2016

WL 3976555, at *2 (D. Mass. July 22, 2016). This means that the statement of the claim must

"'at least set forth minimal facts as to who did what to whom, when, where, and why.'" *Calvi*,

470 F.3d at 430 (quoting *Educadores*, 367 F.3d at 68). Although the requisites of Rule 8(a)(2)

are slight, "'minimal requirements are not tantamount to nonexistent requirements.'" *Id*. (quoting

*Gooley v. Mobil Oil Corp*., 851 F.2d 513, 514 (1st Cir. 1988)).

The amended complaint falls far short of the Rule 8(a) standard in many respects. It is 85

pages and 270 paragraphs long. Six plaintiffs, who seek class certification, have brought charges

against the Town, the Board, the Union, and eight individuals. Their allegations span centuries,

and profess no less than 21 supposed unconstitutional policies by the Town. (#21 at ¶¶127-32.)

The amended complaint presents broad-ranging claims, including many allegations of historical

events that fall far beyond the statute of limitations. (*See,* e.g., #21 ¶124 ("the late 18th century"

and "the 1930's").) Additionally, the amended complaint contains several rough sketches of

events involving non-parties to the action, lacking key features such as names and dates. *See id.*

at ¶¶136-158. It simply is not clear whether the amended complaint presents an actionable case

or controversy that the court can resolve, or states colorable claims against the named

defendants.

Even limiting the inquiry to Alston's claims, the court is unable to determine which facts

Alston alleges, against which defendant, pursuant to which policies, and under what theory of

liability. As a few examples of this, the amended complaint contains information apparently

irrelevant to the actual claims: "Before becoming a Brookline firefighter [in 2002], Mr. Alston

performed in the R&B group 'Classic Example,' which produced several albums and a Billboard 100 hit." *Id.* at ¶102. Some allegations leave open the inference that Alston might be involved, but the link is unclear. *See id.* at 192 (allegations concerning an anonymous poster on an online message board, who was not Mr. Alston, and a response from the president of Local 950 to "the faceless coward," not identified as Mr. Alston). The amended complaint is repetitive and inconsistent. *See id.* at ¶¶3, 134, 177-78 (repeating voicemail allegations); ¶¶120, 132 (Murphy was appointed in 2013; Murphy was appointed "last year"). Alston's allegations are scattered throughout the document among other plaintiffs' facts – some under the heading "Gerald Alston," some under "Parties," some under other headings – and do not present a coherent narrative. *See id.* at ¶¶2-16, 102, 163, 168, 174. Many of the allegations lack dates that would enable the court to apply the statute of limitations, and it is impossible to tell whether they are presented in chronological order. *See id.* at ¶¶187-90 (Pender suspended; Board's "zero-tolerance" policy adopted; Pender and Alston ordered to mediation; Pender promoted to acting captain "a few days after his suspension was handed down").

The amended complaint refers to multiple Town bodies in an inconsistent fashion, making it unclear how many entities there are, which ones might be controlled by the Board, and what each is accused of doing. *See,* e.g*., id.* at ¶6 ("the Town's civil rights commission"), ¶120 ("town meeting" and "town moderator"), ¶148 ("town's advisory committee"), ¶164 ("the Town's human relations commission, also described as the Town's civil rights agency"), ¶207 ("Selectmen's diversity committee"), and ¶245 ("diversity commission"). The confusion is compounded by the allegation that the Town dismantled one group and created another with different powers. *Id*. at ¶172 ("In 2014, the Selectmen's committee successfully passed an article

29

in Town Meeting abolishing the human relations commission and creating a new diversity commission").

The amended complaint contains only conclusory allegations against the Union. *Id.* at ¶185 (the Union "spread rumors that Mr. Alston had made a false allegation of racism against Mr. Pender," without specifying when, how, what was said, or who was involved); *Id.* at ¶156 (the Union filed a grievance on behalf of an unnamed White firefighter in 2015, "pursuant to its practice of filing grievances on behalf of [W]hite employees regardless of the evidence"; no further information about the practice is alleged).

Obviously, Alston complains of racism. But in making his claims, he has to follow the dictates of the law. "[T]here is no duty [on the part] of the trial court or the appellate court to create a claim which appellant has not spelled out in his pleading." *Dep't of Recreation & Sports of Puerto Rico v. World Boxing Ass'n*, 942 F.2d 84, 89 (1st Cir. 1991) (citations omitted). Further, "[a] complaint must contain 'either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory' … [T]he court is not required to either guess the nature of or create a litigant's claim." *Russell v. Tennessee Dep't of Correction*, 99 F. App'x 575, 577 (6th Cir. 2004) (quoting *Car Carriers, Inc. v. Ford Motor Co*., 745 F.2d 1101, 1106 (7th Cir. 1984) (additional citations omitted)).

Alston has discrimination claims that will survive a motion to dismiss. The Town and Board have acknowledged this, by explicitly exempting certain allegations from their motion to dismiss.  These allegations, according to the Town and Board, are:

> Plaintiff Alston made a 'going postal' statement at work… was put on leave, was required to undergo a psychiatric fitness-for-duty examination and follow-up examinations, was discovered while on leave to have used cocaine in previous years… and was found unfit for duty by two Town psychiatrists. … [T]he psychiatrists

> recommended that in order to assure he is fit to serve as a firefighter upon his return to work, he should receive psychiatric treatment and undergo drug testing, and that he refuses to comply with these conditions… [T]he [Board's] adoption of the psychiatrist's conditions was retaliatory and [Alston] challenges his leave status that is based on his non-compliance with them.

(#35 at 4; *see* #21 at ¶¶210-25, 238-39.) Because the amended complaint fails to comply with Rule 8, however, all claims should be dismissed at this juncture. Alston should be granted leave properly to replead his claims against all defendants except Spiegel, as is discussed in detail below.

     Two points are emphasized. First, with regard to the seven individual defendants, government officials sued in their individual capacities are shielded from trial and monetary damages "unless the pleaded facts establish '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Marrero-Méndez v. Calixto-Rodríguez*, --- F.3d ----, No. 14-2030, 2016 WL 3902635, at \*3 (1st Cir. July 19, 2016) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011), and *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); additional citations and quotation marks omitted). "A right is 'clearly established' when '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* at \*4 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Counsel should be sure when filing another complaint that there are allegations sufficient to make out any asserted claims and that he plainly states them with regard to particular defendants.  By signing the pleading, counsel is certifying his belief that "the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous [legal] argument…" Fed. R. Civ. P. 11(b)(2).

     Also, historical information, contextual detail, and evidence do not belong in a complaint.

31

(*See*, e.g., #21 at ¶124 (relating facts from "the late 18th century" and quoting a "historian" from "the 1930's").) The applicable statute of limitations is 4 years for § 1981 actions. *Jones v. R.R. Donelley & Sons Co.*, 541 U.S. 369, 382 (2004). The limitations period for § 1983 and § 1985 actions stems from state law; in Massachusetts, the applicable period is 3 years under Mass. Gen. Laws c. 260, § 2A. *Mangano v. Bellotti*, 187 Fed. Appx. 8, 2006 WL 1828005 at *1 (1st Cir. 2006); *Rodríguez–García v. Municipality of Caguas*, 354 F.3d 91, 96 (1st Cir. 2004).  In stating a viable claim, plaintiff should ensure that he is pleading a cause of action that is not time-barred. Facts dating before the statute of limitations may be relevant as evidence later in the proceedings, but generally should not be included in the amended complaint. *See,* e.g., *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002) (discrimination plaintiff not required "to plead more facts than he may ultimately need to prove to succeed on the merits"); *In re Stone & Webster, Inc., Sec. Litig.,* 414 F.3d 187, 195 (1st Cir. 2005) (even under heightened pleading standard for securities fraud, "plaintiff need not, however, go so far as to 'plead evidence'").

For the reasons stated above, I recommend that the amended complaint be dismissed, and that Alston be granted leave to file a second amended complaint, except with regard to Spiegel, alleging facts which spell out the material elements of his claims in a manner that comports with Rule 8.

## VI. <u>Claims against Spiegel</u>

Alston is the only plaintiff who made allegations against Spiegel.   The amended complaint identifies Spiegel as "an elected town meeting member and an appointed member of

the advisory committee."[17]   (#21 at ¶117.)  The amended complaint states that the advisory

committee must approve any financial settlement of the Town's legal claims, including any

claim for racial discrimination.[18] (#21 at ¶117.)  Spiegel has "frequent contact" with the Board

"both formally and informally." *Id.*

      The amended complaint alleges the following acts with regard to Spiegel.  At an

unspecified time, Spiegel gave town meeting members a letter about Alston that that had been

published in the local newspaper that was critical of Alston.  He gave it to the town members

"for the stated purpose of providing 'diversity' of opinion regarding the lawsuit."   The letter was

"solicited from a retired Black firefighter for the purpose of retaliating against Mr. Alston."[19]  *Id.*

---

[17] There is no explanation in the amended complaint about what these bodies are; therefore, the court
considers materials on the Town's website that explain in greater detail what role Spiegel played in Town
government.  On a motion to dismiss, the court may consider "matters of public record, and other matters
susceptible to judicial notice. *Lydon v. Local 103, Int'l Bhd. of Elec. Workers*, 770 F.3d 48, 53 (1st Cir.
2014); *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993) ("[C]ourts have made narrow exceptions for
documents the authenticity of which are not disputed by the parties; for official public records; for
documents central to the plaintiffs' claim; or for documents sufficiently referred to in the complaint").
Information about Brookline's town government structure is available on the Town's website, and subject
to judicial notice. Spiegel is one of 240 elected town meeting members; the town meeting is Brookline's
legislative body. *See Town Meeting*, BROOKLINEMA.GOV, http://brooklinema.gov/264/Town-
Meeting (last visited Sept. 1, 2016).  He also serves as one of thirty members of Brookline's advisory
committee. The advisory committee makes recommendations to the town meeting on warrant articles and
annual budget issues, but has no final authority on them.  *See Advisory Committee*,
BROOKLINEMA.GOV, http://brooklinema.gov/166/Advisory-Committee (last visited Sept. 1, 2016).
The members of the advisory committee are appointed by the Town Moderator, a town-wide elected
official who is part of the legislative branch and is independent of the Board of Selectmen.  *Id.*  The Board
is part of the executive branch.  *Town of Brookline General By-Laws*, BROOKLINEMA.GOV, available
at http://brooklinema.gov/DocumentCenter/Home/View/353.

[18] Defendants dispute that the advisory committee has to approve settlements for claims of racial
discrimination, *see* #48 at 4, but whether the assertion is true makes no difference to the court's decision.
The amended complaint does not allege that the advisory committee failed to approve any settlement, or
that any of the plaintiffs even had a financial settlement with the Town.

[19] The amended complaint does not say who solicited the letter.  The amended complaint states that a
version of the letter that was "more derogatory" than the one Spiegel distributed was distributed by

at ¶208.

Spiegel viewed Alston's personnel file. *Id.* at ¶222. Spiegel told unnamed individuals "that he had access to Mr. Alston's personnel file in his capacity as a town meeting member." Specifically,

> He told a supporter wearing an "I support Gerald Alston" sticker that she would not support Mr. Alston if she knew the "real story" contained in Mr. Alston's personnel file. He said that she was not entitled to access to it, but that he and the Selectmen were. He represented to the supporter that he was speaking on behalf of the Town. Mr. Spiegel also falsely claimed in front of several witnesses that two Black firefighters had volunteered to him that they did not support Mr. Alston. In a subsequent investigation, Mr. Spiegel failed to identify the names of these firefighters. His claim lacked foundation and was intended to smear Mr. Alston in the eyes of the public and discourage Mr. Alston and others from continuing to speak out publicly about the Town's discriminatory conduct.

*Id.* at ¶230.

Spiegel is alleged to have violated 42 U.S.C. § 1981, § 1983, and § 1985 "by enforcing the Town's unconstitutional policy, practice, and custom." (#21 at ¶258.) He is alleged to have "sought through the execution of the policy to deter the Plaintiffs and others in Brookline from enjoying their First Amendment rights to freedom of speech and to petition the government for redress of grievances" and "retaliating against Plaintiffs for opposing the Town's unconstitutional and racist policy." *Id.* at ¶¶260-61. Finally, he is alleged to have discriminated against "Plaintiffs on the basis of race," acting "under the color of law," and "violating clearly established law." Id. at ¶¶ 262-63.

---

another defendant to "the public" at a meeting of the Board's diversity committee, and the amended complaint provides some details about the "more derogatory" letter, but the amended complaint does not explain what the letter that Spiegel distributed actually said. (#21 at ¶¶207-08.)

**A.  Alston does not allege that Spiegel committed any civil rights violation.**

The allegations against Spiegel suffer from the same ambiguity as the rest of the amended complaint.  For example, the amended complaint never specifies whether Spiegel is sued in his official or individual capacity.[20]  However, on these facts it is clear that Alston has failed to state a claim against Spiegel under *any* actionable legal theory. Regardless of the specific theory of liability, Alston has not met the core requirement of any discrimination claim, which is that he suffered some deprivation of a right, privilege, or immunity because of his race.

"A retaliation claim pursuant to section 1981 requires that a plaintiff show that (1) he engaged in statutorily protected activity (2) *he suffered an adverse employment action* and (3) the protected conduct and adverse employment action were causally connected." *Cabi v. Boston Children's Hosp.*, --- F. Supp. 3d ----, 2016 WL 593495 at *13 (D. Mass. Feb. 12, 2016) (citing *Pina v. Children's Place*, 740 F.3d 785, 801 (1st Cir. 2014); emphasis added).

"To establish municipal liability for a constitutional violation by a municipal officer [under § 1983], a plaintiff must show that 1) *the harm to him* was caused by the constitutional violation, 2) a municipal policy or custom led to that violation and caused the *plaintiff's injury*

---

[20] The First Circuit has adopted the flexible "course of proceedings" test which looks to the substance of the complaint to determine in what capacity individuals are being sued.  *See Powell v. Alexander*, 391 F.3d 1, 22 (1st Cir. 2004).  Nevertheless the First Circuit has cautioned that "it is a far better practice for the allegations in the complaint to be specific" and complaints that do not clearly specify that a defendant is sued in his individual capacity are discouraged.  *Id.*  In their opposition, plaintiffs clarified that they were suing Spiegel in his individual capacity only.  (#56 at 4.)  The First Circuit has repeatedly stated that "'[o]rdinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . .'" *Graf v. Hospitality Mut. Ins. Co.*, 754 F.3d 74, 76 (1st Cir. 2014) (quoting *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001)) and so for purposes of this motion the court disregards plaintiffs' efforts to clarify the complaint.  The court notes that as a result of plaintiffs' sloppy drafting of the amended complaint, Spiegel was forced to defend against a claim that plaintiffs had not even raised, *see* e.g., #48 at 8-9.

and 3) the municipality was 'deliberately indifferent' to the affected constitutional right." *Pisano v. Ambrosino*, No. CV 13-11409-NMG, 2016 WL 3093372, at *3 (D. Mass. June 1, 2016) (citing *Young v. City of Providence*, 404 F.3d 4, 25-26 (1st Cir. 2005); emphasis added). The elements of a First Amendment retaliation claim under § 1983 are (1) speech "protected under the First Amendment so as to shield [plaintiff] from adverse employment action in retaliation for such speech," (2) *an adverse employment action*, and (3) a causal connection between the protected speech and the adverse action. *Gagliardi v. Sullivan*, 513 F.3d 301, 306 (1st Cir. 2008) (quoting *Curran v. Cousins*, 509 F.3d 36, 45 (1st Cir. 2007); emphasis added); *see also Najas Realty, LLC v. Seekonk Water Dist.*, 821 F.3d 134, 141 (1st Cir. 2016).

Finally, "[s]ection 1985(3) provides a remedy for a conspiracy to violate civil rights if the plaintiff establishes 1) a conspiracy, 2) a conspiratorial purpose to deprive him of the equal protection of the laws, 3) an overt act in furtherance of the conspiracy and 4) *an injury to his person or property, or a deprivation of a constitutionally protected right*. … The second requirement of conspiratorial purpose requires 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'" *Pisano*, 2016 WL 3093372 at *3-4 (citing *Perez-Sanchez v. Pub. Bldg. Auth.*, 531 F.3d 104, 107 (1st Cir. 2008); emphasis added).

Alston has not pointed to any actionable harm or civil rights violation that he suffered from Spiegel's participation in Town government, the distribution of a letter that had already been published in the newspaper, or comments insinuating that Alston's personnel file contained negative information. Nor has he suggested that any of his alleged employment discrimination or retaliation is in any way connected with Spiegel's actions.

Spiegel's actions do not rise to the level of actionable retaliation under any of these

36

statutes. "[T]he standard for showing an adverse employment action is lower in the First Amendment retaliation context than it is in other contexts (such as Title VII)… and the Supreme Court has indicated that even relatively minor events might give rise to liability" for First Amendment retaliation. *Rivera-Jimenez v. Pierluisi,* 362 F.3d 87, 94–95 (1st Cir. 2004) (retaliation involved investigation, dismissal, and denial of special benefits and assignments). However, the test is whether the adverse act would dissuade a reasonable person from continuing to speak. *See Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011).

Here, Spiegel's circulation of a published letter and vaguely negative comments to a supporter are not sufficiently adverse to chill the speech of a reasonable person. *See,* e.g., *Barton,* 632 F.3d at 29–30 (citing *McKee v. Hart,* 436 F.3d 165, 170–71 (3rd Cir. 2006), for the proposition that "three comments by supervisor that were critical of plaintiff's job performance, without more, were too trivial to deter a person of ordinary firmness from exercising First Amendment rights"); *Coszalter v. City of Salem*, 320 F.3d 968, 975–76 (9th Cir. 2003) ("when an employer's response includes only minor acts, such as 'bad-mouthing,' that cannot reasonably be expected to deter protected speech, such acts do not violate an employee's First Amendment rights."); and *Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998) ("It would be the height of irony, indeed, if mere speech, in response to speech, could constitute a First Amendment violation.") Finally,

> Yet even in the field of constitutional torts de minimis non curat lex. Section 1983 is a tort statute. A tort to be actionable requires injury. It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise…

*Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982). Because Spiegel's actions were not severe

enough to constitute First Amendment retaliation, they cannot serve as retaliation under the other frameworks either.

This failure to state a claim would not be solved by clearer pleading.  Accepting all the allegations as true, it is plain that Spiegel's innocuous actions simply have not violated any of Alston's rights.

**B.  Spiegel is entitled to qualified immunity.**

Spiegel asserts that he is entitled to qualified immunity from individual liability.[21] (#48 at 10-12.)  Immunity under § 1983 "[does] not vary depending on whether an individual working for the government does so as a full-time employee, or on some other basis." *Filarsky v. Delia*, __U.S. __, 132 S. Ct. 1657, 1665 (2012).  "The qualified immunity doctrine provides defendant public officials an immunity from suit and not a mere defense to liability."  *Maldonado v. Fontanes*, 568 F.3d 263, 268–69 (1st Cir. 2009).  "For this reason, immunity is to be resolved at the earliest possible stage in litigation."  *Id.  See Guzman-Rivera v. Rivera-Cruz*, 98 F.3d 664, 667 (1st Cir. 1996) (qualified immunity may be raised in motion to dismiss).

In *Pearson v. Callahan,* 555 U.S. 223 (2009), the Supreme Court reiterated that the qualified immunity inquiry is a two-part test. A court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was "clearly established" at the time of the defendant's alleged violation.

 "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676

---

[21] Plaintiffs did not even address this argument in their opposition. (#56.)

(2009).  Here, Spiegel's individual actions did not violate Alston's Constitutional or federal statutory rights.  Spiegel is entitled to qualified immunity.

For the reasons above, Alston's claims against Spiegel should be dismissed with prejudice.

## VII. Conclusion

For the reasons stated above, I RECOMMEND that the claims of all plaintiffs except Gerald Alston be SEVERED and DISMISSED, without prejudice. I FURTHER RECOMMEND that Gerald Alston's claims be DISMISSED without prejudice as to all defendants except Stanley Spiegel, and he be GRANTED LEAVE to file a second amended complaint in compliance with the Rules of Civil Procedure. I FURTHER RECOMMEND that all claims against Stanley Spiegel be DISMISSED with prejudice.[22]

/s/ M. Page Kelley
M. Page Kelley
United States Magistrate Judge

September 2, 2016.

---

[22] The parties are hereby advised that any party who objects to this recommendations must file a specific written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review. *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603(1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).