UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-13987-GAO

GERALD ALSTON,
Plaintiff,

v.

TOWN OF BROOKLINE, MASSACHUSETTS, BROOKLINE BOARD OF SELECTMEN,
BETSY DEWITT, KENNETH GOLDSTEIN, NANCY DALY, JESSE MERMELL, NEIL
WISHINSKY, BERNARD GREENE, BEN FRANCO, NANCY HELLER, SANDRA DEBOW,
JOSLIN MURPHY, each of them in his or her individual and official capacity, and LOCAL 950,
INTERNATIONAL ASSOCIATION OF FIREFIGHTERS,
Defendants.

OPINION AND ORDER
March 30, 2018

O'TOOLE, D.J.

The magistrate judge to whom this case was referred issued two reports and

recommendations ("the R&Rs") (dkt. nos. 188 & 189) addressing the motions to dismiss filed by

the Town of Brookline defendants (dkt. no. 110) and the individual defendants (dkt. no. 112),

respectively. The R&Rs recommend that paragraphs of the third amended complaint be stricken

as surplusage. They also recommend rejecting the defendants' arguments that certain claims

apparently pled by the plaintiff are barred either by the Rooker-Feldman doctrine or by principles

of claim preclusion to the extent that they allege facts that pre-date the termination of the plaintiff's

prior Norfolk County action. The defendants filed timely objections to the latter of these

recommendations.[1]

---

[1] The Court only considers matters to which the defendants specifically objected. See e.g., Cortes-Rivera v. Dep't of Corr. & Rehab., 626 F.3d 21, 27 (1st Cir. 2010).

After reviewing the parties' submissions concerning the objections, I agree that the Rooker-Feldman Doctrine does not bar the present case, but I conclude that the doctrine of claim preclusion does apply, because the claims at issue could have or should have been brought in the prior action. See O'Neill v. City Manager of Cambridge, 700 N.E.2d 530, 532–33 (Mass. 1998); Heacock v. Heacock, 520 N.E.2d 151, 153 (Mass. 1988); Martin v. Ring, 514 N.E.2d 663, 664 (Mass. 1987). The plaintiff may only assert claims that post-date the final judgment of the Norfolk Superior Court case.

Accordingly, I ADOPT the R&Rs (dkt. nos. 188 & 189) insofar as portions of the third amended complaint are stricken, but I SUSTAIN the defendants' objection as stated above with respect to claim preclusion.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GERALD ALSTON,
     Plaintiff,

CIVIL ACTION NO. 15-13987-GAO

     v.

TOWN OF BROOKLINE, MASSACHUSETTS,
BROOKLINE BOARD OF SELECTMEN,
BETSY DEWITT,
KENNETH GOLDSTEIN,
NANCY DALY,
JESSE MERMELL,
NEIL WISHINSKY,
BERNARD GREENE,
BEN FRANCO,
NANCY HELLER,
SANDRA DEBOW, and
JOSLIN MURPHY, each of them in his or her individual and official
capacity, and
LOCAL 950, INTERNATIONAL ASSOCIATION OF FIREFIGHTERS,
     Defendants.


REPORT AND RECOMMENDATION ON TOWN DEFENDANTS' PARTIAL
MOTION TO DISMISS (#110).


KELLEY, U.S.M.J.

I. Introduction.

     This is a civil rights action in which a former firefighter for the Town of Brookline (the

Town), Gerald Alston, who is Black, alleges that he was racially discriminated against by the

Town, certain town officials in their individual and official capacities, and the firefighters' union.

This motion to dismiss only concerns Alston's claims against the Town.

Specifically, Alston brought this action against the Town, the Board of Selectmen (the Board), the Town Counsel, and the Human Resources Director (collectively, the Town defendants)[1] alleging that they are liable under §§ 1981 and 1983 because of a custom of racial discrimination in Town governance and because of their actions as policymakers for the Town. Alston claims that the Town defendants violated his Fourteenth Amendment right to equal protection by enforcing the policy, and that they violated his First Amendment rights to freedom of speech and to petition the government for redress of grievances by retaliating against him. (#108 ¶¶ 192-197.)[2] For the reasons outlined below, the court recommends that Town Defendants' Partial Motion to Dismiss (#110) be allowed in part and denied in part.

## II. Procedural History.

On December 1, 2015, Alston filed a 55-page complaint in which he was the sole plaintiff. (#1.) Alston alleged that the Town defendants, individual defendants, and the firefighters' union to which Alston had belonged had violated his rights in much the same way he alleges in the present complaint. *Id.* On January 12, 2016, the Town defendants moved to dismiss the complaint for failure to state a claim (##10, 11) on essentially the same grounds as they do in the present motion. *Compare* #11 at 22 *with* #111 at 15-16; #11 at 18 *with* #111 at 21.

Before the court acted on the motion to dismiss, Alston filed a first amended complaint on January 26, 2016, which was styled as a class action. (#21.) The amended complaint added

---

[1] Claims against the individual defendants in their official capacities are equivalent to claims against their government employer, the Town. *Rosaura Bldg. Corp. v. Municipality of Mayaguez*, 778 F.3d 55, 62 (1st Cir. 2015). Here, the Town moves to dismiss on behalf of the individual defendants in their official capacities as well as on behalf of the Town. *See* #110 at 1. Any reference to the Town defendants in this Report and Recommendation includes the individual defendants in their official capacities.

[2] Alston brings other claims against the individual defendants in their individual capacities and the firefighters' union. *See* #108. The union does not have any motion to dismiss pending before the court at this time. The individual defendants filed a motion to dismiss the claims against them (#112), which is addressed in a separate Report and Recommendation filed February 6, 2018.

seven new plaintiffs who claimed that they, too, had been racially discriminated against by the Town. *Id.* Two of the plaintiffs withdrew from the complaint two weeks later. (##30, 31.) The Town again moved to dismiss the case on the same grounds as in the original motion but added arguments concerning why the new plaintiffs were not properly joined in Alston's case. (##34, 35.)

On September 2, 2016, this court issued a Report and Recommendation to the District Court, O'Toole, J., recommending that the first amended complaint be dismissed without prejudice for failure to conform to Federal Rules of Civil Procedure[3] 8 and 20, and that all plaintiffs other than Alston be required to file new, separate lawsuits. (#72.)[4] The court did not address the substance of the Town defendants' pending motion to dismiss because the court ordered Alston to file a new complaint. *Id.* at 39. Judge O'Toole adopted the Report and Recommendation in part. (#75.)[5]

On October 21, 2016, Alston filed a second amended complaint. (#78.) The Town defendants and individual defendants jointly moved to strike portions of it under Rule 12(f) (#86) and moved alternatively for a more definite statement under Rule (12)(e) (#88). This court issued an Order in which ##86 and 88 were granted in part and denied in part. (#106.)

---

[3] Further references to "Rules" are to the Federal Rules of Civil Procedure.

[4] The court found that the amended complaint "relates the stories of eight individual plaintiffs with no facts in common" (#72 at 22) and that the allegations purportedly relating to Alston spanned centuries, alleged irrelevant facts, and were so jumbled as to make it impossible to identify his claims. *Id.* at 29-30.

[5] This court recommended that the first amended complaint be dismissed with prejudice against one defendant, Stanley Spiegel; the District Court did not adopt this recommendation and instead permitted Alston to replead against Spiegel. (#72 at 39; #75 at 2.) After Alston filed his second amended complaint (#78), the District Court adopted this court's recommendation (#98) that claims against Spiegel be dismissed (#105). The District Court further adopted this court's recommendation that Alston's attorney be sanctioned under Rule 11 for repleading against Spiegel with the same deficient allegations that were in the previous complaint (#132), although the District Court enlarged the time period for attorneys' fees encompassed by the sanction (#153).

Alston then filed the now-operative third amended complaint. (#108.) The Town

defendants have once again moved to dismiss (#110); Alston responded in opposition (#133)[6];

and the Town defendants replied (#135).[7] An oral argument on this motion was held on January

5, 2018.

The Town defendants' motion to dismiss is limited to (1) portions of the third amended

complaint relating to "policy choices by the Town regarding the powers and jurisdiction that

various Town committees should have," including the Town Meeting's amendment of a bylaw to

remove jurisdiction over employee complaints of racial discrimination from a certain

commission, and a claim that the bylaw as amended is unconstitutional; and (2) portions of the

complaint "relating to alleged discrimination against third parties by unrelated actors spanning

decades." (#110 at 2, #111 at 3.) The Town defendants do *not* seek dismissal of Alston's claims

against the Town defendants arising from an alleged hostile work environment and Alston's

ultimate termination. (#111 at 1-2.)[8] The Town defendants explain that they seek dismissal of

"large sections of the Complaint that are lengthy and that would needlessly expand the scope of

---

[6] Alston incorporates by reference his opposition to the individual defendants' earlier motion to dismiss (#40), *see* #133 at 6, and the court has reviewed that document in analyzing the pending motion.

[7] Alston contends that the pending 12(b)(6) motion is barred under Rule 12(g)(2), which states that "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion," because defendants did not raise the defense of failure to state a claim when they filed their previous Rule 12(f) motion to strike (#86) and alternative Rule 12(e) motion for a more definite statement (#88). (#133 at 2-4.) This argument fails. The Town defendants previously have repeatedly filed motions to dismiss (##10, 34) which the court has not addressed until now because of the glaring deficiencies in the previous complaints. Furthermore, plaintiff's interpretation of Rule 12, as applied in this circuit, is incorrect. *See MMB Dev. Grp., Ltd. v. Westernbank Puerto Rico*, 762 F. Supp. 2d 356, 365 (D.P.R. 2010) (citing *Silva v. Encyclopedia Britannica Inc.*, 239 F.3d 385, 387 (1st Cir. 2001)).

[8] The individual defendants have filed a separate motion to dismiss on many grounds, *see* #112. Although the Town defendants did not file anything indicating that they wished to join in the individual defendants' motion to dismiss, at the hearing on January 5, 2018, counsel for the Town defendants informed the court that they do join in certain arguments made by the individual defendants. Those issues are addressed in the court's Report and Recommendation concerning #112.

discovery to the prejudice of the Town and third parties when they have nothing to do with Plaintiff's alleged injury or wrongdoing by the Selectmen, who are the 'Policymaker' for purposes of establishing Section 1981 and/or 1983 municipal liability in this case." *Id.* at 2.

In order to determine whether the complained-of material is relevant or should be stricken, the court must first describe both the facts of the case and the particular factual allegations to which defendants object. The court will then discuss the legal framework of Alston's claims. Finally, applying this law to the facts, the court determines that certain allegations should be stricken, while others should remain in the complaint.

## II. <u>Allegations in the Third Amended Complaint</u>.

The third amended complaint alleges that the Town's policy, practice, and custom of protecting and encouraging acts of racial discrimination and disparate treatment (the custom)[9] was the driving force behind the racially-motivated wrongs inflicted on Alston. *See generally* #108. As explained above, a substantial procedural history exists in this matter and previous orders of the court set out the facts of the case at length, *see, e.g.*, #72 (Report and Recommendation on Motions to Dismiss). While only those facts germane to the pending motion will be repeated here, because of the nature of the analysis those facts must be set out in detail.

### A. <u>Facts Pertaining to Alston</u>.

Alston joined the Brookline Fire Department (BFD) in 2002. (#108 ¶ 2.) On May 30, 2010, Paul Pender, a lieutenant in the BFD, left a voicemail on Alston's phone in which he called Alston a "f***ing n*****" (the voicemail incident). *Id.* ¶ 19. A week later, Alston reported the voicemail incident to BFD's chief operating officer, but the Town took no action other than to

---

[9] Alston refers to the "policy" throughout his pleadings. As explained *infra*, for purposes of municipal liability analysis, the alleged racist practices are more accurately described as a "custom" than a "policy" and the court will use the term "custom."

inform Pender of Alston's complaint. *Id.* ¶ 22. Alston contends that Pender made excuses for the comment, showed no remorse, and told Alston that filing the complaint "was the stupidest thing [Alston] could have ever done." *Id.* ¶¶ 23-24. Pender behaved this way because he knew that the custom of racial discrimination in the Town would protect him and punish Alston. *Id.* ¶ 24.

On August 17, 2010, the Board held a hearing to address the voicemail incident, but failed to question Pender about his excuses; did not investigate Pender's intimidating and retaliatory conduct; and did not "terminate his employment, demote him, or make him ineligible for promotion." *Id.* ¶ 26. The Board kept the facts of the incident secret. *Id.* ¶ 27.

In September 2010, Pender served a "two 24-hour shift suspension." *Id.* ¶ 29. Then the Town, "[w]ith the tacit approval of [the Board]," promoted Pender to acting captain. *Id.* On September 22, 2010, the Board arranged for Pender to travel to the White House to receive a medal of valor from the attorney general. *Id.* ¶ 27. Selectwoman Mermell tweeted out coverage of the medal ceremony. *Id.* The purpose and effect of Selectwoman Mermell's actions was to "protect Lieutenant Pender from any stigma and to mark him with the selectmen's corporate stamp of approval." *Id.* ¶ 28.

In May 2012, Alston filed a complaint with the Massachusetts Commission Against Discrimination (the MCAD) "relating to [Pender's] promotion." *Id.* ¶ 32a. Prior to filing with the MCAD, Alston complained repeatedly to the fire chief and the director of human resources about Pender's promotion. *Id.* According to Alston, "[t]o take advantage of the 300-day statute of limitations for employment discrimination actions in Massachusetts, [the Town] persuaded Mr. Alston to keep his complaints 'in-house' for years by lying to him and cynically taking advantage of his loyalty to the fire department and his desire to be seen as a team player." *Id.* ¶ 33.

On May 7, 2013, the fire chief reported to the Board that Pender was being "assigned to be the assistant trainer for all firefighters in Brookline." *Id.* ¶ 30. Despite knowing that Alston had filed a complaint with the MCAD protesting his treatment after he reported the racial slur, the Board voted unanimously to promote Pender permanently to captain. *Id.* ¶ 31. Alston contends that this action was in contravention to the Board's statement to him that Pender would be ineligible for promotion. *Id.* ¶ 34. The Board told Alston that Pender "had not really been promoted and that his promotion to Captain was temporary and would be rescinded." *Id.*

Alston states that the Town "promised to 'take care of' the retaliation against [Alston] and prohibited him from obtaining relief from the Town's civil rights commission, the Human Relations Commission." *Id.* The Town also failed to investigate properly Alston's complaints that he had been "shunned, ostracized, and denied promotions to temporary Lieutenant in April and May of 2013." *Id.* ¶ 35.

In June of 2013, Alston filed an action in Superior Court of the Commonwealth of Massachusetts, Norfolk County, "complain[ing] about Lieutenant Pender's promotion." *Id.* ¶ 32a.

In the fall of 2013, the Town "attacked Mr. Alston publicly and behind closed doors; forced him out of the fire department on a pretext; and falsely and maliciously arranged for him to be deemed 'unfit for duty' by a biased and incompetent psychiatrist." *Id.* ¶ 36. On December 19, 2013, the word "Leave" was written on the door underneath Alston's jacket on his assigned seat on the firetruck. *Id.* ¶ 32e. Alston asserts that the Town and certain individual defendants failed to investigate the incident adequately, *id.* ¶¶ 161, 174, and that as a result of this failure, other firefighters were encouraged to shun and ostracize him, *id.* ¶ 32e.

By early 2014, the Town had placed Alston on unpaid leave "with the intent to terminate his employment." *Id.* In the summer of the same year, Alston's discrimination lawsuit was dismissed, and he lost his last protection against termination. *Id.* ¶ 40. Within months of the civil suit's being dismissed, the Town stopped Alston's paycheck, which resulted in his inability to afford basic necessities. *Id.* ¶ 42. The Town prohibited Alston from working a second job, "on threat of violating Town rules." *Id.*

Despite Alston's completion of an anger management course and his visits with a psychiatrist, the Town did not contact him regarding his return to the fire department. *Id.* ¶ 41. "On November 24, 2014, after going months without pay, Alston wrote to Selectman Chairman Kenneth Goldstein outlining the many bad decisions that had been made by the Town's administrative staff and request[ing] to be heard pursuant to the Town's anti-discrimination and retaliation policy." *Id.* ¶ 43; *see also id.* ¶ 32a.

On December 2, 2014, after the Board ignored Alston's letter, Alston and several of his supporters appeared before the Board and requested that it "investigate Mr. Alston's case, rectify the racist environment in the fire department, and restore Mr. Alston's job." *Id.* ¶ 44. The Board did not restore Alston to duty. *Id.* ¶ 45. Only after a public protest against the Town's treatment of Alston at the January 2015 Dr. Martin Luther King, Jr. celebration was Alston's job temporarily saved. *Id.*

The Board assigned Town Counsel, who had been involved with the decision to "force Mr. Alston out of the fire department," to oversee a "meaningless and perfunctory third-party 'review'" of the Director of Human Resources' reports.[10] *Id.* ¶ 47. Town Counsel "ensured that

---

[10] Each year from 2010 to 2014, the Director of Human Resources prepared reports for the Board relating to Alston. (#108 ¶ 32t.) These "reports were used as the basis for opinions by the Town's psychiatrists regarding Mr. Alston's fitness for duty in 2014 and 2015, by an outside consultant regarding the propriety of the Town's response to Mr. Alston's complaint in 2015, and by an outside hearing officer hired to

the third-party reviewer would not interview Mr. Alston or any other witnesses and would not look underneath [the Human Resource Director]'s sham reports." *Id.*

The Town hired Dr. Marilyn Price, a board certified psychiatrist at Massachusetts General Hospital, to evaluate Alston. *Id.* ¶¶ 49, 50. In a March 2015 report, Dr. Price found that Alston "was <u>not</u> 'unfit for duty.'" *Id.* ¶ 50 (emphasis in original). Dr. Price found that Pender's use of a racial slur made Alston question how he was perceived by other firefighters and raised concerns as to whether they would "have his back" in dangerous situations. *Id.* ¶ 51. Dr. Price also found that the Town's "swift promotion" of Pender after Alston reported the voicemail incident resulted in harm to Alston, "and that the Town needed to modify the work environment to reduce Mr. Alston's level of stress and restore [his] trust in his fellow [firefighters]." *Id.* ¶ 52. A second psychiatrist, retained by Alston, likewise found that Alston "was otherwise fit for duty, but that the racial environment in the [BFD] was too hostile for [Alston] to safely return to work." *Id.* ¶ 53.

Despite the Town psychiatrist's recommendation that the Town develop a plan that would allow Alston to return to work, the Board "acted in bad faith, and pursuant to the Policy, by refusing to take any reasonable steps to rectify the hostile work environment in the fire department." *Id.* ¶¶ 49, 54. According to Alston, the Board never intended to work with him to ensure that he would feel safe returning to work, and instead, intended to drive him out of the fire department and the Town for protesting racial discrimination. *Id.* ¶¶ 59, 64. It was the Board's goal to maintain "an environment in Brookline in which Black people and their supporters are afraid to speak out about racial discrimination for fear of retaliation." *Id.* ¶ 59.

---

recommend Mr. Alston's termination as a Brookline firefighter in 2016." *Id.* ¶ 32u. Alston states that each of these reports "contains materially false and misleading information and fails to fairly and completely reflect the events it purports to depict." *Id.* ¶¶ 32v, 32w-z.

On February 16, 2016, in a meeting closed to the public, the Board, without affording

Alston the opportunity to be heard, terminated Alston's paid administrative leave for failure to

comply with a return to work plan. *Id.* ¶ 60. On October 5, 2016, at a public meeting held at

Alston's request, the Board, by unanimous vote, formally terminated his position with the BFD.

*Id.* ¶ 61. In so doing, the Board adopted the recommendation of an outside hearing officer paid

for and selected by the Town. *Id.* ¶ 63. The hearing officer "heard no witnesses in support of Mr.

Alston's termination and . . . simply summarized, often unfairly, Dr. Price's report and certain

correspondence from the Town." *Id.* Alston contends that "Mr. Lampke[11] falsely claimed that

Mr. Alston had not cooperated with the Town's efforts to return him to duty, which the [Board]

knew was not true." *Id.*

While no justification for the decision to terminate Alston was provided at the public

meeting, the Board authorized Town Counsel to issue a press release that "falsely implied that

the Board had terminated Mr. Alston because of drug use, violence, and a refusal to work with

[the Town] to return to duty." *Id.* ¶ 62. "Although the [Board] knew this innuendo was false,

Board members expected and tacitly encouraged their unofficial surrogates, including advisory

committee member Fred Levitan, to use it to smear Mr. Alston privately and on social media."

*Id.*

In sum, Alston alleges that he has been persecuted since he reported the voicemail

incident in 2010, *id.* ¶ 32, and that "[b]y failing to properly sanction Lieutenant Pender's conduct

and by promoting him in 2010, 2013, and 2016, the [Board] encouraged firefighters to take the

position that Mr. Alston's complaint was meritless, personal to Mr. Alston only, and did not

relate to a serious violation of the firefighters' code of conduct that affected all firefighters." *Id.* ¶

---

[11] Mr. Lampke presumably is the outside hearing officer referenced in #108 ¶ 63.

32d. Alston asserts that "[e]ach defendant knows that Lieutenant Pender called Mr. Alston a racial slur, failed to take responsibility for it in subsequent conversations with Mr. Alston, and blamed Mr. Alston for creating a problem by reporting the slur. The defendants have concealed this knowledge from other firefighters in the Brookline fire department." *Id.* ¶ 32b.

## B. The Structure of Town Government.

The Town government is headed by the board of selectmen, which is comprised of five elected members, and the town meeting. *Id.* ¶ 3. The selectmen are the chief elected and executive officers of the Town "with overall responsibility for supervising Town affairs." *Id.* ¶ 4. The Town operates under a "weak chief" charter, which means that the Board serves as the police and fire commissioner for the Town:

> The Selectmen are the ultimate decision-makers with respect to the hiring, firing, promotion, demotion, and discipline (Selectmen must approve suspensions longer than 5 days) of Brookline police officers and firefighters. The Selectmen have the authority to hire and fire the town administrator, the town counsel, the director of human resources, the police chief, the fire chief, and other department heads. The Selectmen appoint members of Town boards and commissions, including the Town's Diversity, Inclusion, and Community Relations Commission [] and the prior Human Relations Commission. The Selectmen are responsible for adopting and overseeing town administrative policies, including the Town's anti-discrimination and retaliation policy, and representing the Town of Brookline in lawsuits, as plaintiff and defendant. The Chair of the Brookline Board of Selectmen sets the agenda for the Board and communicates regularly with the administrative staff, including the town counsel, human resources director, and the town administrator. The Selectmen frequently appoint and serve on ad-hoc committees to address Town issues.

*Id.*

## C. The Custom.

According to Alston, the Town has been plagued by "a deeply embedded [p]olicy of elevating white people and subordinating Black people" for many years. *Id.* ¶¶ 64, 67. The custom is enforced by the Board through its agents in the Town administration. *Id.* ¶ 65.

1. <u>Effect on Housing Demographics</u>.

Alston contends that the custom has affected the racial makeup of the Town's population compared to neighboring Boston.[12] *Id.* ¶ 67. He notes that in 2013 the Town found that it was likely that racial discrimination was occurring in its sale and rental housing markets. *Id.* ¶ 68. Despite these findings, the Town does not conduct fair housing testing or otherwise enforce its fair housing bylaw. *Id.* Plaintiff asserts that the Town has been aware of these problems in the housing market for many years. *Id.* ¶¶ 68, 69.

2. <u>Effect on Employment</u>.

a. <u>Composition of the Town Workforce</u>.

According to Alston, the custom's effects can be seen in the racial composition of the Town's employees. Many white employees have multi-generational employment legacies and there are "kinship networks" across the municipal workforce. *Id.* ¶ 70. In the 1970s, federal court orders forced the Town to hire Black police officers and firefighters. *Id.* ¶ 71. Despite these orders the Board has maintained a virtually all-white command staff in both departments. *Id.* The only Black lieutenant to serve in the Brookline police department (BPD) was forced to file an action with the MCAD after the Board delayed his promotion, *id.* ¶ 72; there have only been three Black lieutenants in the history of the BFD and no higher ranking officers. *Id.* ¶ 73. According to reports commissioned by the Town in 2015 and 2016, Black police officers and firefighters do not feel that their work is valued the same as the work of their white counterparts. *Id.* ¶ 74.

---

[12] As stated in the third amended complaint, "Brookline has a population of approximately 59,000, which is approximately 3% Black, 76% white, 16% Asian-American, and 5% Hispanic or Latino." (#108 ¶ 3.)

The third amended complaint asserts that this same disparity can be seen in the Town department-head positions because the Board has reserved these positions for white people.[13] *Id.* ¶ 75. In an effort "[t]o conceal its opposition to racial equality and to maintain the facade of compliance with civil rights laws, [the Town] from time to time establishes committees, working groups and commissions whose nominal charge is to investigate racial inequality, prepare reports, and propose action." *Id.* ¶ 78. These bodies have never been given the authority to rectify racial discrimination in the Town. *Id.*

b. <u>Treatment of Town Employees</u>.

Alston offers many examples of how the custom has allegedly produced unjust results in employment matters based on the race of Town employees.

In 2005, a white employee in the department of public works (DPW) was convicted of assault with a dangerous weapon and intimidation of a witness, but suffered no adverse employment consequences. *Id.* ¶ 80. Six years later, the Town promoted this DPW employee. *Id.* ¶ 81. The DPW employee resigned in 2014 after challenging the Town's failure to promote him a second time. *Id.* ¶ 82. The Town did not assert the DPW employee's criminal convictions as a basis for denying the promotion. *Id.*

From 2006 to 2009, a Black employee in the parks department was racially harassed by supervisors and his fellow employees. *Id.* ¶ 96. The Director of Human Resources conducted a "sham investigation" into the employee's complaint and denied it. *Id.* ¶ 97. The employee filed a

---

[13] Alston notes that the Board appointed a Black man as the director of the Human Rights Commission in 1971, but he resigned the following year complaining of "tokenism" and was replaced by a white man. (#108 ¶ 76.)  In 2014, the Board appointed a Black man with no civil rights qualifications to "head the new Office of Diversity, Inclusion, and Community Relations" but "[t]he remaining 24 department head positions in the Town have always been reserved for white people. Brookline also reserves the position of superintendent of schools and principal of the high school for white people. And out of Brookline's eight elementary schools, only one has had a Black principal." *Id.* ¶ 77.

complaint with the MCAD. *Id.* ¶ 98. In 2009, the MCAD found probable cause "that the Town had fostered a racially hostile environment."[14] *Id.* The Town did nothing to address the racial climate. *Id.*

In 2007, the Town promoted a white employee to a senior administrative position over a Black employee with superior qualifications. *Id.* ¶ 83. A Town Meeting member raised questions to the Board about the hiring decision. *Id.* ¶ 84. In response to the Town Meeting member's inquiry, an unidentified selectman met privately with the member and disparaged the competency of the Black employee. *Id.* ¶ 85. In so doing, the selectman referenced negative comments in the Black employee's personnel file, comments of which the employee was not aware because the employee's supervisor had secretly inserted them in the employee's file without him or her[15] being made aware of them. *Id.* ¶¶ 85, 86.

In 2007, BPD brought a criminal assault charge against a Black Town Meeting member, and Town Counsel[16] banned that member from Town hall, because the Black Town Meeting member objected to a white Town official's rudeness to a senior citizen following a public meeting. *Id.* ¶ 99. The BPD officer who recommended the criminal charge was the nephew of the white Town official. *Id.* ¶ 100. The charges were dropped, but the Town failed to sanction BPD, the Town official, or Town Counsel for their "misconduct." *Id.* ¶ 101. The Board appointed an ad hoc committee to review the matter, "but instructed the committee to make no findings about the

---

[14] The third amended complaint states that "[o]n February 28, 2010, the MCAD found probable cause to credit allegations that the Town of Brookline had fostered a racially hostile work environment in the parks department based on the use of racial slurs, including the N-word." (#108 ¶ 32f.) It is unclear whether this allegation concerns the same finding as the one referenced in paragraph 98 of the third amended complaint.

[15] The third amended complaint does not state the gender of the employee. *See* #108 ¶¶ 83-86.

[16] It should be noted that Joslin Murphy was not appointed to her position as Town Counsel until June 2013. (#108 ¶ 15.) Alston fails to identify the individual acting as Town Counsel in 2007.

incident." *Id.* ¶ 104. The chief of police subsequently promoted the BPD officer who recommended the charge and appointed him to head the internal affairs department, which is tasked with investigating citizen complaints against the police. *Id.* ¶ 102. According to Alston, the Town's actions "defamed the Black [T]own [M]eeting member by creating the innuendo that he had done something criminal, inappropriate, or otherwise out of bounds." *Id.* ¶ 103.

In late 2007, in an effort to shield itself from charges of racism after two Black employees filed racial discrimination claims with the MCAD the previous year, the Town hired a Black woman as the director of the Town's early childhood education center, which is run by the recreation department. *Id.* ¶ 87. Parents and staff did not approve of the new director and requested that the head of the recreation department terminate the director or force her to resign. *Id.* ¶ 88. "The department head did not support the director, and town counsel began to investigate pretexts on which to fire her." *Id.* ¶ 89. In early 2008, the head of the recreation department conducted a meeting for parents and staff, the purpose of which was to persuade the director to resign. *Id.* ¶ 90.

The day after the meeting, an unidentified individual left a bomb threat that contained a racial slur in the director's work mailbox at the center. *Id.* ¶ 91. In response, Town Counsel coordinated a "sham investigation" with the police that yielded no suspects. *Id.* ¶ 92. The Town then fired the director for "a pre-textual reason that it had been aware of before the bomb threat." *Id.* ¶ 93. To avoid potential liability for discrimination, the Town hired another Black woman to head the center. *Id.* ¶ 94. This individual subsequently left a year later "because of the hostile racial climate at the center." *Id.* The Town never addressed the racial climate at the center, and despite inquiry from a parent with children at the center regarding the two Black directors' departures, the Board never investigated the issue. *Id.* ¶¶ 94, 95.

In 2008, the Board appointed a white woman as a BPD officer over a Black woman with a higher score on the civil service exam. *Id.* ¶ 105. The white applicant was a Brookline High School graduate, a Brookline resident, and the daughter of a BFD firefighter. *Id.* The Black applicant was also a Brookline High School graduate and a resident of Brookline, but had no relatives employed by the Town. *Id.* To justify hiring the white applicant with the lower score, "the Town manufactured a pretext." *Id.* ¶ 106. The Town claimed that the Black applicant was bypassed due to an inconsistent work history and because she stated on her application that she had never used drugs, but admitted in her interview to having smoked marijuana as a teenager. *Id.* The applicant told the Town and the interviewers that she understood the question on the application to have only pertained to her drug use as an adult. *Id.* In 2013, the Black applicant made inquiries to the Town regarding her application, to which officials from the Town responded by discouraging her from examining her application by falsely suggesting that it contained damaging information about her. *Id.* ¶ 107. Town Counsel also falsely claimed that the Black applicant had scored lower on the civil service exam than the white woman who was ultimately hired. *Id.*

In 2008, a white employee of the DPW, who was hired by the Town in 2003 shortly after having completed a two and one half year sentence in the house of correction, was arrested for possession of heroin. *Id.* ¶¶ 108, 111. This employee allegedly used heroin and drank frequently while employed by the Town. *Id.* Despite his being arrested, the Town took no disciplinary measures against the white employee and did not make him enroll in a substance abuse program or subject him to drug or alcohol testing. *Id.* ¶ 109. This same employee was fired by his previous employer in 2000 after being arrested for armed robbery while masked. *Id.* ¶ 110.

According to Alston, "the white [DPW] employee's misconduct was an open secret among Town employees." *Id.* ¶ 112.

In 2010, a citizen brought a criminal complaint against four white BPD officers for assault and battery with a dangerous weapon. *Id.* ¶ 113.[17] Despite the victim's being taken to the hospital via ambulance for broken ribs, no officer was fired. *Id.* The officers in question received two-day suspensions and wrote letters to the police chief apologizing for exercising poor judgment. *Id.* ¶ 114. Six years later, in 2016, one of the officers involved in the 2010 incident was promoted to Sergeant by the Board despite the existence of an unresolved racial discrimination complaint against him. *Id.*

On November 4, 2012, BPD Sergeant Robert Murphy, the husband of Town Counsel, released a white man from the BPD station who had been arrested for driving under the influence. *Id.* ¶ 119. Sergeant Murphy had the white man's car towed back to the station and then allowed the man to drive away. *Id.* ¶ 120. As part of this same incident, Sergeant Murphy ordered the arresting officer to throw out several containers of alcohol that had been collected at the scene as evidence. *Id.* ¶ 121. After learning of the incident, the chief of police disciplined Sergeant Murphy with a written reprimand. *Id.* ¶ 122. The third amended complaint notes that "[s]everal years earlier, Mr. Murphy, while still an officer, received no consequences for not reporting, and concealing with the help of his sister, [who was also a] BPD officer, that his department issued firearm had gone missing. In fact, he was subsequently promoted to Sergeant by the [Board]." *Id.* ¶ 123.

In 2013, the Town convened a search committee to identify candidates to fill the position of head of the planning department. *Id.* ¶ 124. According to Alston, the planning department is

---

[17] The race of the citizen is not alleged. *Id.* ¶ 113.

"responsible for serving [the Town]'s low-income residents by administering [the Town]'s community development block grant funds." *Id.* The Town selected only white individuals to serve on the six-person search committee "and did not highlight the need for a candidate with expertise in working with and for low income residents." *Id.* ¶ 125. It is Alston's position that "[t]he most qualified applicant for the department head position was a Black man with a master's degree from Harvard, but the Town did not offer him the job because it had identified a preferable, although less qualified, white woman candidate with connections to the former [T]own administrator." *Id.* ¶ 126.

On August 26, 2014, a white BFD firefighter was arrested for allegedly driving 114 mph while under the influence of alcohol. *Id.* ¶ 127. The Town protected the white firefighter by refusing to confirm his employment with BFD to the press. *Id.* This same firefighter previously had been arrested for assault and battery and for driving under the influence in 2012. *Id.* ¶ 128. "Despite this pattern of arrests, the white firefighter has been protected by the Town from termination." *Id.* ¶ 129.

In November 2015, a white employee of the DPW threatened to shoot people in the department. *Id.* ¶ 130. In response, the Town posted police protection at the department and conducted an investigation. *Id.* "Because the employee was white, however, the Town claimed that the threat was a misunderstanding. The employee was not subjected to the same procedures as Mr. Alston." *Id.*

On December 7, 2015, Sergeant Robert Lawlor, a white BPD officer, "was protected from any substantial disciplinary action after he told Prentice Pilot[18] to do 'n***** jumping jacks.'" *Id.* ¶ 115. In response, the Board hired a consultant who claimed that when Sergeant

_____

[18] The third amended complaint does not explain who Prentice Pilot is. *See* #108.

Lawlor said the word "naked" it sounded like "n*****." *Id.* ¶ 116. The consultant did not confront Sergeant Lawlor with the fact that he told the initial police investigation that he said "nude." *Id.* ¶ 117. According to Alston, "[t]he [Board] [is] aware that Sergeant Lawlor and other employees use the n-word but tacitly approve its use to maintain racial subordination." *Id.* ¶ 118.

D. <u>Diversity and Anti-Discrimination Commissions</u>.

1. <u>The Human Relations Commission</u>.[19]

In May 2010, just days before the voicemail incident, the Town Meeting passed a resolution calling for the Town to "improve its diversity practices by (1) issuing an annual diversity report, (2) appointing a committee to examine and improve the Town's diversity practices, and (3) holding an annual Dr. Martin Luther King, Jr. celebration." *Id.* ¶ 131. The Board only supported the third prong of this resolution, and, during discussions of the resolution, Selectwoman Daly "cautioned that the author of the resolution should not expect [the Town] to 'look like Boston.'" *Id.* ¶ 132.

Selectwoman Mermell was assigned by the Board to chair the Dr. Martin Luther King, Jr. celebration committee. *Id.* ¶ 133. "[Selectwoman] Mermell prevented the committee from examining the Town's diversity practices, and the [Board] instead assigned [the Director of Human Resources] to write non-substantive annual reports regarding the racial composition of the workforce and the town's diversity practices, which did not include any data regarding the

---

[19] Attorney Ames, counsel for Alston, was a member of the Human Relations Commission and chair of a diversity subcommittee of the Commission during the time of the actions related in the third amended complaint. The court has commented before that certain of the pleadings in this case reference a long history of acrimony between Attorney Ames and the Town on the topic of racial discrimination. (#72 at 2 n.1.) With regard to claims concerning the Human Rights Commission, the Town asserts that Attorney Ames simply failed to persuade the Town to adopt his view of how racial discrimination should be addressed in the Town, and none of his claims are actionable. *See, e.g.*, #11 at 22. The court will confine itself to analyzing the pleadings and notes that facts concerning Attorney Ames's motives are not properly before the court on a motion to dismiss.

Town's handling of racial discrimination complaints." *Id.* The Board discontinued the annual reports after three years. *Id.* ¶ 134.

In 2011, concerns raised by Black employees with respect to racially disparate treatment by the Town were brought to the Board's attention. *Id.* ¶ 135. In response, the chair of the Board, Selectwoman DeWitt, announced at a Board meeting that Selectwoman Mermell was going to chair an ad hoc committee to examine and update the Town's workforce diversity policies. *Id.* ¶ 135. Neither selectwoman intended to do anything to ameliorate the employees' concerns. *Id.* Selectwoman Mermell "deliberately did not appoint anyone to the ad-hoc committee and did not convene any meetings[,]" and the Board "took no action to correct the racially disparate treatment that had been repeatedly brought to [its] attention." *Id.* ¶ 136.

At the end of 2012, the Human Relations Commission[20] started to investigate racial discrimination in the Town's workforce. *Id.* ¶ 137. As part of this process, the commission inquired about Alston's case. *Id.* The Human Relations Commission was governed by the Town bylaws, which empowered the Commission to investigate "complaints charging discrimination . . . in connection therewith by any town official or employee," *id.* ¶ 139 (quoting Section 3.14.3(g) of the bylaws), and required all departments of the Town to cooperate fully with the Commission. *Id.* ¶ 140 (quoting Section 3.14.5 of the bylaws).

In 2013, the Board blocked the Human Relations Commission from enforcing its mandate by: intentionally depriving the Commission of a quorum "by refusing to appoint two Black men and a Latino man with civil rights experience to seats vacated by resignations;"

---

[20] The third amended complaint notes that this commission is described as "the Town's civil rights commission" (#108 ¶¶ 37, 137) and is "charged with enforcing the Town's by-law against racial discrimination" and "investigat[ing] and resolv[ing] complaints of racial discrimination, including Mr. Alston's." *Id.* ¶ 37.

opposing a resolution in the Town Meeting that requested that the Board lift the moratorium on appointments and appoint the three applicants of color; and by naming Selectwoman Daly to an ad hoc committee on diversity, equal employment opportunities, and affirmative action to develop a warrant article to abolish the Human Rights Commission and eviscerate the Town's anti-discrimination bylaw. *Id.* ¶ 141; *see also id.* ¶ 38 (addressing the Board's alleged failure to appoint commissioners).

In the fall of 2013, Alston's case was reported publicly for the first time, and the Board refused to provide to the Human Rights Commission the Town's investigatory reports concerning Alston's case and prohibited the fire chief from meeting with the commission about the racial climate in the fire department. *Id.* ¶¶ 38, 142. Throughout Alston's interactions with the Town, the Town fought to prevent the Human Relations Commission from fulfilling its charge. *Id.* ¶¶ 37, 141.

## 2. Diversity, Inclusion, and Community Relations Commission.

In the spring of 2014, the Board "had [the Town Meeting] abolish the [Human Relations] Commission and replace it with the toothless [Diversity, Inclusion, and Community Relations (DICR)] Commission, which was stripped of any authority to rectify racial discrimination in the [Town] workforce." *Id.* ¶ 39; *see also id.* ¶ 143. The DICR Commission was promulgated under Article 3.14 of the Town's bylaws. *Id.* ¶ 143.[21]

In December 2014, the Board promised to "work with the newly constituted DICR Commission to conduct a Racial Climate Review in the fire department and 'seek out and eradicate any discrimination or unfairness that we hear about.'" *Id.* ¶¶ 48, 144. Alston contends that the Board failed to follow through on its December 2014 promises. *Id.* ¶¶ 48, 150. The

---

[21] Plaintiff requests that the court "[s]trike down Article 3.14 of the Town's bylaws as unconstitutional." (#108 at 42.)

Board repeatedly refused to meet with Alston to discuss the scope of the Racial Climate Review, including meetings requested by others on Alston's behalf. *Id.* ¶ 55.

Six months after promising to work with the DICR Commission, the Board "stripped the DICR Commission of responsibility for supervising the Racial Climate Review and directed that it not include any meaningful effort to examine, rectify, and improve the racial climate in the fire department." *Id.* ¶ 56. The final Racial Climate Review report failed to include any interviews with Black firefighters, and only five out of the fifteen Black firefighters responded to written survey questions. *Id.* ¶ 57. As part of its conclusion, the report stated that "Black respondents in the fire department 'believed it was not clear to whom to report harassment incidents' and that 'their work is not valued by others.'" *Id.* The report did not include any concrete steps for change. *Id.*

At a public meeting of the DICR Commission held on January 16, 2015,[22] Selectman Greene refused to discuss the final Racial Climate Review report because Alston was present. *Id.* ¶¶ 58, 145-146. At this same meeting, two Black police officers stated that the Town had failed to rectify the racially hostile environment present in the BPD, which included the failure to discipline members of the command staff who used racial slurs. The officers said they feared retaliation for coming forward with their complaints and neither has returned to work since. *Id.* ¶¶ 58, 147.

On January 5, 2016, the Board held a meeting to address public complaints about racism in the Town including those made by the two Black BPD officers. *Id.* ¶ 148. At the meeting, the chair of the DICR Commission read a statement, which had been approved unanimously by the Commission, in which the Commission accused the Board of allowing a culture of racism to

---

[22] The date of this meeting is listed as both December 16, 2015 and January 16, 2015. *See* #108 ¶¶ 58, 145-147.

permeate the Town's hiring practices and requested that the Board take action to ameliorate this issue. *Id.* ¶ 149. Alston asserts that the Board has not taken up the DICR Commission's charge. *Id.* ¶ 150.

## III. Standard of Review.

A Rule 12(b)(6) motion to dismiss challenges a party's complaint for failing to state a claim. In deciding such a motion, a court must "'accept as true all well-pleaded facts set forth in the complaint and draw all reasonable inferences therefrom in the pleader's favor.'" *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011) (quoting *Artuso v. Vertex Pharm., Inc.*, 637 F.3d 1, 5 (1st Cir. 2011)). In order to survive a motion to dismiss under Rule 12(b)(6), the plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The "obligation to provide the grounds of [the plaintiff's] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (internal quotation marks and alteration omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level," and to cross the "line from conceivable to plausible." *Id.* at 555, 570.

In this case, the Town does not ask the court to dismiss any claim of municipal liability asserted in the third amended complaint. The only claim the Town moves to dismiss is the claim that bylaw 3.14 is unconstitutional, and the Rule 12(b)(6) standard will be applied to that claim. For the remaining claims, the Town seeks only to narrow the evidence that Alston may use to establish municipal liability. To the extent the court recommends striking factual allegations, rather than claims, the court does so under Rule 12(f), under which "[t]he court may strike from a pleading . . . any redundant, immaterial, impertinent or scandalous matter."

## IV. Discussion.

As stated above, the Town defendants do not seek dismissal of claims relating to alleged racially-motivated actions taken against Alston, including claims "arising from an alleged hostile work environment and his termination . . . ." (#111 at 1.) The motion is limited to allegations concerning: 1) "[t]he portions of the Complaint relating to policy choices by the Town regarding the power and jurisdiction" of Town committees and the asserted unconstitutionality of Article 3.14 of the Town bylaws; and 2) allegations of "alleged discrimination against third parties by unrelated actors spanning decades." *Id.* at 3.

Alston's opposition to the Town defendants' pending motion consists of: 1) his Rule 12 procedural bar argument which is without merit, *see supra* n.7; 2) a two-paragraph defense of his assertion that Article 3.14 of the Town bylaws is unconstitutional; and 3) the contention that because this court and the Town defendants have acknowledged that some of Alston's claims will survive the motion to dismiss, he should therefore be entitled to conduct discovery on all his allegations. *See* #133. Alston makes no effort to rebut the Town defendants' argument that many of the examples he sets out to establish the municipal custom are not sufficiently connected to the harm he allegedly suffered, and he fails to address the objections raised by the Town that many of the examples in the third amended complaint assert harms perpetrated by actors over whom the Board has no control.[23]

As described below, the court finds that certain allegations in Alston's third amended complaint are irrelevant to his claims and recommends that they be stricken. Other allegations about which defendants complain are sufficiently related to Alston's claims that they should not

---

[23] As previously mentioned, in his opposition Alston incorporates an earlier opposition he filed to defendants' previous motions to dismiss, #40. That 37-page pleading consists almost entirely of a rehash of factual allegations set out in the first two complaints, *see id*. at 5-34, and devotes only three pages to legal argument concerning the individual defendants' motion to dismiss.

be stricken at this juncture. The court finds, further, that the Brookline bylaw complained of is not unconstitutional, and recommends that the corresponding claim be dismissed.

A. <u>The Law</u>.

1. <u>42 U.S.C. § 1981</u>.

Section 1981 prohibits racially discriminatory impairment of one's right "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." Title 42 U.S.C. § 1981(a). The statute defines "make and enforce contracts" as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Title 42 U.S.C. § 1981(b). In the First Circuit, "'[t]o state a claim under this statute, a plaintiff must show (1) that he is a member of a racial minority, (2) that the defendant discriminated against him on the basis of his race, and (3) that the discrimination implicated one or more of the activities enumerated in the statute.'" *Odunukwe v. Bank of Am.*, 335 F. App'x 58, 61 (1st Cir. 2009) (quoting *Garrett v. Tandy Corp.*, 295 F.3d 94, 98 (1st Cir. 2002)).

Section 1981 has been interpreted to cover various forms of employment discrimination:

> [Plaintiff] grounds her claims in both Title VII and 42 U.S.C. § 1981. The same legal framework applies to both statutory bases. . . . This framework allows for distinct claims of disparate treatment, retaliation, and hostile work environment, all of which [plaintiff] alleges, and all of which fit into the familiar *McDonnell Douglas* burden-shifting scheme.

*Bhatti v. Trustees of Boston Univ.*, 659 F.3d 64, 70 (1st Cir. 2011) (internal citation and footnote omitted) (affirming summary judgment in favor of employer).

Under the *McDonnell Douglas* burden-shifting scheme, "a plaintiff bears the initial burden of proffering evidence sufficient to establish a prima facie case of discrimination."

*Cherkaoui v. City of Quincy*, 877 F.3d 14, 24 (1st Cir. 2017); *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 19 (1st Cir. 1999) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  The defendant then has the burden of articulating a legitimate, nondiscriminatory reason for the adverse employment action.  *Cherkaoui*, 877 F.3d at 24 (citations omitted).  If defendant accomplishes this task, the plaintiff then has the burden of offering "evidence that [defendant's] explanation is pretextual and that discriminatory animus prompted the adverse action."  *Id.* (quotation marks and citations omitted).[24]

2. <u>42 U.S.C. § 1983</u>.

Section 1983 "is a vehicle through which individuals may sue certain persons for depriving them of federally assured rights, such as the First Amendment's right to free speech . . . ."  *Gagliardi v. Sullivan*, 513 F.3d 301, 306 (1st Cir. 2008). A claim under § 1983 has two essential elements: the defendant must have acted under color of state law, and his or her conduct must have deprived the plaintiff of rights secured by the Constitution or by federal law.  *Id.* "The second element requires the plaintiff to show 'that the [defendant's] conduct was the cause in fact of the alleged deprivation.'" *Id.* (quoting *Rodriguez-Cirilo v. Garcia*, 115 F.3d 50, 52 (1st Cir. 1997)).

---

[24] The Supreme Court, in *Jett v. Dallas Independent School District*, 491 U.S. 701, 731 (1989), explained that "the explicit remedial provisions of § 1983 [are] controlling in the context of damages actions brought against state actors alleging violation of the rights declared in§ 1981." Two years after *Jett*, Congress, via the Civil Rights Act of 1991, amended § 1981 in such a way that some courts questioned whether Congress had reversed *Jett*. In *Buntin v. City of Boston*, 857 F.3d 69 (1st Cir. 2017), the First Circuit held that *Jett's* reading of § 1981 had not been reversed by Congress and that § 1981 "provides no implied private right of action for damages against state actors." 857 F.3d at 72. There is a question whether the import of *Jett* is that § 1981 claims against state actors should be dismissed. *See McGovern v. City of Philadelphia*, 554 F.3d 114, 121 (3rd Cir. 2009) (affirming dismissal of § 1981 claim against city because § 1983 is exclusive remedy for violations of § 1981 by state actors). Defendants do not raise this issue and, in the absence of First Circuit precedent, the court does not reach it.

The federally protected rights at issue here are (1) Alston's rights under § 1981 to be free from racial discrimination in his employment, outlined above, (2) Alston's First Amendment rights to freedom of speech and to petition the government for redress of grievances, and (3) Alston's Fourteenth Amendment right to equal protection. (*See* #108 ¶¶ 1, 193-95.)

"When a government actor retaliates against someone for exercising constitutionally protected First Amendment rights, that individual has a cognizable retaliation claim pursuant to § 1983." *Najas Realty, LLC v. Seekonk Water Dist*., 821 F.3d 134, 141 (1st Cir. 2016). "The First Amendment protects (among other things) the right to free speech and the right to petition all branches of the government." *Id*. The elements of a First Amendment free speech retaliation claim in a case involving a government employee are (1) whether the employee spoke as a citizen on a matter of public concern, (2) whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public, and (3) whether the plaintiff can show that the protected expression was a substantial or motivating factor in the adverse employment decision. *Barton v. Clancy*, 632 F.3d 9, 27 (1st Cir. 2011) (quoting *Curran v. Cousins*, 509 F.3d 36, 45 (1st Cir. 2007)).

A claim of retaliation for petitioning the government for redress of grievances can take many forms, *see Powell v. Alexander*, 391 F. 3d 1, 16 (1st Cir. 2004) (citing cases), including termination of an employee. *See Fishman v. Clancy*, 763 F.2d 485, 486-87 (1st Cir. 1985) (finding attempts to terminate public school teacher for filing grievances and engaging in other First Amendment activities cognizable under § 1983). Such a claim is governed by the two-part burden-shifting analysis established by the Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977). A plaintiff must first show by a preponderance of the evidence that he "engaged in constitutionally protected conduct, and that

the conduct was a substantial or motivating factor for the adverse employment decision." *Padilla-Garcia v. Guillermo Rodrigues,* 212 F.3d 69, 74 (1st Cir. 2000). [25]

A plaintiff makes out a claim for violation of his Fourteenth Amendment right to equal protection under § 1983 by showing "'that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Freeman v. Town of Hudson*, 714 F.3d 29, 38 (1st Cir. 2013) (quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 909–910 (1st Cir. 1995)). A plaintiff in a disparate treatment race discrimination case must show that others similarly situated to him in all relevant respect were treated differently by the employer. *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir. 1999) ("Reasonableness is the touchstone: while the plaintiff's case and the comparison cases that he advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances.").

### 3. <u>Municipal Liability</u>.

Municipalities may be sued under § 1983. *Monell v. Dept. of Soc. Serv. of City of N.Y.*, 436 U.S. 658, 690 (1978). It is axiomatic that a municipality cannot be held liable on a theory of respondeat superior just because it employs a tortfeasor. *Id.* at 691. To establish municipal liability under § 1983, a plaintiff must not only identify conduct attributable to the municipality, but:

> must prove that "action pursuant to official municipal policy" caused [his] injury.
> Official municipal policy includes the decisions of a government's lawmakers, the
> acts of its policymaking officials, and practices so persistent and widespread as to

---

[25] If Alston is able to prove these elements, then defendants may avoid liability only by proving by a preponderance of the evidence that they would have taken the same action "even in the absence of the protected conduct." *Mt. Healthy,* 429 U.S. at 287.

practically have the force of law. These are "action[s] for which the municipality is actually responsible."

*Connick v. Thompson*, 563 U.S. 51, 60-61 (2011) (some alteration in original) (internal citation omitted); *see Baron v. Suffolk Cty. Sheriff's Dep't*, 402 F.3d 225, 236-37 (1st Cir. 2005).

Municipal liability will attach if a violation occurs pursuant to an official policy or a custom. *Welch v. Ciampa*, 542 F.3d 927, 941 (1st Cir. 2008). When an official policy exists that is unconstitutional on its face, the inquiry is straightforward. *See*, *e.g.*, *Monell*, 436 U.S. 658 (finding liability for enforcement of an unconstitutional city policy that required pregnant employees to take unpaid leaves of absence before medically necessary). When a plaintiff points to no specific unconstitutional policy, however, as is the case here, a claim of municipal liability must be grounded in a custom as evidenced by widespread action or inaction by public officials. *See McElroy v. City of Lowell*, 741 F. Supp. 2d 349, 353 (D. Mass. 2010) (citing *Fletcher v. Town of Clinton*, 196 F.3d 41, 55 (1st Cir. 1999)).

The First Circuit has explained the difference between official policy and unofficial custom: "[u]nlike a 'policy,' which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up." *Baron*, 402 F.3d at 236 (alteration in original) (internal citation omitted). Such a custom "must be so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989); *Whitfield v. Melendez–Rivera*, 431 F.3d 1, 13 (1st Cir. 2005).

The Supreme Court has explained the causation requirement: a plaintiff who brings a § 1983 action against a municipality bears the burden of demonstrating that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must

demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original) (internal citation omitted); *Burrell v. Hampshire Cty.*, 307 F.3d 1, 10 (1st Cir. 2002); *see also Melendez–Rivera*, 431 F.3d at 13 (quoting *Bordanaro*, 871 F.2d at 1156) ("[T]he custom must have been the cause of and 'the moving force behind' the constitutional violation.").

There are two theories of municipal liability at issue in this case. One is that because of long-standing and widespread racism in the Town condoned by the Town government, there exists a custom of treating city employees in a racist manner; the Board treated Alston in accordance with this custom; and Alston suffered as a result. (#108 ¶¶ 1, 193.) A second theory is that acts committed by the members of the Board in their handling of Alston's case, in their role as "policymaking officials" of the Town, constituted a policy for which the Town is liable. *Id*. at ¶196. *See Connick*, *supra*, 563 U.S. at 60-61 ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials[. . . .]"); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) ("[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances."); *Welch,* 542 F.3d at 941 ("We are bound by *Pembaur* and conclude that a single decision by a final policymaker can result in municipal liability."); *see also Saunders v. Town of Hull,* 874 F.3d 324, 330 (1st Cir. 2017) (finding no *Monell* liability where there was insufficient evidence that Board of Selectmen ratified official's retaliation against individual).

Whether an official "has this requisite level of specific policymaking authority is a matter of state law." *Walden v. City of Providence, R.I.,* 596 F.3d 38, 55 (1st Cir. 2010) (citing *Jett*, 491 U.S. at 737); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988). The Town defendants

have conceded that the Board members are the policymakers for purposes of liability concerning Alston's employment decisions. (#111 at 12.)

4. Proving Municipal Liability.

Alston claims that a superior officer in the BFD called him a racial slur; Alston reported the incident but the Town's response was grossly inadequate; and after reporting the racial slur incident and complaining about the Town's lackluster response, Alston was the victim of the Town's orchestrated effort to silence him, retaliate against him, and ultimately terminate him from the BFD. In short, Alston avers that the Town, primarily through the actions of the Board, retaliated against him for protesting his "unequal and racist treatment." (#108 ¶¶ 18-64.)

Alleging that the members of the Board are "final decisionmakers," *see id.* ¶ 4, and that their actions deprived Alston of constitutional rights is an acceptable method of establishing municipal liability under § 1983, and the third amended complaint is not deficient in this regard. *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 406 (1997). As set out above, however, Alston further asserts that he was discriminated against pursuant to a wide-spread custom of racial discrimination in the town. (#108 ¶¶ 65-130.) Some of the facts he sets out to establish the existence of this alleged custom are problematic.

Courts have required that the evidence used to demonstrate a municipal custom have a close connection to the acts alleged in the case itself. For example, in *Connick*, in the context of municipal liability for the failure to train employees, plaintiff sought to establish that the prosecutor's office in question had a pattern of perpetrating *Brady* violations. *Connick*, 563 U.S. at 62. Plaintiff proffered that in the ten years preceding his trial, Louisiana courts had overturned four convictions because of *Brady* violations by prosecutors in the same office. *Id.* The Supreme Court, however, ruled that the four reversals did not prove a pattern of constitutional violations because they were not sufficiently similar to the *Brady* violation in that case:

> Those four reversals could not have put Connick on notice that the office's *Brady* training was inadequate with respect to the sort of *Brady* violation at issue here. None of those cases involved failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind. Because those incidents are not similar to the violation at issue here, they could not have put Connick on notice that specific training was necessary to avoid this constitutional violation.

*Id.* at 62-63.[26]

Conduct was deemed similar enough in *Bordanaro*, where plaintiffs sought to show that their injuries, suffered after Everett police officers forced open a hotel room door and beat them, were caused by the unconstitutional practice of the Everett Police Department of breaking down doors without warrants when apprehending felons. 871 F.2d at 1155. The practice was established at trial by a witness's testimony that the police had broken down doors in such situations for many years. *Id*. The Police Chief's failure to eradicate "this facially unconstitutional practice from the police department attribute[ed] that custom to the municipality." *Id*.

The Third Circuit, in *Watson v. Abington Twp.*, 478 F.3d 144, 157 (3rd Cir. 2007), expounded at length on what evidence might be similar enough to establish a municipal custom. The court there found that the plaintiffs' alleged claim—that the police were raiding establishments associated with Black individuals—was incongruous with the evidence proffered to establish a custom, namely, the use of racial profiling tactics by the police with respect to the issuance of traffic tickets and the use of racial slurs within the department. The *Watson* court explained that

> Here … the only evidence advanced by the Plaintiffs is evidence that officers at one point may have used racial profiling as a way to increase the number of traffic tickets they were writing and may have used racial slurs. *This evidence is simply*

---

[26] While the "pattern of similar constitutional violations by untrained employees" standard necessary to make out a failure to train claim is not identical to that of general municipal custom, the Supreme Court has relied on failure to train cases in its analysis of general municipal liability. *See, e.g.*, *Bd. of Cty. Comm'rs of Bryan Cty., Okl.*, 520 U.S. at 406-08.

*too general to sustain their claims. Our cases under Monell have typically involved an alleged constitutional violation that was an actual occurrence of the specific alleged custom.* In *Bielevicz*, for example, we found that there was sufficient evidence of a custom of arresting people for public intoxication without probable cause to support a § 1983 claim that the plaintiff had been arrested for public intoxication without probable cause. 915 F.2d at 851–52. Similarly, in *Beck v. Pittsburgh,* 89 F.3d 966 (3d Cir. 1996), we found that the plaintiff's § 1983 claim for police brutality could survive a motion for judgment as a matter of law based on evidence of the department's alleged custom of ignoring police brutality. *Id.* at 976. Here, the Plaintiffs do not have evidence that the Abington Township Police Department had a custom of raiding establishments associated with African–Americans.

*Watson*, 478 F.3d at 157 (emphasis added).

Alston does not cite to any cases, and this court has found none, in which conduct as wide-ranging, disparate, and remote in time as that alleged in the third amended complaint has been found to be relevant in proving a custom to establish municipal liability. There simply is no legal precedent for finding that facts such as racial discrimination in housing, the favorable treatment of a white police officer who lost his firearm, or problems encountered by a Black director of the Town's early childhood education center, to name just a few of the many examples Alston proffers, properly may be offered as evidence of a municipal custom of racism that led to retaliation against a firefighter who complained about being called a racial slur. Surely, racism is a pervasive problem in our society. But not every example of racism in a town, or of favoritism toward white people, can be mustered to establish a municipal custom in a particular civil rights suit. As detailed below, this court therefore finds that many of the allegations pled are irrelevant to establishing the custom and should be stricken from the third amended complaint.

The court does find that some of the allegations challenged by the Town should not be stricken. They may be relevant to Alston's claims for violation of his Fourteenth Amendment right to equal protection under § 1983 by showing that Alston was selectively treated compared

with others similarly situated on the basis of his race. *See Freeman v. Town of Hudson*, 714 F.3d at 38. Certain allegations may also be relevant to the alleged violation of Alston's § 1981 right to be free from employment discrimination based on race, and to Alston's claims that he was retaliated against, in violation of the First Amendment, because of his complaints to the town. Whether these allegations are pertinent to an alleged custom on which municipal liability can be based, and if so, whether they constitute enough evidence to establish a custom, may be explored further as the case progresses.

The Town argues that with regard to much of the conduct alleged in the third amended complaint involving individuals other than Alston, it is not clear whether members of the Board were the final policymakers. (#111 at 13-14, 15.) The court does not have enough information at this time to make findings on this basis. For example, the Town argues that the Board may not be deemed responsible for any conduct alleged to have occurred in the DPW, because "[a]side from DPW Division Heads . . . , the DPW Commissioner is otherwise the appointing authority for DPW." (#111 at 4.) At this point in the case, it is not clear what control the Board has over the DPW Commissioner, or whether in a particular case the Board could be said to have had actual or constructive knowledge of a certain problem. *See Silva v. Worden*, 130 F.3d 26, 31-32 (1st Cir. 1997) (finding that, to establish custom that has not been formally approved by a decision-maker, final policymakers must have had actual or constructive knowledge of the custom but did nothing to end the practice). At this stage the court will confine its recommendation to whether the asserted conduct appears to be sufficiently related to the harms allegedly suffered by Alston to be relevant to the action.

B. <u>Allegations in the Third Amended Complaint</u>.

1. <u>Evidence to Establish Custom</u>.

a. <u>Housing Demographics</u>.

The third amended complaint's reference to a 2013 study that found that racial discrimination was occurring in the Town's housing and rental markets, (#108 ¶ 68), and the findings of a 1969 committee that reached a similar conclusion, *id.* ¶ 69, do not have a sufficient connection to Alston's claims to establish any municipal custom. These allegations should be stricken.

b. <u>Municipal Employee Demographics</u>

Alston's assertion that the custom is the reason for the racially disparate makeup of the municipal workforce, *id.* ¶ 67, his allegations with respect to white, multi-generational kinship networks, *id.* ¶ 70, and his assertion that the Board reserves the Town department head positions for white people, *id.* ¶¶ 75-77, are not sufficiently linked to the harm Alston suffered. Court orders from the 1970s regarding the employment of Black firefighters and police officers, *id.* ¶ 71, are too remote in time to be relevant. However, claims concerning Black firefighters' and police officers' not being promoted, *id.* ¶¶ 72-73, and Black firefighters' and police officers' opinions about how their work is viewed, *id.* ¶ 74, should not be stricken, as allegations pertaining to racial discrimination in the fire and police departments, and the Board's response to those issues, are relevant to Alton's claims. [27]

---

[27] The third amended complaint does not give many details about these matters and the court may revisit their relevancy as the case progresses.

c. <u>Advantageous Treatment of White Individuals</u>.

Alston's general statements regarding which Town agents "enforce" the "unconstitutional policy" are sufficiently related to his claims and should remain. *Id.* ¶¶ 65-66. However, Alston's statement that Brookline "favors white people and discriminates against Black people in all aspects of Town affairs, *id.* ¶ 79, is conclusory and should be stricken.

The 2005 incident in which an unidentified white DPW employee was convicted of a crime, yet the Town refused to take any action and subsequently promoted him, *id.* ¶¶ 80-82, bears too tenuous a connection to Alston. These allegations should be stricken.

The Town's 2007 decision to promote an unidentified white employee to a senior administration position over a Black employee with "superior qualifications," *id.* ¶¶ 83-86, is not sufficiently related to Alston's claims to be relevant. These allegations should be stricken.

The Town's 2007 decision to hire a Black woman as the director of the Town's early childhood education center and the subsequent problems that unfolded, *id.* ¶¶ 87-95, are not sufficiently connected to the harm Alston allegedly suffered. These allegations should be stricken.

The 2008 appointment of an unidentified white woman as a BPD officer over an unidentified Black woman with a higher score on the civil service exam for allegedly pretextual reasons, *id.* ¶¶ 105-107, is not a basis from which one can draw any reasonable inferences relating to the harm alleged against Alston. These allegations should be stricken.

The Town's allegedly insufficient response to a white DPW employee's 2008 arrest for possession of heroin and the subsequent promotion of the employee, *id.* ¶¶ 108-112, bears no connection to the harm alleged to have been inflicted upon Alston, and therefore fails to support the claims advanced in the third amended complaint. These allegations should be stricken.

Sergeant Robert Murphy's November 4, 2012 decision to release a white individual from BPD custody and the chief of police's resultant decision to discipline Murphy with a written reprimand, *id.* ¶¶ 119-122, are not connected sufficiently the allegations pertaining to Alston. These allegations should be stricken.

The allegations pertaining to Murphy's not being disciplined for losing and concealing the loss of his department issued firearm, *id.* ¶ 123, are in no way connected to the conduct concerning Alston. These allegations should be stricken.

The Town's 2013 decision to appoint white members to a committee tasked with finding candidates for the position of head of the planning department and subsequent appointment of a white department head, *id.* ¶¶ 124-126, do not show any malfeasance on the part of the Town. These allegations should be stricken.

Alston's contention that the Town protected a white firefighter who was arrested for driving 114 mph while under the influence of alcohol and had been previously arrested in 2009 and 2012, *id.* ¶¶ 127-129, should remain in the case and not be dismissed as it is sufficiently similar to his claims.[28]

The allegations pertaining to a white DPW employee's threatening comments and the Town's reaction, *id.* ¶ 130, and Alston's contention that "[t]he employee was not subjected to the same procedures as Mr. Alston," *id.*, are relevant to Alston's claims and should not be dismissed.

d. Mistreatment of Black Individuals.

The allegations pertaining to a Black DPW employee's mistreatment and victimization via racial epithets by supervisors and co-workers, *id.* ¶¶ 96-98, are analogous to the conduct directed at Alston and should not be stricken.

---

[28] Again, as with other facts the court finds should not be dismissed at this stage, the complaint contains little information about this incident and the court may revisit its relevancy as the case progresses.

The 2007 incident where a Black Town Meeting member was criminally charged and banned from Town hall for objecting to a white Town official's rudeness to a senior citizen, *id.* ¶¶ 99-104, does not support Alston's claims with respect to the harm inflicted on him. Alston does not assert any basis on which the Town's failure to "sanction the police, the [T]own official, or [T]own [C]ounsel for their misconduct," *id.* ¶ 101, could support a municipal liability claim. Alston's assertion that "[t]he Town's actions defamed the Black [T]own [M]eeting member by creating the innuendo that he had done something criminal, inappropriate, or otherwise out of bounds," *id.* ¶ 103, is conclusory and need not be credited. These allegations should be stricken.

The 2010 incident involving a citizen's filing of a criminal complaint against four white BPD officers, and the subsequent promotion of one officer despite the existence of an outstanding racial discrimination complaint, *id.* ¶¶ 113-114, is not sufficiently linked to Alston's claims. These allegations should be stricken.

The portion of the third amended complaint relating to the December 7, 2015 incident where Sergeant Robert Lawlor told an individual to do "n***** jumping jacks" and the Town's efforts to protect Sergeant Lawlor "from any substantial disciplinary action," *id.* ¶¶ 115-118, is sufficiently similar to the harm allegedly inflicted on Alston and resulting Town response to support Alston's claims and should not be stricken.

e. Town Commissions.

Many of Alston's allegations concerning the Human Rights and DICR Commissions are insufficiently connected to the harm allegedly suffered by Alston to support his claims. The general claim that Brookline has "from time to time" established committees "to investigate racial inequality" but "has never given these bodies any power to rectify racial discrimination" is too general and is conclusory, and should be stricken. *Id.* ¶ 78. The third amended complaint

discusses a 2010 resolution passed by the Town Meeting that called for the Town to improve its diversity practices. *Id.* ¶ 131. Plaintiff asserts that the Board only partially supported this resolution, *id.* ¶ 132, and that Selectwoman Mermell prevented a committee, which had been formed as a result of the resolution, from examining the Town's diversity practices, *id.* ¶ 133. Plaintiff does not explain how Selectwoman Mermell inhibited the committee nor does he allege that her actions harmed him. These allegation should be stricken.

Alston also alleges that the Board assigned the Director of Human Resources to "write non-substantive annual reports regarding the racial composition of the workforce and the town's diversity practices, which did not include any data regarding the Town's handling of racial discrimination complaints," *id.* ¶ 133, and that the reports were discontinued after three years, *id.* ¶ 134. Alston's cursory claims do not identify how these reports impacted him, or how a failure to include certain data or to complete reports beyond three years reflected a custom of racial discrimination. These allegations should be stricken.

Understanding that the Town defendants are not, at this juncture, moving for dismissal of claims relating to Alston's ultimate termination, that the Board is the entity responsible for his termination, and that Alston's treatment by the two commissions may have had some effect on the decision to terminate his employment, as set out below, several of the allegations in this section of the third amended complaint should not be stricken.

Allegations pertaining to a 2011 incident in which Black employees raised concerns of racially disparate treatment to the Board, who announced an ad hoc committee to examine the Town's "workforce diversity policies" lack detail regarding the Black employees' identities or departments. Nonetheless, the conduct alleged is sufficiently related to Alston's claims and the allegations should stand. *See id.* ¶¶ 135, 136.

Allegations that the Human Relations Commission, at the end of 2012, began to investigate Alston's case, *id.* ¶ 137, and that the Board refused to provide the commission with the Town's investigatory reports and prohibited the fire chief from meeting with the commission regarding the racial climate in the fire department, *id.* ¶ 142, are sufficiently connected to the alleged malfeasance inflicted on Alston to withstand scrutiny at this stage.[29] The portions of the third amended complaint addressing the Human Relations Commission's charge and authority, *id.* ¶¶ 138-140, can be construed to support plaintiff's assertion that the Board impeded the Human Relations Commission's efforts to investigate Alston's case and should also stand. Alston's allegations pertaining to generalized efforts on the part of the Board to block the efforts of the Human Relations Commission, however, without any connection to the harm borne by plaintiff, *id.* ¶ 141, fail to support his position, and those allegations should be stricken.

The allegations that the Board replaced the Human Relations Commission with a "toothless" DICR commission to avoid taking action against discrimination are sufficiently related to Alston's alleged claim of a custom of racism in employment and should remain. *Id.* ¶¶ 39, 143-144. The allegations pertaining to the December 16, 2015 DICR Commission meeting at which the Racial Climate Review was to be discussed, and Selectman Greene's refusal to do so because Alston was present, *id.* ¶¶ 145-146, relate sufficiently to the Board's alleged mistreatment of plaintiff and should stand. The allegations regarding two unidentified Black BPD officers' complaints made at the December 16th meeting regarding racial discrimination and the fear of retaliation, *id.* ¶ 147, and the subsequent decision to hold a meeting to address racism, *id.* ¶ 148, are sufficiently related to Alston's claims and should remain. The statement read by the

---

[29] The court's recommendation that ¶ 137 stand is limited to the extent that it asserts that the Human Relations Commission began to investigate Alston's case and should not be construed as allowing Alston to advance claims relating to the overly broad category of "racial discrimination in the Town's workforce." (#108 ¶ 137.)

DICR Commission at the January 5, 2016 meeting, *id.* ¶¶ 149, is potentially relevant to the Board's notice of alleged discrimination and should also remain.

Alston's contention that the Board has "failed to take up the DICR Commission's charge," *id.* ¶ 150, is conclusory and should be stricken.

## 2. The Constitutionality of Article 3.14.

The third amended complaint's reference to Article 3.14 is cursory:

> In the spring of 2014, led by Selectwoman Daly, the Selectmen's ad-hoc Committee on Diversity, Equal Employment Opportunities, and Affirmative Action passed an article in Town Meeting which abolished the Human Relations Commission and replaced it with a Commission with no jurisdiction over the Town's workforce, the DICR Commission. The new bylaw is Article 3.14 of the Town's bylaws.

*Id.* ¶ 143. Alston notes that under this new bylaw the DICR Commission, unlike its predecessor, lacks jurisdiction over the Town's workforce, *id.*, and, in his "Relief Requested" section, Alston asks the court to strike down the bylaw as unconstitutional, *id.* at 42. Alston does not explain how the bylaw violates the Constitution in his complaint; one might infer that he is claiming that the bylaw was passed in order to thwart his efforts to have the Town address his complaints about racial discrimination, or that the replacing of one bylaw with another less-stringent one demonstrates the Town's custom of racism.

The Town defendants' arguments regarding Article 3.14 are minimal. In a single paragraph of their Motion, the Town defendants contend that the Article 3.14 is constitutional both on its face and as applied. (#111 at 14-15.)  Although the Town defendants make no argument concerning how the statute is constitutional on its face, it undoubtedly is. *See Watchtower Bible and Tract Society of New York, Inc., v. Sagardia De Jesus*, 634 F.3d 3, 12 (1st Cir. 2011) ("Such a challenge [that a statute is unconstitutional on its face] ordinarily requires that the statute be invalid in every possible application, or, in some First Amendment contexts,

that it be clearly overbroad in some applications that cannot or should not be severed.") (citing *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984)).

The Town defendants argue that Article 3.14 is constitutional as applied because the third amended complaint fails to allege any adverse action against Alston or change in Alston's working conditions as a result of Article 3.14's enactment. (#111 at 14-15.) The court will construe this as an argument that Alston does not have standing to raise his constitutional claim because he suffered no injury caused by the passage of Article 3.14. The court will consider this argument because standing is jurisdictional. *Rumford Pharmacy, Inc. v. City of E. Providence*, 970 F.2d 996, 1001 (1st Cir. 1992) ("Since appellant lacked standing to challenge the constitutionality of the Rhode Island statute, the district court was without jurisdiction to address its claim for declaratory or injunctive relief.").

Alston has "Article III standing" to challenge the constitutionality of the bylaw if he can "'allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)) (additional citation omitted). In other words, Alston must plead that he was injured by the passage of bylaw 3.14 and that if it is declared unconstitutional, his injury will be cured. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977). He has not done this. While one could infer from the third amended complaint that Alston alleges that the passage of 3.14 was motivated by the Board's wish to squash his complaints, (*see* #108 ¶¶ 56, 131-150), the allegations are nebulous and the link is tenuous. Moreover, even if Alston had adequately pled that he was injured by the passage of 3.14, there is no evidence that declaring the bylaw unconstitutional would provide Alston with a remedy. *See Rumford Pharmacy*, 970 F.2d at 1001 ("As it has not been alleged, nor does it appear, that equitable relief could restore or protect any

right of the appellant . . . appellant lacks standing to assert its claim for injunctive or declaratory relief.").

Alston notes that a facially neutral law is still unconstitutional if its enactment or enforcement was motivated by a discriminatory purpose—in this case, to racially discriminate. *Id.* He is correct that a discriminatory intent or purpose by the Board in enacting the bylaw would render it unconstitutional. *Vill. of Arlington* Heights, 429 U.S. at 265-66 (finding zoning constitutional where "[r]espondents simply failed to carry their burden of proving that discriminatory purpose was a motivating factor in the Village's decision"). Alston has no standing to pursue this claim, however. Section D of the relief requested, that the court find bylaw 3.14 unconstitutional, should be stricken, and the claim should be dismissed.

## V. Conclusion.

For all of the reasons stated, I RECOMMEND that Defendant Town's Partial Motion to Dismiss (#110) be ALLOWED in part and DENIED in part. Specifically, I RECOMMEND that the allegations in paragraphs 67-71, 75-95, 99-114, 119-126, 131-134, 141, 150 be stricken, and section D of relief requested (asking that Article 3.14 of the Town's bylaws be stricken as unconstitutional) be dismissed from the third amended complaint.

## VI. Review by District Court Judge.

The parties are advised that any party who objects to this Report and Recommendation must file specific written objections with the Clerk of this Court within 14 days of the party's receipt of it. The objections must specifically identify the portion of the Recommendation to which objections are made and state the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review. *See Keating v.*

*Secretary of Health & Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano*

*Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983);

*United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford*

*Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).


/s / M. Page Kelley
M. Page Kelley
United States Magistrate Judge

February 6, 2018

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


GERALD ALSTON,
     Plaintiff,


     v.                             CIVIL ACTION NO. 15-13987-GAO


TOWN OF BROOKLINE, MASSACHUSETTS,
BROOKLINE BOARD OF SELECTMEN,
BETSY DEWITT,
KENNETH GOLDSTEIN,
NANCY DALY,
JESSE MERMELL,
NEIL WISHINSKY,
BERNARD GREENE,
BEN FRANCO,
NANCY HELLER,
SANDRA DEBOW, and
JOSLIN MURPHY, each of them in his or her individual and official
capacity, and
LOCAL 950, INTERNATIONAL ASSOCIATION OF FIREFIGHTERS,
     Defendants.


REPORT AND RECOMMENDATION ON INDIVIDUAL DEFENDANTS'
MOTION TO DISMISS THIRD AMENDED COMPLAINT (#112).[1]


KELLEY, U.S.M.J.

## I. Introduction.

This is a civil rights action in which a former firefighter for the Town of Brookline,

Gerald Alston, who is Black, alleges that he was racially discriminated against by Brookline,

various town officials in their individual and official capacities, and the firefighters' union.[2]

---

[1] The Town defendants informed the court at the hearing on this motion on January 5, 2018, that they join in the individual defendants' motion with regard to certain arguments. The results will be noted *infra*.

[2] The defendants are the Town of Brookline (the Town), its board of selectmen (the Board), town counsel and the human resources director in their official capacities (collectively, the Town defendants); the union of firefighters to which Alston belonged (the Union); former Selectwoman Betsy DeWitt, former

The claims stem from an alleged policy, practice, and custom of racial discrimination in Town governance. (#108 ¶ 1.) Alston claims that the individual defendants are liable under 42 U.S.C. §§ 1981, 1983, and 1985 for violating his Fourteenth Amendment right to equal protection and his First Amendment rights to freedom of speech and to petition the government for redress of grievances by enforcing the Town's unconstitutional custom, retaliating against him for complaining about his unequal treatment and discriminating against him on the basis of his race. *Id.* ¶¶ 198-205 (Count II – the individual defendants).

The individual defendants moved to dismiss the third amended complaint (#112); Alston responded in opposition[3] (#133); and the individual defendants replied (#135). Oral argument on the motion was held on January 5, 2018. After the hearing both the individual defendants and plaintiff filed supplemental memoranda of law. (##186, 187.) For the reasons set out below, the court recommends that the motion to dismiss be denied.

## II. The Facts.[4]

The court previously set out the lengthy facts alleged in the case and separately set out the facts alleged to establish the Town's custom of discrimination,[5] and will not repeat the facts here except as they pertain to Alston's claims against the individual defendants.

---

Selectwoman Jesse Mermell, former Selectman Kenneth Goldstein, current Selectman Neil Wishinsky, former Selectwoman Nancy Daly, current Selectman Bernard Greene, current Selectman Ben Franco, current Selectwoman Nancy Heller, Town Director of Human Resources Sandra DeBow, and Town Counsel Joslin Murphy in their individual capacities (collectively, the individual defendants).

[3] Alston incorporated by reference his opposition to the individual defendants' earlier motion to dismiss (#40), *see* #133 at 6, and the court has reviewed that document in analyzing the pending motion.

[4] Although the case is only at the motion to dismiss stage, a substantial history exists. All that need be said here is that the present motion concerns the now-operative third amended complaint. For details concerning the procedural history of the case, *see* the court's Report and Recommendation on the Town defendants' motion to dismiss, docketed on February 6, 2018.

[5] *See* #72 (Report and Recommendation on previous motions to dismiss) and the Report and Recommendation on Town defendants' motion to dismiss.

A. <u>The Structure of Town Government</u>.

The Town government is headed by the board of selectmen, which is comprised of five elected members, and the town meeting. (#108 ¶ 3.) The selectmen are the chief elected and executive officers of the Town "with overall responsibility for supervising Town affairs." *Id.* ¶ 4. The Town operates under a "weak chief" charter, which means that the Board serves as the police and fire commissioner for the Town. *Id.*

> The Selectmen are the ultimate decision-makers with respect to the hiring, firing, promotion, demotion, and discipline (Selectmen must approve suspensions longer than 5 days) of Brookline police officers and firefighters. The Selectmen have the authority to hire and fire the town administrator, the town counsel, the director of human resources, the police chief, the fire chief, and other department heads. The Selectmen appoint members of Town boards and commissions, including the Town's Diversity, Inclusion, and Community Relations Commission [] and the prior Human Relations Commission. The Selectmen are responsible for adopting and overseeing town administrative policies, including the Town's anti-discrimination and retaliation policy, and representing the Town of Brookline in lawsuits, as plaintiff and defendant. The Chair of the Brookline Board of Selectmen sets the agenda for the Board and communicates regularly with the administrative staff, including the town counsel, human resources director, and the town administrator. The Selectmen frequently appoint and serve on ad-hoc committees to address Town issues.

*Id.*

B. <u>Facts Pertaining to the Individual Defendants' Treatment of Alston</u>.[6]

---

[6] Alston's third amended complaint is full of references to actions taken by "the Town" or "the Board of Selectmen" without attributing those actions to any particular individuals. In the section of the complaint entitled "Claims Against Individual Selectmen," however, he specifies which selectmen performed certain actions. (#108 ¶¶ 151-59.) Even though the Board members had different tenures, Alston makes claims against each of them sufficient to withstand this motion to dismiss. *See, e.g., id.* ¶ 158 (Board members Daly, Wishinsky, Heller, Greene and Franco decided to terminate Alston), ¶¶ 152-53 (Board members DeWitt, Goldstein, and Mermell decided to give Pender "grossly insufficient discipline for racist and retaliatory conduct"). Alston also makes sufficient specific claims against Town Counsel and the Director of Human Resources, *see id.* ¶¶ 160-68 ("Claims Against Town Counsel") and ¶¶ 169-79 ("Claims Against the Human Resources Director"). *See Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 15 (1st Cir. 2011) (holding that each defendant's role must be sufficiently alleged "to make him or her a plausible defendant.").

Alston joined the Brookline Fire Department (BFD) in 2002. *Id.* ¶ 2. On May 30, 2010, Paul Pender, a lieutenant in the BFD, left a voicemail on Alston's phone in which he called Alston a "f***ing n*****" (the voicemail incident). *Id.* ¶ 19. A week later, Alston reported the incident to BFD's chief operating officer, but the Town took no action other than to inform Pender of Alston's complaint. *Id.* ¶ 22. Alston contends that Pender made excuses for the comment, showed no remorse, and told Alston that filing the complaint "was the stupidest thing [Alston] could have ever done." *Id.* ¶¶ 23-24. Pender behaved this way because he knew that the custom of racial discrimination in the Town would protect him and punish Alston. *Id.* ¶ 24.

On August 17, 2010, the Board held a hearing to address the voicemail incident, but failed to question Pender about his excuses; did not investigate Pender's intimidating and retaliatory conduct; and did not "terminate his employment, demote him, or make him ineligible for promotion." *Id.* ¶ 26. The Board kept the facts of the incident secret. *Id.* ¶ 27.

In September 2010, Pender served a "two 24-hour shift suspension." *Id.* ¶ 29. Then the Town, "[w]ith the tacit approval of [the Board]," promoted Pender to acting captain. *Id.* On September 22, 2010, the Board arranged for Pender to travel to the White House to receive a medal of valor from the attorney general. *Id.* ¶ 27. Selectwoman Mermell tweeted out coverage of the medal ceremony. *Id.* The purpose and effect of Selectwoman Mermell's actions was to "protect Lieutenant Pender from any stigma and to mark him with the selectmen's corporate stamp of approval." *Id.* ¶ 28.

In May 2012, Alston filed a complaint with the Massachusetts Commission Against Discrimination (the MCAD) "relating to the promotion." *Id.* ¶ 32a. Prior to filing with the MCAD, Alston complained repeatedly to the fire chief and the director of human resources about Pender's promotion. *Id.* According to Alston, "[t]o take advantage of the 300-day statute of

limitations for employment discrimination actions in Massachusetts, [the Town] persuaded Mr. Alston to keep his complaints 'in-house' for years by lying to him and cynically taking advantage of his loyalty to the fire department and his desire to be seen as a team player." *Id.* ¶ 33.

On May 7, 2013, the fire chief reported to the Board that Pender was being "assigned to be the assistant trainer for all firefighters in Brookline." *Id.* ¶ 30. Despite knowing that Alston had filed a complaint with the MCAD protesting his treatment after he reported the voicemail incident, the Board voted unanimously to promote Pender permanently to captain. *Id.* ¶ 31. Alston contends that this action was in contravention to the Board's statement to him that Pender would be ineligible for promotion. *Id.* ¶ 34. The Board told Alston that Pender "had not really been promoted and that his promotion to Captain was temporary and would be rescinded." *Id.*

Alston states that the Town "promised to 'take care of' the retaliation against [Alston] and prohibited him from obtaining relief from the Town's civil rights commission, the Human Relations Commission." *Id.* The Town also failed to investigate properly Alston's complaints that he had been "shunned, ostracized, and denied promotions to temporary Lieutenant in April and May of 2013." *Id.* ¶ 35.

In June of 2013, Alston filed an action in Superior Court of the Commonwealth of Massachusetts, Norfolk County, "complain[ing] about Lieutenant Pender's promotion." *Id.* ¶ 32a.

In the fall of 2013, the Town "attacked Mr. Alston publicly and behind closed doors; forced him out of the fire department on a pretext; and falsely and maliciously arranged for him to be deemed 'unfit for duty' by a biased and incompetent psychiatrist." *Id.* ¶ 36. On December 19, 2013, the word "Leave" was written on the door underneath Alston's jacket on his assigned

seat on the firetruck. *Id.* ¶ 32e. Alston asserts that the Town and certain individual defendants failed to investigate the incident adequately, *id.* ¶¶ 161, 174, and that as a result of this failure, other firefighters were encouraged to shun and ostracize him. *Id.* ¶ 32e.

By early 2014, the Town had placed Alston on unpaid leave "with the intent to terminate his employment." *Id.* In the summer of the same year, Alston's discrimination lawsuit was dismissed, and he "lost his last protection against termination." *Id.* ¶ 40. Within months of the civil suit's being dismissed, the Town stopped Alston's paycheck, which resulted in his inability to afford basic necessities. *Id.* ¶ 42. The Town prohibited Alston from working a second job, "on threat of violating Town rules." *Id.*

Despite Alston's completion of an anger management course and his visits with a psychiatrist, the Town did not contact him regarding his return to the fire department. *Id.* ¶ 41. "On November 24, 2014, after going months without pay, Alston wrote to Selectman Chairman Kenneth Goldstein outlining the many bad decisions that had been made by the Town's administrative staff and request[ing] to be heard pursuant to the Town's anti-discrimination and retaliation policy." *Id.* ¶ 43; *see also id.* ¶ 32a.

On December 2, 2014, after the Board ignored Alston's letter, Alston and several of his supporters appeared before the Board and requested that it "investigate Mr. Alston's case, rectify the racist environment in the fire department, and restore Mr. Alston's job." *Id.* ¶ 44. The Board did not restore Alston to duty. *Id.* ¶ 45. Only after a public protest against the Town's treatment of Alston at the January 2015 Dr. Martin Luther King, Jr. celebration was Alston's job temporarily saved. *Id.*

The Board assigned Town Counsel, who had been involved with the decision to "force Mr. Alston out of the fire department," to oversee a "meaningless and perfunctory third-party

'review'" of the Director of Human Resources' reports.[7] *Id.* ¶ 47. Town Counsel "ensured that the third-party reviewer would not interview Mr. Alston or any other witnesses and would not look underneath [the Human Resource Director]'s sham reports." *Id.*

The Town hired Dr. Marilyn Price, a board certified psychiatrist at Massachusetts General Hospital, to evaluate Alston. *Id.* ¶¶ 49, 50. In a March 2015 report, Dr. Price found that Alston "was <u>not</u> 'unfit for duty.'" *Id.* ¶ 50 (emphasis in original). Dr. Price found that Pender's use of a racial slur made Alston question how he was perceived by other firefighters and raised concerns as to whether they would "have his back" in dangerous situations. *Id.* ¶ 51. Dr. Price also found that the Town's "swift promotion" of Pender after Alston reported the voicemail incident resulted in harm to Alston, "and that the Town needed to modify the work environment to reduce Mr. Alston's level of stress and restore [his] trust in his fellow [firefighters]." *Id.* ¶ 52. A second psychiatrist, retained by Alston, likewise found that Alston "was otherwise fit for duty, but that the racial environment in the [BFD] was too hostile for [Alston] to safely return to work." *Id.* ¶ 53.

Despite the Town psychiatrist's recommendation that the Town develop a plan that would allow Alston to return to work, the Board "acted in bad faith, and pursuant to the Policy, by refusing to take any reasonable steps to rectify the hostile work environment in the fire department." *Id.* ¶¶ 49, 54. According to Alston, the Board never intended to work with him to ensure that he would feel safe returning to work, and instead, intended to drive him out of the fire

---

[7] Each year from 2010 to 2014, the Director of Human Resources prepared reports for the Board relating to Alston. (#108 ¶ 32t.) These "reports were used as the basis for opinions by the Town's psychiatrists regarding Mr. Alston's fitness for duty in 2014 and 2015, by an outside consultant regarding the propriety of the Town's response to Mr. Alston's complaint in 2015, and by an outside hearing officer hired to recommend Mr. Alston's termination as a Brookline firefighter in 2016." *Id.* ¶ 32u. Alston alleges that each of these reports "contains materially false and misleading information and fails to fairly and completely reflect the events it purports to depict." *Id.* ¶¶ 32v, 32w-z.

department and the Town for protesting racial discrimination. *Id.* ¶¶ 59, 64. It was the Board's goal to maintain "an environment in Brookline in which Black people and their supporters are afraid to speak out about racial discrimination for fear of retaliation." *Id.* ¶ 59.

On February 16, 2016, in a meeting closed to the public, the Board, without affording Alston the opportunity to be heard, terminated Alston's paid administrative leave for failure to comply with a return to work plan. *Id.* ¶ 60. On October 5, 2016, at a public meeting held at Alston's request, the Board, by unanimous vote, formally terminated his position with the BFD. *Id.* ¶ 61. In so doing, the Board adopted the recommendation of an outside hearing officer paid for and selected by the Town. *Id.* ¶ 63. The hearing officer "heard no witnesses in support of Mr. Alston's termination and . . . simply summarized, often unfairly, Dr. Price's report and certain correspondence from the Town." *Id.* Alston contends that "Mr. Lampke[8] falsely claimed that Mr. Alston had not cooperated with the Town's efforts to return him to duty, which the [Board] knew was not true." *Id.*

While no justification for the decision to terminate Alston was provided at the public meeting, the Board authorized Town Counsel to issue a press release that "falsely implied that the Board had terminated Mr. Alston because of drug use, violence, and a refusal to work with [the Town] to return to duty." *Id.* ¶ 62. "Although the [Board] knew this innuendo was false, Board members expected and tacitly encouraged their unofficial surrogates, including advisory committee member Fred Levitan, to use it to smear Mr. Alston privately and on social media." *Id.*

---

[8] Mr. Lampke presumably is the outside hearing officer referenced in #108 ¶ 63.

III. <u>Motion to Dismiss Standard.</u>

A Rule 12(b)(6) motion to dismiss challenges a party's complaint for failing to state a claim. In deciding such a motion, a court must "'accept as true all well-pleaded facts set forth in the complaint and draw all reasonable inferences therefrom in the pleader's favor.'" *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011) (quoting *Artuso v. Vertex Pharm., Inc.*, 637 F.3d 1, 5 (1st Cir. 2011)). When considering a motion to dismiss, a court "may augment these facts and inferences with data points gleaned from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." *Id.*, (citing *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003)).

In order to survive a motion to dismiss under Rule 12(b)(6), the plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The "obligation to provide the grounds of [the plaintiff's] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (internal quotation marks and alteration omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Simply put, the court should assume that well-pleaded facts are genuine and then determine whether such facts state a plausible claim for relief. *Id.* at 679.

IV. Discussion.

The individual defendants (and the Town defendants, with respect to certain issues) seek dismissal of the complaint against them on the grounds that (A) the claims are barred by the *Rooker-Feldman* doctrine and by the doctrine of claim preclusion; (B) they are barred by the statute of limitations; (C) claims against certain defendants are barred by the doctrine of legislative immunity; (D) the claims should be dismissed for failure to state a claim; (E) the individual defendants are entitled to qualified immunity; (F) the doctrine of constitutional avoidance applies; and (G) claims against Town Counsel should be dismissed for reasons of public policy. (#122 at 16-17.)

A. The *Rooker-Feldman* Doctrine and Claim Preclusion.

1. The Norfolk Superior Court Case.[9]

On June 17, 2013, Alston filed a complaint in the Norfolk Superior Court, no. 2013-00898, alleging racial discrimination under Mass. Gen. Laws ch. 151(B), because Lieutenant Pender called him a racial slur, and because he was retaliated against for reporting the incident and complaining about Pender's subsequent promotion. (#15-2, complaint.) Alston sued the Town of Brookline, claiming that "[a]s a result of nearly three years of discriminatory and retaliatory harassment Mr. Alston has suffered from severe anxiety, depression, rage, humiliation, loss of self-esteem and severe emotional distress." *Id*. at 5. He alleged under chapter 151(B), § 4(1) that he was a member of a protected class; he engaged in a protected activity by speaking out; and he was subjected to unequal, unacceptable working conditions and practices because of his race. *Id.* at 5-6. He further claimed he was retaliated against under § 4(4) for

---

[9] In deciding this issue the court considers documents attached to the pleadings from the prior state court case as they are matters of public record and are appropriate for consideration on a motion to dismiss. *See Giragosian v. Ryan*, 547 F.3d 59, 66 (1st Cir. 2008).

engaging in protected activity, as he was shunned and humiliated at work and treated differently from others by not being granted certain "injured on duty" benefits. *Id.* at 6-7.

On June 25, 2014, the Town moved for dismissal of the action for discovery violations; on July 8, 2014, final judgment was entered for the Town. *Id.* at 10-12. Approximately one year later, Alston filed a motion for relief from judgment under Mass. R. Civ. P. 60(b), *id.* at 11, and on July 10, 2015, Judge Connors denied the motion in a written Order. *Id.* at 14. Judge Connors found that: final judgment had entered because of Alston's failure to comply with the court's order concerning an overdue discovery response; Alston moved to be relieved from the judgment because of "excusable neglect," but the only support he offered for his motion was a five-sentence affidavit from counsel stating that he had moved his office a year before the entry of judgment; and there was no explanation for the delay of a year in filing the motion for relief from judgment. *Id.* The court found that "the history of this case is replete with multiple instances of the defendant's having to file repeated motions seeking the court's assistance to compel the plaintiff to provide discovery . . . The conduct at issue here is reflective not of 'mistake, inadvertence or excusable neglect' as referenced in Rule 60(b), but rather of egregious inattention of counsel or client." *Id.* at 14-15.

2. The *Rooker-Feldman* Doctrine Does Not Apply.

The Town defendants join in the individual defendants' motion to dismiss on the grounds that this court lacks jurisdiction under the *Rooker-Feldman* doctrine (#122 at 22), which prohibits "federal complaints…[that] essentially invite[] federal courts of first instance to review and reverse unfavorable state-court judgments." *Exxon Mobil Corp. v. Saudi Basic Indust. Corp.*, 544 U.S. 280, 283 (2005); *see D.C. Court of Appeals v. Feldman*, 460 U.S 462 (1983); *Rooker v. Fid. Trust Co*., 263 U.S. 413 (1923). The rationale for the doctrine is that Congress, in enacting

28 U.S.C. § 1257, gave authority only to the United States Supreme Court to reverse or modify

state court judgments; lower federal courts are not the "appropriate appellate proceeding" in

which to correct state court errors, as "[t]he jurisdiction possessed by the District Courts is

strictly original." *Rooker*, 263 U.S. at 415-16. Despite the uncontroversial foundation on which it

rests, the doctrine spawned decades of confusion, in large part because courts often blurred the

distinction between the doctrine and the law of claim preclusion. *See* Allison B. Jones, *The*

*Rooker-Feldman Doctrine: What Does It Mean To Be Inextricably Intertwined?* 56 Duke Law

Journal 643, 661-678 (2006) (discussing circuits' differing interpretations of the doctrine prior to

*Exxon Mobil*); *GASH Associates v. Village of Rosemont, Ill.,* 995 F.2d 726, 728 (7th Cir. 1993)

(stating that while equating *Rooker-Feldman* doctrine with preclusion is understandable, the two

concepts are distinct).

      The Supreme Court finally clarified the rule in *Exxon Mobil*, 544 U.S. at 291-94; *see*

*Federacion de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico,* 410

F.3d 17, 20-21 (1st Cir. 2005) (describing "the somewhat uncertain path" First Circuit law had

taken prior to "the clarification provided by *Exxon Mobil*"). In *Exxon Mobil*, the Supreme Court

plainly stated that the doctrine "is confined to . . . cases brought by state-court losers

*complaining of injuries caused by state-court judgments* rendered before the district court

proceedings commenced and inviting district court review and rejection of those judgments."

544 U.S. at 284 (emphasis added); *Lance v. Dennis*, 546 U.S. 459, 466 (2006) (noting that the

doctrine only applies where a party "in effect seeks to take an appeal of an unfavorable state-

court decision to a lower federal court").

      The Supreme Court in *Exxon Mobil* stressed that § 1257 does not "stop a district court

from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal

court a matter previously litigated in state court." 544 U.S. at 293. If a federal plaintiff presents some independent claim, one in which he is not simply complaining of the state court judgment itself, "'then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.'" *Id*. (quoting *GASH,* 995 F.2d at 728). In other words, the doctrine is narrow; it only prohibits *de facto* appeals of state court judgments, and it is distinct from the law of issue and claim preclusion. "*Rooker-Feldman* is not simply preclusion by another name." *Lance,* 546 U.S. at 466.

The present case is not barred by the *Rooker-Feldman* doctrine because Alston is not attempting to appeal any decision rendered by the state court. The plaintiff's suit in *McKenna v. Curtin*, 869 F.3d 44, 47 (1st Cir. 2017), was barred by *Rooker-Feldman* because he complained in federal court that the suspension of his license to practice law in Rhode Island through a state disciplinary hearing was in violation of his state and federal rights, and asked the district court to countermand that order. *Id*. at 48. Alston's complaint here is not based on actions taken by the state court. He does not take issue with what the court there decided.

> If a federal plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court, and seeks relief from a state court judgment based on that decision, *Rooker-Feldman* bars subject matter jurisdiction in federal district court. If, on the other hand a federal plaintiff asserts as a legal wrong an allegedly illegal act or omission by an adverse party, *Rooker-Feldman* does not bar jurisdiction.

*Noel v. Hall*, 341 F.3d 1148, 1164 (9th Cir. 2003).

In this matter Alston is asserting a legal wrong perpetrated by the Town and various town officials. He is not seeking relief from any state court judgment. *Rooker-Feldman* does not apply. *See Silva v. Massachusetts*, 351 Fed. Appx. 450, 2009 WL 2902712, at *3 (1st Cir. 2009) (stating that *Rooker-Feldman* applies where plaintiff's federal action complains of injuries directly caused by the state court judgment); *Galibois v. Fisher,* 174 Fed. Appx. 579, 2006 WL

827326, at *2 (1st Cir. 2006) (finding *Rooker-Feldman* inapplicable where plaintiff sought relief "not from an injury allegedly caused by the state court but from an injury allegedly inflicted by the defendant."). The motion should be denied.

3. The Doctrine of Claim Preclusion Does Not Apply.

The Town defendants join the individual defendants' motion asserting that plaintiff's claims are barred by the doctrine of claim preclusion. (#186.) The effect that the Norfolk Superior Court action has on this case is determined according to Massachusetts law. *Torromeo v. Fremont*, 438 F.3d 113, 115 (1st Cir. 2006); *see also* 28 U.S.C. § 1738.

In Massachusetts, claim preclusion "makes a valid, final judgment conclusive on the parties and their privies, and prevents relitigation of all matters that were or could have been adjudicated in the action." *Kobrin v. Bd. of Registration in Med.*, 444 Mass. 837, 843 (2005) (internal quotation marks omitted); *Bagley v. Moxley*, 407 Mass. 633, 636 (1990). The three elements of claim preclusion are: 1) the prior action must have produced a final judgment on the merits; 2) the parties to the prior and present actions must either be identical or in privity; and 3) the causes of action must be the same. *Kobrin,* 444 Mass. at 843; *DaLuz v. Dep't of Correction*, 434 Mass. 40, 45 (2001); *Bui v. Ma*, 62 Mass. App. Ct. 553, 561 (2004). The moving party bears the burden of establishing each of these factors. *Sarvis v. Boston Safe Deposit & Trust Co.*, 47 Mass. App. Ct. 86, 99 (1999).[10]

---

[10] This case concerns claim preclusion, not issue preclusion, which is a separate doctrine that has different elements. *See Heacock v. Heacock*, 402 Mass. 21, 23 n.2 (1986). Issue preclusion "is the modern term for the doctrine traditionally known as 'collateral estoppel,' and prevents relitigation of an issue determined in an earlier action where the same issue arises in a later action, based on a different claim, between the same parties or their privies." *Id*. Issue preclusion does not apply to this case because no issues were litigated in the Norfolk Superior Court. *See Fidelity Mgmt. & Research Co. v. Ostrander*, 40 Mass. App. Ct. 195, 199 (1996) (stating that issue preclusion is used only to prevent relitigation of issues actually litigated in the prior action). The question whether default judgments are final judgments for the purposes of *issue preclusion* under Massachusetts law was decided by the Supreme Judicial Court in *Treglia v. MacDonald*, 430 Mass. 237, 241 (1999). The SJC "reaffirm[ed] that preclusive effect should not be given

a. <u>There Was a Final Judgment on the Merits in State Court</u>.

Final judgment entered in the Norfolk Superior Court case on motion of the defendant under Mass. R. Civ. P. 33(a)(3) for Alston's failure to comply with the court's discovery orders. *See* #15-2 at 11 (docket); 12 (Final Judgment Order); 14-15 (Judge Conner's Order denying plaintiff's motion for relief from judgment). Under Mass. R. Civ. P. 41(b)(3), such a dismissal "operates as an adjudication upon the merits." *Dawe v. Capital One Bank,* 456 F. Supp. 2d 236, 241 (D. Mass. 2006) (finding that state court dismissal for discovery sanction satisfied requirement of "final judgment on the merits" for claim preclusion, as under Massachusetts law, an involuntary dismissal constitutes an "adjudication on the merits" under Rule (41)(b)(3)); *see Jarosz v. Palmer,* 436 Mass. 526, 536 (2002) (finding that dismissal with prejudice constitutes a valid and final judgment for purposes of claim preclusion). The requirement under the doctrine of claim preclusion that the previous action must have resulted in a "final judgment on the merits," *Kobrin,* 444 Mass. at 843, does not mean any issues had to have been actually litigated. "'Adjudication on the merits' is not synonymous with the actual litigation and determination of the facts of a case." *Dawe,* 456 F. Supp. 2d at 241 n.3 (citing *Semtek Int'l, Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 498 (2001)) (stating that "adjudication upon the merits" under federal counterpart to Mass. R. Civ. P. 41(b)(3) means action was dismissed with prejudice). This requirement is met.

---

to issues or claims that were not actually litigated in the prior action." *Id*. The SJC added a caveat to that rule, however, stating there may be "circumstances in which a litigant may so utilize our court system in pretrial procedures, but nonetheless be defaulted for some reason, that the principle and rationale behind collateral estoppel would apply." *Id*. at 254. Since it concerns issue, not claim, preclusion, the SJC's dicta in *Treglia* does not apply to this case, contrary to defendants' arguments, *see* #122 at 19-20, #186 at 3.

b. <u>The Town is an Identical Party But the Individual Defendants Are Not</u>.

The Town of Brookline was the sole defendant in the first suit; in the present suit, the Town and various officials sued in their official capacities are named as defendants. Since an official sued in his official capacity "is a proxy for the government entity that employs him and is in privity with that entity," *see Goldstein v. Galvin,* 719 F.3d 16, 23 (1st Cir. 2013) (citation omitted), the Town defendants here are identical with the defendant named in the Norfolk Superior Court action, and the requirement of identity of the parties is met.

The individual defendants, however, cannot be said to have been in privity with the Town defendants in the first suit.[11] The First Circuit in *Goldstein*, applying Massachusetts law, held that for purposes of claim preclusion, "[a] person sued in his official capacity is a different party, in contemplation of law, than the same person sued in his individual capacity. It follows inexorably that a person sued only in his official capacity is neither identical to, nor in privity with, the same person sued in his individual capacity." *Id.* "The upshot is that a person who is sued in one capacity (whether official or individual) cannot assert a defense of claim preclusion

_____

[11]The individual defendants argue that they may raise the defense of claim preclusion "under the doctrine of non-mutual claim preclusion" as set out in *In re El San Juan Hotel Corp*., 841 F.2d 6, 10 (1st Cir. 1988), where the First Circuit found that claim preclusion is appropriate if new defendants "have a close and significant relationship with the original defendants, such as when the new defendants were named as conspirators in the first proceeding but were not joined in the action." *Id.* There are two problems with this argument. First, *San Juan* is based on federal law, and Massachusetts law applies here. Defendants "have cited to no Massachusetts authority indicating that Massachusetts courts would follow the rule of nonmutual claim preclusion applied in *San Juan*." *Hermes Automation Technology, Inc. v. Hyundai Electronics Industries Co., Ltd*., 915 F.2d 739, 751 (1st Cir. 1990). In fact, "in an analogous context the Massachusetts Supreme Judicial Court has stated that Massachusetts preclusion rules are narrower than those imposed by federal law." *Id.* (citing *Whitehall Co., Ltd. v. Barletta*, 404 Mass. 497, 502 (1989)) (noting that federal law would permit offensive use of nonmutual issue preclusion in situations in which Massachusetts law would require technical privity). The second problem with this argument is that even if federal law applied, under federal law the individual defendants here cannot be in privity with the Town defendants. *See Goldstein,* 719 F.3d at 23 (although applying Massachusetts law, court cites federal cases for the proposition that a person who is sued in one capacity cannot assert a defense of claim preclusion in a later action in which he is sued in a different capacity).

in a later action in which he is sued in a different capacity." *Id.* Thus the individual defendants cannot raise claim preclusion as a bar to the present suit. The analysis will proceed only with regard to the Town defendants.

### c. The Claims Are Not Identical.

The Town defendants do not ask the court to dismiss Alston's claims against the Town arising from actions that occurred after the Norfolk Superior Court action was dismissed. (#111 at 1-2.) They ask the court to find that factual allegations raised in the Norfolk Superior Court suit are barred by the doctrine of claim preclusion, and concede that allegations that post-date the dismissal of the Norfolk Superior Court suit, such as those concerning Alston's termination, should proceed in this court.[12]

Under the doctrine of claim preclusion, "the guiding principle is that [a party] is precluded from litigating not only those claims that were actually decided in the [previous] case but also those that could have been brought in that action." *Bui,* 62 Mass. App. Ct. at 563; *Ratner v. Rockwood Sprinkler Co*., 340 Mass. 773 (1960) (stating that prior adjudication on the merits operates as a bar to a later proceeding on the same cause of action "as to every issue that in fact was or in law might have been adjudicated"); *Charlette v. Charlette Bros. Foundry, Inc.,* 59 Mass. App. Ct. 34, 44 (2003) ("Claim preclusion will apply even though a party is prepared in a second action to present different evidence or legal theories to support his claim or seeks different remedies.").[13]

---

[12] The Town's memorandum only obliquely states this point. *See* #111 at 1-2. At oral argument on January 5th counsel affirmed that this is the Town's position.

[13] Alston could have brought federal constitutional claims in the Norfolk Superior Court action. *See Roy v. City of Augusta*, 712 F.2d 1517, 1521 (1st Cir. 1983) (quoting *Lovely v. Laliberte*, 498 F.2d 1261, 1263 (1st Cir.)), *cert denied*, 419 U.S. 1083 (1974). The fact that Alston brought claims under Mass. Gen. Laws ch. 151(B) in the state court action, while here he relies on federal law and the U.S. Constitution, is of no import with regard to whether the new case is barred by claim preclusion. *See Martins v. Cook*, 2015 WL

17

Massachusetts courts use a transactional approach to determine whether claims are the same. *Saint Louis v. Baystate Med. Ctr., Inc.*, 30 Mass. App. Ct. 393, 399 (1991). "A claim is the same for [claim] preclusion purposes if it is derived from the same transaction or series of connected transactions." *Id.* What factual grouping constitutes "a transaction" is to be determined pragmatically, giving weight to such factors as "whether the facts are related in origin or motivation and whether they form a convenient trial unit." *Id.* at 399.

The voicemail incident occurred in 2010. (#108 ¶ 1.) Alston filed the Norfolk Superior Court action in 2013. (#15-2 at 8.) Alston alleged that after the voicemail incident, he was discriminated against and retaliated against for reporting the incident and for complaining about Pender's subsequent promotion, and that his superiors and the Town not only did nothing to help him but in fact participated in further violation of his rights. *Id*. at 1-5.

The Norfolk Superior Court case was dismissed in June 2014; Alston's motion for relief from judgment was denied in June 2015. (#15-2 at 11.) Alston filed the action in this court in December 2015. (#1.) Although his present allegations originate from the voicemail incident as did the Norfolk Superior Court matter, *see* #108 ¶ 6, they are substantially broader and post-date to a significant degree the claims brought in the Norfolk Superior Court action. For example, in the present case, Alston complains about many discriminatory and retaliatory actions taken against him occurred after the dismissal of the Norfolk Superior Court case, by Board members and others in Town government, in response to his attempts to return to work after being put on leave. *See, e.g.,* #108 ¶¶ 32(a), (b), (d), (t), (u), (v). He specifically alleges that after the Norfolk Superior Court case was dismissed, the Board intensified its retaliation against him by

224670, at *3 (D. Mass. 2015) (citing *Saint Louis v. Baystate Med. Ctr., Inc.*, 30 Mass. App. Ct. 393, 399 (1991)) (finding that plaintiff who brought action in state court under chapter 151(B) was barred under doctrine of claim preclusion from bringing subsequent suit in federal court alleging civil rights violations).

terminating his pay. *Id.* ¶¶ 36, 40-42. Some of the allegations Alston makes are supported by information he alleges he did not receive until after the Norfolk Superior Court case was dismissed. *See, e.g., id.* ¶ 32(z). Eventually, in October 2016, long after the dismissal of the Norfolk Superior Court case, after a lengthy dispute with the Board over what conditions he needed to meet in order to return to work, the Board terminated Alston's employment. *Id.* ¶¶ 59-61.

Here, where Alston is not only complaining of being retaliated against by being ostracized and treated differently from others at work as he did in the first suit, but is complaining about many more acts of retaliation, including being suspended without pay and being terminated, he is not putting forth claims "based on the same set of operative facts and seek[ing] redress for the same wrongs" as in the prior case. *TLT Const. Corp. v A. Anthony Tappe and Associates, Inc.*, 48 Mass. App. Ct. 1, 8 (1999). Nor can it be said that Alston knew the substance of the present claims when he filed the first claim. In fact, he could not possibly have known the substance of them, as they had not yet occurred. *Compare Massaro v. Walsh*, 71 Mass. App. Ct. 562, 567 (2008). The instant allegations "involve subsequent conduct, and thus lack sufficient identicality of causes of action with the earlier suit." *Gonzalez-Pina v. Rodriguez*, 407 F.3d 425, 430 (1st Cir. 2005) (finding that claim preclusion did not apply where employee returning to work after first action was subjected to new conduct) (internal quotations omitted). Subsequent conduct, "'even if it is of the same nature as the conduct complained of in a prior lawsuit, may give rise to an entirely separate cause of action.'" *Id.* (quoting *Kilgoar v. Colbert Cty. Bd. of Educ.*, 578 F.2d 1033, 1035 (5th Cir. 1978)); *see also Walsh v. International Longshoremen's Ass'n, AFL-CIO, Local 799*, 630 F.2d 864, 873 (1st Cir. 1980) (finding a

second action not barred by claim preclusion where "subsequent conduct was broader and more far-reaching than the conduct which led to the original complaint").

The Town defendants do not ask the court to bar the present proceeding under the doctrine of claim preclusion, but ask the court to excise the facts alleged in the first case from the present case. Obviously, such a ruling would complicate the trial of the case; at argument on January 5th, the Town defendants conceded that a jury would have to hear the initial facts concerning the voicemail incident in order to understand the case. They yet appear to request that under the doctrine of claim preclusion the trial judge instruct the jury that they could not award damages for anything occurring prior to the dismissal of the Norfolk Superior Court case. Where claim preclusion does not prevent a second case from going forward, ought the plaintiff to be prohibited from asking for damages concerning actions that were alleged in the first case? The court has not found any Massachusetts cases, and the Town defendants have not provided any, relating to this situation. In fact, the Town defendants have made no written argument pertaining to this question. The Town defendants have not met their burden to show that claim preclusion should apply in this manner, and the court recommends that their motion be denied.

B.  The Claims Are Not Barred by the Statute of Limitations.

The Town defendants join in the individual defendants' motion that Alston's claims are barred by the statute of limitations. The individual defendants argue simply that "[t]o the extent that the Plaintiff relies upon the incident with Lt. Pender his Section 1983 and Section 1985 claims are time-barred," and add that "[t]he same result is required upon analysis of the plaintiff's claims under Section 1981…" (#122 at 23.) They do not cite one case in support of their assertion that the 2010 voicemail incident triggered the statute of limitations. The court is not persuaded.

Alston brings claims under 42 U.S.C. §§ 1981, 1983, and 1985. (#108 ¶¶ 192-211.) Title 42 U.S.C. § 1983 has no internal statute of limitations, but instead "borrows the appropriate state law governing limitations unless contrary to federal law." *Poy v. Boutselis*, 352 F.3d 479, 483 (1st Cir. 2003). The appropriate state law is the Massachusetts three year statute of limitations for personal injury causes of action. *See Nieves v. McSweeney*, 241 F.3d 46, 51 (1st Cir. 2001) (stating that a forum state's personal injury statute of limitations governs constitutional claims); Mass. Gen. Laws ch. 260, § 2A. Federal law controls the determination of when the action accrues. *Wallace v. Kato,* 549 U.S. 384, 388 (2007).

Alston filed his first complaint in this case in December 2015. (#1.)[14] Regarding claims under § 1983, "[t]here are two varieties of continuing violations: serial and systemic." *Kassaye v. Bryant College*, 999 F.2d 603, 606 (1st Cir. 1993).[15] "Serial violations are 'composed of a number of discriminatory acts emanating from the same discriminatory animus, each act constituting a separate [actionable] wrong.'" *Muniz-Cabrero v. Ruiz*, 23 F.3d 607, 610 (1st Cir. 1994) (quoting *Jensen v. Frank,* 912 F.2d 517, 522 (1st Cir. 1990)). The theory of serial violations "recognizes that some acts are imbricated, *i.e.*, they involve an interlinked succession of related events or a fully-integrated course of conduct." *Mack v. Great Atlantic and Pacific Tea Co., Inc.*, 871 F.2d 179, 183 (1st Cir. 1989). In his initial complaint, Alston alleged serial

---

[14] Defendants argue only that Alston's initial complaint, filed in December 2015, is time-barred. (#122 at 23.) They do not make any argument concerning the statute of limitations with regard to particular defendants who were added in subsequent amended complaints, nor do they argue that claims in the present third amended complaint are time-barred. Therefore the court will analyze their argument solely with regard to the initial complaint.

[15] "A 'continuing violation' however, is not a theory of recovery; it is a theory under which a limitations period may be extended. The 'continuing violation' doctrine is an equitable exception that saves otherwise time-barred claims if they are based on an ongoing series of acts anchored by similarity to some violation that is not time-barred." *Bolduc v. Town of Webster*, 629 F. Supp. 2d 132, 151 n.26 (D. Mass. 2009) (quoting *O'Rourke v. City of Providence*, 235 F.3d 713, 730 (1st Cir. 2001)).

violations in the retaliatory acts that were taken against him over time, starting with his complaining about the voicemail incident in 2010 up to actions taken by the Board against him in early 2015. *See, e.g.*, #1 ¶¶ 138-42. In the same way that "an employee, say, is passed over several times for promotion, based on the same (actionable) animus," *Jensen*, 912 F.2d at 522, Alston alleges that he was punished over time by a stream of retaliatory actions for exercising his rights. Alston's allegations that in February 2015, the Board required him to comply with punitive conditions in order to return to work, suggesting that his complaints of retaliation and harassment were "in his head and that he was a problem worker," and then refused to meet with him to discuss his case, are part of the "fully-integrated course of conduct" that place the allegations well within the statute of limitations. *Id.* ¶¶ 139-41; *Mack,* 871 F2d at 183.

Because Alston successfully alleges serial violations, the court need not take up whether he has successfully pled systemic violations. *See Megwinoff v. Banco Bilbao Bizcaya*, 233 F.3d 73, 76 (1st Cir. 2000) ("Systemic violations have been recognized rarely, usually in instances of a discriminatory promotion, hiring, training, or compensation system where direct evidence, statistics, or other evidence demonstrate the discriminatory effects of that policy.").

The statute of limitations for § 1981 actions is four years. *Buntin v. City of Boston,* 813 F.3d 401, 404-05 (1st Cir. 2015) (citing *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004)). "[C]laims for discrimination and retaliation accrue when the alleged unlawful act 'has a crystallized and tangible effect on the employee and the employee has notice of both the act and its invidious etiology.'" *Buntin*, 813 F.3d at 405 (quoting *Shervin v. Partners Healthcare Sys., Inc.*, 804 F.3d 23, 33 (1st Cir. 2015)). In *Buntin*, an employee was issued a written warning by his employer for bringing his personal vehicle into a City garage for repairs, "discipline that he protested on grounds that it was applied to him in a discriminatory manner." *Id.* He was later

suspended and then fired. *Id*. The First Circuit held that the statute of limitations did not begin to run when he was issued the written warning, rather, it began to run when he learned of his suspension and termination, as those were "the alleged unlawful acts." *Id*.

Here, Alston's claims did not accrue when Pender called him a racial slur in 2010, as defendants argue. (#122 at 23.) Alston alleges that he tried for years to work with the Board to ameliorate the problems that arose after he complained of the voicemail incident and was retaliated against for complaining, and even alleges that as time passed, the Board deceived him into thinking that a resolution would be found. *See, e.g*., #108 ¶¶ 33, 43-46. One could say that the alleged unlawful acts of the Town "crystallized" and had a "tangible effect" on Alston at least as recently as October 2014 (prior to his filing this case in December 2015) when the Board suspended Alston without pay, a date well within the four-year statute of limitations. (#1 ¶ 11.) There is no statute of limitations bar under § 1981.

Defendants make no argument concerning the statute of limitations for Alston's conspiracy claims under § 1985, s*ee* #122 at 22-23, therefore, any argument on this point is waived.

### C.  The Doctrine of Legislative Immunity.

Local legislators have absolute immunity from suit under § 1983 for their legislative activities. *Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998). "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Id*. at 54. Acts such as voting for an ordinance, introducing a budget, or vetoing a law, are all legislative acts for which governmental actors may not be sued. *Id*. at 55. Absolute immunity, however, does "not apply to administrative or executive functions. The touchstone is the nature of the

contested action, not the job title of the official who is sued." *Figueroa-Serrano v. Ramos-Alverio*, 221 F.3d 1, 4 (1st Cir. 2000).

Individual defendants DeWitt, Goldstein, Daly, Mermell, Wishinsky, Greene, Franco, and Heller (all Board members) move to dismiss all of the claims against them in Count II as barred by the doctrine of legislative immunity. Defendants do not specify what particular alleged acts are covered by this claim. (#122 at 23-25.) They argue in their memorandum that "they were engaged in legislative acts when they proposed, discussed and voted upon the policies at issue" and so "their alleged personal motives in doing so is irrelevant." *Id.* at 24. This statement suggests that their argument is limited to claims having to do with promulgating policies, but then they move to dismiss all the claims against them, *id.* at 25, which obviously encompass a wider range of actions.[16]

There are some actions by the individual defendants alleged in the third amended complaint that clearly are not covered by legislative immunity. For example, Alston alleges that he was terminated because he is Black and in retaliation for his making claims of racial discrimination. (#108 ¶ 158.) The actions of the Board in terminating employees are not protected by legislative immunity, except in particular circumstances which are not present here. *See, e.g., Acevedo-Garcia v. Vera-Monroig,* 204 F.3d 1, 8 (1st Cir. 2000) (stating that employment decisions generally are administrative, except when they are accomplished through traditional legislative functions such as policymaking and budgetary restructuring that "strike at the heart of the legislative process"). Since the individual defendants fail to specify which of their actions are covered by legislative immunity, and the court will not do their work for them

---

[16] Plaintiff, demonstrating the baffling inattention to legal analysis that he has throughout this litigation, opposes the argument in one sentence, without citing to anything: "And legislative immunity does not apply because none of the defendants are legislators." (#40 at 36.)

by examining the third amended complaint line by line to try to discern what arguments the individual defendants might have made, the individual defendants have not sustained their burden on the motion and it should be denied.[17] *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

### D. Failure to State a Claim.[18]

#### 1. Count II Alleging Violation of § 1983 Does Not Fail to State a Claim.

The Town defendants join in the individual defendants' motion to dismiss counts alleging a violation of § 1983 for failure to state a claim. (#122 at 36-40.) Section 1983 "is a vehicle through which individuals may sue certain persons for depriving them of federally assured rights, such as the First Amendment's right to free speech . . . ." *Gagliardi v. Sullivan*, 513 F.3d 301, 306 (1st Cir. 2008). A claim under § 1983 has two essential elements: the defendant must have acted under color of state law, and his or her conduct must have deprived the plaintiff of rights secured by the Constitution or by federal law. *Id.* "The second element requires the plaintiff to show 'that the [defendant's] conduct was the cause in fact of the alleged deprivation.'" *Id.* (quoting *Rodriguez-Cirilo v. Garcia*, 115 F.3d 50, 52 (1st Cir. 1997)).

Alston claims his First Amendment rights initially were violated when he was retaliated against for reporting the voicemail incident. "When a government actor retaliates against

---

[17] In a separate Report and Recommendation on the Town's motion to dismiss (#110), docketed on February 6, 2018, this court recommended that some of the allegations in the third amended complaint having do to with decisions of the Board concerning policy be dismissed on other grounds.

[18] As previously mentioned, at the hearing on January 5th, the Town defendants informed the court that they joined in the individual defendants' motion to dismiss regarding certain issues, including for failure to state a claim. The Town defendants are charged in Count I with, among other things, violating Alston's Fourteenth Amendment guarantee of equal protection. The individual defendants are not charged with this. *Compare* #108 ¶ 193 *with* ¶¶ 199-202. The court will not rule on whether the equal protection claim is adequately pled in the absence of any written argument by the Town defendants.

someone for exercising constitutionally protected First Amendment rights, that individual has a cognizable retaliation claim pursuant to § 1983." *Najas Realty, LLC v. Seekonk Water Dist.*, 821 F.3d 134, 141 (1st Cir. 2016). "The First Amendment protects (among other things) the right to free speech and the right to petition all branches of the government." *Id.* The elements of a First Amendment free speech retaliation claim in a case involving a government employee are (1) whether the employee spoke as a citizen on a matter of public concern, (2) whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public, and (3) whether the plaintiff can show that the protected expression was a substantial or motivating factor in the adverse employment decision. *Barton v. Clancy*, 632 F.3d 9, 27 (1st Cir. 2011) (quoting *Curran v. Cousins*, 509 F.3d 36, 45 (1st Cir. 2007)).

Alston has made out a claim for First Amendment retaliation based on free speech. Alston complained about being called a racial slur by a superior, says that he was retaliated against by his fellow-firefighters, and the individual defendants did nothing to help him. (#108 ¶¶ 1, 32.) Instead, they made matters worse by failing properly to sanction the superior, encouraging those who were discriminating against him, and then retaliating against him themselves. *Id.* Alston's speech, i.e., complaining about the voicemail incident, and then complaining that he was mistreated for reporting the incident, is undeniably protected conduct. *See Connick v. Myers*, 461 U.S. 138, 148 n.8 (1983) (stating that the "right to protest racial discrimination [is] a matter inherently of public concern").

Allegations that the individual defendants did nothing to stop retaliatory harassment by others, such as Alston's fellow firefighters, is in itself adequate to plead a cause of action against the individual board members. *See Manzer v. Town of Anson,* 771 F. Supp. 2d 121 (D. Mass.

2011) (denying motion to dismiss action for harassment for protected speech). In *Manzer*, the protected speech consisted of a supervisor's "deleting overtime from [plaintiffs'] timecards, forcing them to work unnecessarily during Selectmen's meetings, and threatening their employment." *Id.* at 131. The court found plaintiffs stated a claim against the selectmen, as their complaint established a reasonable inference that that the selectmen knew of the protected speech, did nothing in response, and thus tacitly authorized violation of rights. *Id.* at 132. Here, it is not disputed that the Board knew what had happened to Alston and that he complained about it, and one may reasonably infer from the progression of events set out in the third amended complaint that the Board did not help him when he was subjected to retaliation. Therefore Alston, like the *Manzer* plaintiffs, has stated a claim that the individual defendants violated his free speech rights.

Alston has adequately pled an adverse employment action. *See Barton*, 632 F.3d at 29 (holding that "adverse employment action" under § 1983 analysis focuses on whether defendant's actions would deter reasonably hardy person from exercising rights; even relatively minor events can give rise to liability). Alston makes many specific allegations that the individual defendants took adverse employment actions against him as a result of his protected complaints about his treatment. For example, Alston claims that Town Counsel failed to investigate matters pertaining to his case, including the "Leave" incident, and recommended terminating Alston without notice or a hearing. (#108 ¶¶ 161-63, 166.) The Human Resources Director is accused, among other things, of participating in the decision to give Pender "grossly insufficient discipline," of failing to investigate Alston's retaliation complaints, failing to investigate the "Leave" incident, and preparing multiple reports that unfairly discredited Alston. *Id.* ¶¶ 170, 172, 177. Alston alleges that the individual selectmen, among other things, gave

Pender insufficient discipline, distributed letters to the public disparaging Alston, terminated his paid leave, and terminated his employment. *Id.* ¶¶ 152, 154, 156. One may reasonably infer from the third amended complaint that these actions were taken as a result of Alston's exercise of his First Amendment rights.

Alston also claims retaliation for petitioning the government for redress of grievances, a charge which can take many forms, *see Powell v. Alexander*, 391 F.3d 1, 16 (1st Cir. 2004) (citing cases), including termination of an employee. *See Fishman v. Clancy*, 763 F.2d 485, 486-87 (1st Cir. 1985) (finding attempts to terminate public school teacher for filing grievances and engaging in other First Amendment activities cognizable under § 1983). A claim for retaliation for petitioning the government for redress of grievances is governed by the two-part burden-shifting analysis established by the Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977). Alston must first show by a preponderance of the evidence that he "engaged in constitutionally protected conduct, and that the conduct was a substantial or motivating factor for the adverse employment decision." *Padilla-Garcia v. Guillermo Rodrigues,* 212 F.3d 69, 74 (1st Cir. 2000).[19] As set out above, he has met this burden. Alston has adequately pled both that he engaged in constitutionally protected speech about race discrimination, and that this speech was a substantial factor in the individual defendants' adverse employment actions.

In short, Alston has met his burden adequately to plead a claim under § 1983: he has pled that the defendants were acting under color of state law, and their actions deprived him of rights

---

[19] If Alston is able to prove these elements, then defendants may avoid liability only by proving by a preponderance of the evidence that they would have taken the same action "even in the absence of the protected conduct." *Mt. Healthy,* 429 U.S. at 287.

secured by federal law and by the Constitution. *Gagliardi*, 513 F.3d at 306. The motion should be denied.

          2. <u>Count II Alleging Violation of § 1981 Does Not Fail to State a Claim</u>.

The Town defendants join in the individual defendants' motion that Alston has failed to state a claim under Title 42 U.S.C. § 1981. (#122 at 33-36.) Section 1981 prohibits racially discriminatory impairment of one's right "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The statute defines "make and enforce contracts" as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

In the First Circuit, "'[t]o state a claim under this statute, a plaintiff must show (1) that he is a member of a racial minority, (2) that the defendant discriminated against him on the basis of his race, and (3) that the discrimination implicated one or more of the activities enumerated in the statute.'" *Odunukwe v. Bank of Am.*, 335 F. App'x 58, 61 (1st Cir. 2009) (quoting *Garrett v. Tandy Corp.*, 295 F.3d 94, 98 (1st Cir. 2002)).

Section 1981 has been interpreted to cover various forms of employment discrimination:

> [Plaintiff] grounds her claims in both Title VII and 42 U.S.C. § 1981. The same legal framework applies to both statutory bases. . . . This framework allows for distinct claims of disparate treatment, retaliation, and hostile work environment, all of which [plaintiff] alleges, and all of which fit into the familiar *McDonnell Douglas* burden-shifting scheme.

*Bhatti v. Trustees of Boston Univ.*, 659 F.3d 64, 70 (1st Cir. 2011) (internal citation and footnote omitted) (affirming summary judgment in favor of employer).[20]

Under the *McDonnell Douglas* burden-shifting scheme, "a plaintiff bears the initial burden of proffering evidence sufficient to establish a prima facie case of discrimination." *Cherkaoui v. City of Quincy*, 877 F.3d 14, 24 (1st Cir. 2017). The defendant then has the burden of articulating a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* (citations omitted). If defendant accomplishes this task, the plaintiff then has the burden of offering "evidence that [defendant's] explanation is pretextual and that discriminatory animus prompted the adverse action." *Id.* (quotation marks and citations omitted).

The question here is whether Alston has set out a prima facie case. Alston is a member of a racial minority and as set out above, he has adequately alleged that the Town defendants and each of the individual defendants engaged in racial discrimination, including harassment, retaliation, and termination, that adversely impacted his employment. For purposes of a motion to dismiss under Rule 12(b)(6), he has adequately alleged facts from which one could infer that the harms he suffered were because of his race. Therefore, he has adequately pled a claim under § 1981.[21] The motion should be denied.

---

[20] While Alston has not pled that he was contractually employed, and defendants have not raised the issue, it appears that § 1981 also applies to employees at will:

> The court of appeals for this circuit has yet to address this issue. However, the great weight of authority from other circuit courts of appeals supports the view that employees at will can avail themselves of the protections afforded by section 1981. . . . And, at least one district court in this circuit shares the view that an employee at will may pursue claims against his or her former employer under section 1981. *See Joseph v. Wentworth Institute of Technology*, 120 F. Supp. 2d 134, 144 (D. Mass. 2000).

*Hill v. Textron Auto. Interiors, Inc.*, No. CIV. 00-221-M, 2001 WL 276972, at *6 (D.N.H. Mar. 17, 2001) (internal citations omitted).

[21] Although the court finds that Alston has pled a viable claim under § 1981, there is a question whether this claim should be dismissed for other reasons. In *Jett v. Dallas Independent School District*, 491 U.S.

### 3. Count II Alleging Violation of §1985 Does Not Fail to State a Claim.

Plaintiff's only mention of §1985 in the third amended complaint is in Count II, where he includes it along with §§ 1981 and 1983 in claims against the individual defendants for enforcing the Town's unconstitutional custom, for retaliating against Alston for opposing the Town's custom, and for discriminating against Alston on the basis of race. (#108 ¶¶ 199-202.) Alston does not specify under which subsection of § 1985 he is suing. In fact, Alston's sole mention of the § 1985 claim is one sentence in an opposition to a previous motion to dismiss, which consists of a citation to *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971), a case which deals with §1985(3). In light of this clue, the court will assume that Alston's claim is made under §1985(3).

"Section 1985(3) prohibits two or more persons in any State or Territory from conspiring to deprive any person or class of persons of the equal protection of the laws." *Perez-Sanchez v. Public Bldg. Auth.*, 531 F.3d 104, 107 (1st Cir. 2008) (internal punctuation, quotation marks, and citation omitted). The claim has four elements: "First, the plaintiff must allege a conspiracy; second he must allege a conspiratorial purpose to deprive the plaintiff of the equal protection of the laws; third he must identify an overt act in furtherance of the conspiracy; and finally, he must show either injury to person or property, or a deprivation of a constitutionally protected right." *Id.* at 107.

---

701, 735 (1989), the Supreme Court held that the rights set out in § 1981 could only be enforced against state actors through the remedial provisions of § 1983. *Jett*, 491 U.S. at 734. *See Buntin v. City of Boston*, 857 F.3d 69, 75 (1st Cir. 2017) (affirming that under *Jett*, § 1983 remains "the exclusive federal damages remedy" for § 1981 violations by state actors). It is not clear whether § 1983 is also the exclusive remedy for § 1981 violations against state actors sued in their individual capacities. *See McCormick v. Miami University*, 693 F.3d 654, 661 (6th Cir. 2012) (holding that the reasoning of *Jett* applies equally to government officials sued in their individual capacity). Nor is it clear whether the import of *Jett* is that § 1981 claims against state actors should be dismissed. *See McGovern v. City of Philadelphia*, 554 F.3d 114, 121 (3rd Cir. 2009) (affirming dismissal of § 1981 claim against city because § 1983 is exclusive remedy for violations of § 1981 by state actors). Defendants do not raise these issues, and in the absence of First Circuit precedent, the court does not reach them.

Alston alleges a conspiracy, *see, e.g.,* #108 ¶¶ 1, 27-29, 32-33, 46-49, 59, 151; he alleges a conspiratorial purpose to deprive him of equal protection of the laws, *id.*; he identified overt acts, *id.*; and he demonstrates injury, *id.* ¶¶ 32, 36, 42. Thus, he has adequately pled a viable § 1985 claim, and it should not be dismissed.

E.  <u>The Individual Defendants are Not Entitled to Qualified Immunity</u>.

The individual defendants assert that they are protected by the doctrine of qualified immunity. The First Circuit has adopted a two-part test for qualified immunity: "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Ciolino v. Gikas*, 861 F.3d 296, 303 (1st Cir. 2017) (quotation marks and citations omitted); *see also D.C. v. Wesby*, No. 15-1485, 2018 WL 491521, at *10 (U.S. Jan. 22, 2018). The second step of the analysis "has two elements: We ask (a) whether the legal contours of the right in question were sufficiently clear that a reasonable [defendant] would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable [defendant] would have understood that his conduct violated the right." *Ciolino*, 861 F.3d at 303 (internal quotation marks and citations omitted). "Qualified immunity is an affirmative defense, and thus the burden of pleading it rests with the defendant." *DiMarco-Zappa v. Cabanillas*, 238 F.3d 25, 35 (1st Cir. 2001); *Tibbs v. Samuels*, No. CV 13-11095-DJC, 2017 WL 1164484, at *13 (D. Mass. Mar. 28, 2017) (citations omitted). "It is generally unwise though to venture into a qualified immunity analysis at the pleading stage because in the majority of cases it is necessary to develop the factual record to test the veracity of the complaint's allegations." *Maroney v. Fiorentini*, No. 16-CV-11575-DLC, 2017 WL 6063064, at *8 (D. Mass. Dec. 7, 2017).

Alston asserts that the individual defendants are liable under §§ 1981, 1983, and 1985 for enforcing the Town's unconstitutional custom by (1) racially discriminating against him, (2) violating his First Amendment rights to freedom of speech and to petition the government for redress of grievances, and (3) violating his Fourteenth Amendment right to equal protection. (#108 ¶¶ 198-205.) Accepting Alston's well-pled allegations as true, and as explained above in part (D), Alston adequately claims the individual defendants violated clearly established anti-discrimination laws.

These well-established laws would have been understood by public officials. *See El Dia, Inc. v. Governor Rossello*, 165 F.3d 106, 109-10 (1st Cir. 1999) (affirming denial of motion to dismiss on qualified immunity grounds where relevant free speech rights were clearly established and "mistaken judgment" could not apply) (citation omitted); *Hayes v. State of R.I. Dep't of Bus. Regulation*, 70 F.3d 1252 (1st Cir. 1995) (Table) ("[W]e summarily affirm the district court's purely legal determination that, at the time of the challenged conduct, there existed a clearly established right under the fourteenth amendment's equal protection clause to be free from sex discrimination in the workplace.") (citing *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 884-85 (1st Cir.1988)). Reasonable individuals would have understood that the actions of which Alston complained, such as terminating him because he complained of racial discrimination, violated his rights.

To the extent the individual defendants dispute Alston's characterization of the employment actions taken against him and their roles in these acts, these are factual issues. Factual disputes preclude dismissal based on qualified immunity. *See McCue v. City of Bangor, Maine,* 838 F.3d 55, 61–62 (1st Cir. 2016); *Maldonado v. Fontanes,* 568 F.3d 263, 267-72 (1 Cir. 2009); *Sebunya v. Cty. of Cumberland*, 201 F.3d 428 (1st Cir. 1999) (dismissing defendants'

interlocutory appeal for lack of jurisdiction where application of qualified immunity turned on "factual questions as to whether defendants acted with discriminatory intent").

At this stage of the case, the facts alleged by the plaintiff make out violations of constitutional rights, and those rights were "clearly established at the time of the defendant's alleged violation." *Maldonado,* 568 F.3d at 268-69. The individual defendants are not entitled to dismissal based on qualified immunity at this time, without prejudice to renew on summary judgment.

### F.  The Doctrine of Constitutional Avoidance Does Not Apply.

Both the Town defendants and the individual defendants assert that "[t]o the extent that the plaintiff's claims are based upon claimed loss of pay while he was out of work on stress or otherwise unfit for duty, his remedy for redress is G.L. c. 41, § 111F."[22] They argue that under the doctrine of constitutional avoidance, the court should analyze his claims under this statute and not reach any constitutional questions. (#122 at 30-33.)

"A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 445 (1988); *see also Camreta v. Greene*, 563 U.S. 692, 705 (2011) (same). The doctrine embodies the court's

> considered practice not to decide abstract, hypothetical or contingent questions . . . or to decide any constitutional question in advance of the necessity for its decision . . . or to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied . . . or to decide any constitutional question except with reference to the particular facts to which it is to be applied.

*Clinton v. Jones*, 520 U.S. 681, 690 n.11 (1997) (internal quotations and citations omitted).

---

[22] Mass. Gen. Laws ch. 41, §111F provides that when a firefighter is incapacitated for duty because of an injury sustained in the performance of his duty without fault of his own, "he shall be granted leave without loss of pay for the period of such incapacity . . . ."

The doctrine does not apply here. Alston has raised valid constitutional claims that cannot be avoided by application of a Massachusetts statute having to do with firefighters' entitlement to paid leave while injured on the job. His constitutional claims are not "abstract, hypothetical or contingent," nor is he asking the court to "formulate a rule of constitutional law broader than is required." *Id*. This is not a case such as *Sony BMG Music Entertainment v. Tenenbaum,* 660 F.3d 487, 511 (1st Cir. 2011), where the First Circuit held that a district court erred in unnecessarily deciding the question whether a jury's award of damages was constitutionally excessive, when the court could have simply ordered remittitur. "If the district court had ordered remittitur, there would have been a number of possible outcomes that would have eliminated the constitutional due process issue altogether . . . . " *Id*. at 513. Contrary to defendants' assertion that "it is clear that the action is based almost, if not, entirely upon G. L. c. 41, § 111F," Alston's claims are much broader than the question of whether he was properly granted paid leave or not when he was injured. Defendants' arguments fail.

G. Claims Against Town Counsel Should Not be Dismissed for Reasons of Public Policy.

Town Counsel Murphy, one of the individual defendants, argues that because she is "the legal advisor to the Board . . . her communications with the Selectmen in carrying out that function stand on a unique, protected footing." (#122 at 41.) As she "merely conveyed to her client the information that had been provided to her," "had no decision-making authority over the terms of Murphy's [sic] continued employment," and "did not know or direct what the Town would do with the information," she could not have deprived Alston of his employment. *Id*. at 41-42. Murphy further argues that because she is an attorney, "she must be given qualified immunity in these circumstances in order to protect her attorney-client relationship with the Town." *Id.* at 42.

Murphy does not cite one case in support of her argument, and this court cannot find one that even indirectly validates it. There is nothing about her position as an attorney for the Town, or the fact that she was not the final decision-maker regarding Alston's employment, that prohibits her from being sued. *See Powell v. Alexander*, 391 F.3d 1 (1st Cir. 2004) (finding that city solicitor for Pittsfield, Massachusetts may properly be sued under § 1983 in her individual capacity for her part in violating rights of plaintiff, a police officer, by participating in concerted campaign to prevent his reinstatement to the city's police force in retaliation for his exercise of constitutional rights). The motion should be denied.

## V. <u>Conclusion</u>.

For all of the reasons stated, I RECOMMEND that the Individual Defendants' Motion to Dismiss Third Amended Complaint (#112) be DENIED.

## VI. <u>Review by District Court Judge</u>.

The parties are advised that any party who objects to this Report and Recommendation must file specific written objections with the Clerk of this Court within 14 days of the party's receipt of it. The objections must specifically identify the portion of the Recommendation to which objections are made and state the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review. *See Keating v. Secretary of Health & Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983);

*United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

/s / M. Page Kelley
M. Page Kelley
United States Magistrate Judge

February 6, 2018