## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **GERALD ALSTON,** )<br>*Plaintiff* )<br> )<br>**v.** )<br> )<br>**TOWN OF BROOKLINE,** )<br>**LOCAL 950, INTERNATIONAL** )<br>**ASSOCIATION OF FIREFIGHTERS,** )<br>*et al.,* )<br>*Defendants* ) | **CIVIL ACTION: 1:15-CV-13987-GAO** |

## SECOND AFFIDAVIT OF PAUL TRAHON

I do hereby state as follows:

1. My name is Paul B. Trahon.

2. I am a fire lieutenant employed by the Town of Brookline Fire Department.

3. I am currently Union president and have served in that position since 2013, serving the approximately 150 members of Local 950, IAFF.

4. Joe Canney was not a member of the elected executive board of the Union in 2010 or any time thereafter. The minutes for the Union's January 14, 2010 meeting include a Roll Call of Officers. Joe Canney is not on the list. (A copy of the relevant portion of the minutes from January 14, 2010 is attached as Attachment 1.)

5. Article 9 of the Union By-Laws provides a procedure for charging members with misconduct. I do not recall this procedure being used during my tenure as Union president. Specifically, neither Firefighter Gerald Alston ("Alston") or any other member has complained to me that any other member has committed misconduct within the meaning of the by-laws.

6. I have no recollection of Alston asking me for permission to speak at a Union meeting. As a Union member in good standing, Alston had the right to attend Union meetings and speak at those meetings. He did not need permission or an invitation from me or anyone else.

7. I do recall Alston telling me on September 13, 2013 that he wanted to explain to the Union membership that he wasn't naming them in his lawsuit. Based on this conversation, I believed that Alston would come to a Union meeting and speak to the Union about the issue, but he never did. I don't know why he didn't.

8. With regard to singing the National Anthem, it was my experience during my tenure as Union President, that Alston was never specifically invited to a Union event to sing the National Anthem. If Alston happened to be present at a Union event, we would usually ask him to sing. There were events he attended when he did sing the National Anthem and other events he attended when he did not.

9. In conversations I had with Alston regarding his dispute with the Town, he has told me that he didn't need Union assistance because, "I'm all set - I've got my lawyer", or words to that effect.

10. My practice was to reach out to Alston if I learned any information about his case. This was rare because neither the Town nor Alston provided me with much information. One exception to this was when I found out about the May 14, 2014 meeting with the Town. I asked Alston via text message if he wanted me to attend. He said yes, but he also told me that his personal attorney would be there. (A copy of my text message exchange with Alston is attached as Attachment 2.)

11. Other times I reached out to Alston were on December 23, 2013, shortly after I heard about the "leave" incident, and again in early December 2014, when I heard rumors that Alston was being advised not to show up at an evaluation, which I was concerned might lead to an insubordinate charge. I also responded immediately to Alston's request to call him on June 23, 2014. (A copy of my notes of the call are Attached as Attachment 3.)

12. I believe there was no conflict between my role in December 2013/January 2014 in taking steps to make sure my members were safe and in also representing Alston in his dispute with the Town. My membership was concerned that Alston had made threatening statements involving shooting and I asked the Department to protect my members from harm. At the same time, I wanted to make sure that Alston was receiving fair treatment from the employer and provide any Union assistance he wanted in obtaining his rights and benefits under the collective bargaining agreement ("CBA"). These two different concerns did not create a conflict of interest either then or later. Dealing with the interests and concerns of a diverse 150-member bargaining unit is just part of being a Union president. On the other hand, it is very difficult to assist members who do not ask for help and who do not provide the Union with information.

13. Shortly after the "leave" incident, in December 2013, I reached out to Alston with an offer of Union assistance. I told him "the local is here to assist you in any way" and if he had any questions "to give me a call at any time." I also mentioned that the Union has resources through the Boston EAP program to help him, but he said he was getting help on his own. During the conversation, Alston did not ask for Union assistance and chose not to discuss the allegations that he had made threatening statements. I asked Alston to follow up with me after a scheduled meeting with the Fire Chief, but he did not.

14. Whether or not Alston actually made the threatening statements that were attributed to him by several co-workers, I still would have been able to provide representation to him consistent with my duties as Union president. The problem was that, when he chose not to ask the Union for help on a particular issue, and did not provide information to the Union about meetings, hearings and other matters, the Union was unable to assist him on that matter unless we found out about the situation from elsewhere.

15. Another factor that made it difficult for the Union to assist Alston was the Town's refusal to provide the Union with information about his situation. The Town claimed that correspondence between Alston and the Town was confidential. Even when Alston agreed on May 14, 2014 to allow the Town to provide copies of correspondence to the Union, the Town failed to provide most documents and failed to notify the Union of meetings and hearings involving Alston.

16. In early January 2014, I received information that Alston felt comfortable at Station 5, Group 2 and that his threats had been directed at other groups and other stations. Based on this new information, I told Chief Ford I wanted 24/7 police details at all stations until more information was obtained and we could reassess the situation. Chief Ford rejected the idea, stating "You're insane."

17. At some point in January 2014, I learned that Alston was going to be getting an evaluation to determine if he could return to work following the "leave" incident. At the time, I did not know if there was a violation of the CBA's provisions regarding medical evaluations. My understanding of the CBA was that the Town was allowed to send employees for medical evaluations at any time if they were out injured, but that if they were out sick, the Town could not insist on an evaluations until the employee had been

4

out for at least 30 days (as I stated in my deposition). It was not clear to me what the basis for Alston's leave was and I was trying to get more information from the Town on this matter, in part through my January 3, 2014 letter to Chief Ford. Alston did not ask the Union for any assistance regarding any medical evaluations in January 2014.

18. I attended the May 14, 2014 meeting as a representative of the Union, although I was told by HR Director Sandra DeBow ("DeBow") that I was only there as an observer. During the meeting, Alston was represented by his personal attorney. As in other cases in which Union members had individual attorneys, I deferred to the decisions of Alston and his attorney with regard to issues that pertained to him personally. If they were satisfied, then I was satisfied - this is the same policy we have followed in other cases.

19. It was my understanding that Alston and his attorney agreed to the Town's proposals at that meeting, including his two-tour suspension for the workplace safety violation and the return-to-work requirements. I do not recall any disagreement being voiced by either Alston or his attorney and my notes of the meeting state "all in agreement." I recall the Alston and his attorney agreed to the two-day suspension. I also recall Alston saying at the meeting that he would do everything he could to get back to work.

20. Also mentioned at the May 14, 2014 meeting was the Town's decision to switch Alston from administrative leave to sick leave. The Town also noted that it was granting Alston's request to be transferred.

21. Although Alston now says that he disagreed with some of the proposals, I was not aware of any such disagreement at the time.

22. If I believed that Alston did not agree with the Town's proposals, I would have advocated on his behalf, whether or not I was considered an observer or not.

23. Because I would have advocated on Alston's behalf if I knew that he disagreed with the Town's proposals even in the position of observer, it was unnecessary for me to inform Alston that I was told I was there at the meeting as an observer.

24. The Union's position was that, given the Town's findings of a workplace safety violation, the two-day suspension was significantly lower than the penalty that could have been imposed under the circumstances and that it was a very good deal.

25. At the May 14, 2014 meeting, I asked DeBow if the Union could get copies of all past correspondence between Alston and the Town regarding his dispute. DeBow agreed to do this as long as Alston assented, and he did. After this meeting, the Town did not keep to its agreement and continued to correspond with Alston without sending copies of the correspondence to the Union.  In addition, Alston did not provide copies of documents to the Union.  The Town also failed to give me copies of correspondence from before May 14, 2014.

26. Immediately following the May 14, 2014 meeting, I asked Alston to contact me about any other assistance he needed from the Union. He never contacted me regarding the results of the May 14, 2014 meeting to complain about the results of the meeting or to ask me to file a grievance on his behalf regarding the two-tour suspension for the workplace safety violation or the return-to-work requirements. It was my understanding that Alston and his attorney agreed to the two-days suspension at the May 14, 2014 meeting.

27. On June 23, 2014, I received a text message from Alston saying "Hey, can you give me a call when you get this.  I have a question."  (A copy of the text message is attached as Attachment 2.)

28. I called Alston back the same day.  He had a question about a June 18, 2014 letter from DeBow. During the conversation we discussed whether the Town would pay the co-pays for the anger management program that Alston had agreed to go to at the May 14, 2014 meeting. I told him that he should pay for it and then we might be able to get the Town to reimburse him.  I also said I would obtain an opinion from Union counsel on the matter. I also mentioned to him that there was an alternative anger management program in Boston that was not associated with the Town and I would get him the phone number.

29.  The Town did not send me a copy of the June 18, 2014 letter and I had not seen it.  I asked Alston if he could send me a copy of the letter.  He said he would, but I never received the letter from him.

30. The next day (June 24, 2014), I followed up on our telephone conversation by sending Alston a text message with advice from Sandulli Grace attorney Leigh Panettiere stating her legal opinion that towns rarely reimburse for these kinds of co-pays.  (A copy of the text message I sent to Alston with Attorney Panettiere's advice is attached as Attachment 4, with the final part of the message in Attachment 5.)

31. On June 25, 2014, I provided Alston with the phone number of the alternative anger management program that I had mentioned to him on June 23. I also asked him if he was receiving my texts and reminded him that he promised to give me a copy of DeBow's June 18 letter. He responded that he had received the text.  (A copy of the text message exchange is attached as Attachment 5, with the final part of the exchange in Attachment 6.)

32. In August 2014, I was in a meeting with Town officials, including DeBow, on another matter, when I suggested to DeBow that the Town pay Alston for lost overtime

opportunities for the period when he was on administrative leave.  Although Alston had

not asked me to seek these benefits for him, I was trying to get him some extra pay

during a difficult time.

33. DeBow rejected my request in an August 20, 2014 e-mail. (A copy is attached as

Attachment 7.)

34. On or about November 28, 2014, I obtained a copy of a November 25, 2014 letter from

DeBow to Alston with the subject line "Reasonable Accommodation Dialogue and

Examination."  I did not receive this letter from either the Town or Alston.

35. I noticed that the letter referred to two other letters: one from November 3, 2014

referencing a November 10, 2014 meeting and one from November 10, 2014 referring to

a November 24, 2014 meeting.  I never received copies of the November 3 or November

10 letters and I never received notice of the November 10 or November 24 meetings from

either the Town or Alston.

36. The November 24, 2014 letter also referred to a psychiatric examination to take place in

the Public Safety Building on December 5, 2014.  This was a serious problem for the

Union.  I was aware that the Union had previously successfully blocked an attempt by the

Town to have a medical evaluation of a member take place in a public building.

37. After I obtained a copy of the November 25, 2014 letter I contacted the Town and asked

them for copies of the November 3 and 10 correspondence.  I never received them.

38. I also wrote a letter on December 2, 2014 objecting to the plan to have Alston's

psychiatric evaluation take place on Town property.  Even though Alston had not asked

the Union for any assistance on this issue, allowing a fitness for duty examination to take

place in that location was a bad precedent for the entire membership and the Union needed to take a stand on it, whether or not Alston wanted us to.

39. In early December 2014, I heard rumors that Alston was being advised not to appear for an ordered evaluation, which could have led to an insubordination charge. I tried on numerous occasions to get in touch with Alston to discuss an alternative that would be less likely to lead to discipline (showing up at the time and place of the evaluation as ordered but refusing to participate in it). I called his cell phone, but it was out of service. I sent him e-mails and text messages but he did not respond.  (My text messages to Alston on December 3 and 4, 2014 are attached at Attachment 6 and 8.)

40. Later on December 4, 2014, I contacted Alston through Facebook Messenger, and he did respond, giving me a number to call.  (My Facebook Messenger exchange with Alston is attached as Attachment 9.)

41. I called that number on December 8, 2014 and spoke to Alston for the first time in months.  It was in this conversation that he asked me for a copy of the Union by-laws. Unfortunately, the request slipped my mind and I didn't send the by-laws at that time.

42. With regard to the issue of non-payment of Union dues and Alston's standing in the Union, Alston was given the several options in the Union's December 12, 2014 letter to deal with his failure to pay dues. Option 1 allowed Alston to pay the dues he owed and remain a member in good standing.  Option 2 allowed Alston to withdraw from the Union as a member in good standing and apply for reinstatement at a later date after paying all back dues.  Option 3 indicated that if Alston did nothing, he would be suspended from the Union after 60 days, with the possibility of future reinstatement after payment of back dues. (A copy of the Union's December 12, 2014 letter is attached as Attachment 10.)

43. Alston chose Option 3.

44. The Union was not informed by either the Town and Alston regarding his pay status at the end of 2014 and the beginning of 2015.  The Union was not informed by either the Town or Alston when he was removed from the payroll or when he was returned to the payroll on administrative leave.  It was Alston's responsibility to provide the Union with this information in connection with his status in the Union.  Return to the payroll does not automatically mean reinstatement to membership in good standing if there is an outstanding dues balance.

45. In March 2015, Alston called me and said that I had not sent him the CBA that he had asked for in December.  I explained that he never asked me for a copy of the CBA before but that I would send him a copy.

46. On March 13, 2015, I sent Alston copies of both the CBA and the Union by-laws by certified mail.

47. With regard to Joe Canney's May 16, 2016 blog post about Alston, I did not see the blog post when it was on the blog and it was eventually deleted.  If I had seen it on the blog I would have deleted it.  It is no longer in the blog archives.  The blog has always been the the opinion of the members and not of the Union.

48. As a general rule, the Union does not get involved with promotional issues.  When I signed a petition in favor of Paul Pender's promotion to acting deputy chief, I did not do so in my capacity as Union president, but as an individual.  The Union was not involved in the promotional process or in organizing support for Pender.

49. I never received notice from the Town or Alston of the August 30, 2016 pre-termination before Hearing Officer James Lampke.  I only learned of this hearing after it happened.  I

never received a request from Alston to represent him at the pre-termination hearing or even to be present at the hearing.

50. I have recently seen an October 6, 2016 Notice of Discharge letter from Neil Wishinsky to Alston but I never received a copy of the letter from the Town, even though the letter contains a "cc" to me. I don't know why I never received this letter. If I had received it, I would have asked Alston if he needed Union assistance.

51. The Union did not provide legal representation for Gerald Alston's civil service appeal because he never asked us to provide him with legal representation. He had his own personal attorney and had told me and prior Union president Shaun Fay that "he was all set - he had his own attorney."

52. As I have said in my deposition and my previous affidavit, the Union normally provides services to members who request those services. Members who have requested the Union's services for disciplinary matters during my tenure as Union president include the individuals referred to as Firefighter A and Firefighter B in Court records for this case.

53. The above information is true to the best of my knowledge.

Signed under the pains and penalties of perjury this 2 9 day of June, 2019,

Paul B. Trahon